QUINN EMANUEL URQUHART & SULLIVAN, LLP

David Perlson (CA Bar No. 209502)
davidperlson@quinnemanuel.com
Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Jared Newton (admitted *pro hac vice*)
jarednewton@quinnemanuel.com
Sandy Shen (admitted *pro hac vice*)
sandyshen@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Catlin Williams (CA Bar No. 336464)
catwilliams@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 4:09-CV-05718-SBA<br><br>**DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF ABSOLUTE INTERVENING RIGHTS**<br><br>**JUDGE**: Hon. Saundra Brown Armstrong<br>**HEARING DATE**: October 13, 2021<br>**TIME**: 2:00 PM PT<br><br>**REDACTED FOR PUBLIC FILING** |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE that on October 13, 2021, before the Honorable Saundra Brown Armstrong, Defendant Google LLC ("Google") shall and hereby does move for an order granting summary judgment of absolute intervening rights for accused products that Google used and/or purchased prior to February 8, 2021.

Google's Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations of Sandy Shen, Collin Burdsall, and Michael Branch; exhibits accompanying those declarations; all matters of which the Court may take judicial notice; other pleadings on file in this action; and other written or oral argument that Google may present to the Court.

**RELIEF REQUESTED**

Google respectfully seeks summary judgment of absolute intervening rights for accused products that Google used and/or purchased prior to February 8, 2021.

**CERTIFICATION**

Pursuant to Paragraph 4 of the Court's Standing Order, counsel for Google certifies that it met and conferred with counsel for Netlist in a good-faith effort to resolve the issues raised in this motion, but the parties were not able to reach a resolution.

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION..............................................................................................1

II.    FACTUAL BACKGROUND ..........................................................................2

       A.    Netlist's Original Infringement Allegations........................................2

       B.    Google's Request for *Inter Partes* Re-examination............................3

       C.    Lifting of the Stay and Netlist's Amended Infringement Contentions....................4

III.   LEGAL STANDARD ......................................................................................5

IV.    ARGUMENT....................................................................................................7

       A.    The Asserted Claims Are Subject to Absolute Intervening Rights .........................7

             1.    The Asserted Claims Are "Amended or New" ...........................7

             2.    Netlist Substantively Changed The Scope Of The Asserted Claims............7

                   (a)    Netlist Narrowed the "Phase-Lock Loop Device" Limitation...........8

                   (b)    Netlist Narrowed the "Register" Limitation ...................................10

                   (c)    Netlist Narrowed the "Logic Element" Limitation .........................11

                   (d)    Netlist Narrowed the "Operatively Coupled" Limitation ..............12

                   (e)    Netlist Narrowed Claim 16 by Amending It to Include the Limitations of Original Claim 15........................15

       B.    The Accused Products Are Subject to Absolute Intervening Rights.....................18

             1.    ███████████ .............................................................19

             2.    ███████████ .............................................................20

             3.    ███████████ .............................................................20

             4.    ███████████ .............................................................21

             5.    ███████████ .............................................................23

V.     CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,*
    1 F.3d 1214 (Fed. Cir. 1993).............................................................18, 20, 21, 22, 23, 24

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*
    370 F.3d 1131 (Fed. Cir. 2004)..............................................................................15, 16

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.,*
    523 F.3d 1304 (Fed. Cir. 2008)..................................................................................... 15

*Laitram Corp. v. NEC Corp.,*
    163 F.3d 1342 (Fed. Cir. 1998)................................. 6, 7, 8, 9, 10, 11, 12, 15, 17

*Marine Polymer Techs., Inc. v. HemCon, Inc.,*
    672 F. 3d 1350 (Fed. Cir. 2012)............................... 5, 6, 7, 8, 14, 17, 18, 23, 24

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).................................................................................... 13

*Samsung Elecs. Amer. v. Prisua Eng'g,*
    948 F.3d 1342 (Fed. Cir. 2020)..................................................................................... 6

*Sontag Chain Stores Co. v. Nat'l Nut Co.,*
    310 U.S. 281 (1940)...................................................................................................... 6

*Tech. Props. Ltd. LLC v. Huawei Techs Co., Ltd.,*
    849 F.3d 1349 (Fed. Cir. 2017).................................................................................. 13

*Vasudevan Software, Inc. v. MicroStrategy, Inc.,*
    782 F.3d 671 (Fed. Cir. 2015)..................................................................................... 13

*Wahpeton Canvas Co., Inc. v. Frontier, Inc.,*
    870 F. 2d 1546 (Fed. Cir. 1989) ........................................................ 7, 9, 11, 12, 14

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997)...................................................................................................... 15

## STATUTES

35 U.S.C. § 252............................................................................................ 6, 18, 22, 24

35 U.S.C. § 316(b).................................................................... 6, 7, 18, 20, 22, 23, 24, 25

Patent Act of 1952 ........................................................................................................ 5

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

This case recently restarted after a ten-year stay during which the sole asserted patent — U.S. Patent No. 7,619,912—was subject to *inter partes* re-examination before the United States Patent & Trademark Office.  During the re-examination proceeding, Plaintiff Netlist was forced to cancel or amend each of the originally asserted claims in order to overcome the prior art.  Netlist also added dozens of new claims that either depend from the amended claims or recite similar limitations.  As a consequence of those amendments and additions, the asserted claims of the '912 Patent are subject to the defense of absolute intervening rights, a doctrine that shields a defendant like Google from liability for products purchased or used prior to issuance of the re-examination certificate.[1]

The defense of absolute intervening rights in this case is straightforward and turns on three principal questions: first, whether the asserted claims were amended or newly added during re-examination; second, whether the claims had their scope substantively changed due to amendments or arguments that Netlist made to avoid the prior art; and third, whether Google's accused products were purchased or used prior to issuance of the re-examination certificate.  Each question is answered in the affirmative here.  First, the asserted claims were all amended or added—as plainly identified on the re-examination certificate.  Second, the scope of the asserted claims was substantively changed through narrowing amendments and arguments that Netlist made to avoid the prior art.  Third, Google has come forward with evidence showing its purchase and use of the accused products prior to issuance of the re-examination certificate, which cannot genuinely be disputed.

Accordingly, Google respectfully requests that the Court enter summary judgment in its favor on the defense of absolute intervening rights.

---

[1]   The instant motion is limited to the issue of *absolute* intervening rights.  Google will address the related defense of *equitable* intervening rights, to the extent necessary, later in the case after discovery into that defense has been completed.

## II.     FACTUAL BACKGROUND

### A.     Netlist's Original Infringement Allegations

On December 4, 2009, Netlist filed a complaint for alleged infringement of U.S. Patent No. 7,619,912, titled *Memory Module Decoder*. *See* Dkt. 1.  After four months of discovery into Google's products, Netlist served its Patent Local Rule 3-1 and 3-2 Disclosure of Asserted Claims and Infringement Contentions on April 8, 2010.  *See* Ex. 1.[2]  That disclosure asserted claims 1, 3, 4, 6-11, 15, 18-22, 24, 25, 27-29, 31-34, 36-39, 41-45, and 50 of the '912 Patent against certain computer memory modules known as 4-Rank DDR2 FBDIMMs.  *Id*. at 1.[3]  Asserted claims 1, 15, 28, and 39 were written in independent form and described a memory module comprising various components.  *See* Ex. 2.  Original independent claim 1 is reproduced below as an example:

> 1. A memory module connectable to a computer system, the memory module comprising:
>
> a printed circuit board;
>
> a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;
>
> a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input control signals corresponding to a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals corresponding to the first number of DDR memory devices arranged in the first number of ranks,
>
> wherein the circuit further responds to a first command signal and the set of input control signals from the computer system by generating and transmitting a second

---

[2]  Numbered exhibits are attached to the attorney declaration of Sandy Shen ("Shen Decl."). Lettered exhibits are attached to the fact witness declarations of Collin Burdsall ("Burdsall Decl.") and Michael Branch ("Branch Decl.").  Except as otherwise noted, page cites refer to the native page numbers in an exhibit.

[3]  The term "rank" refers to a block of memory chips.  The term "DDR2" refers to the second generation of Double Data Rate technology, which describes the manner in which memory modules transmit data relative to a clock signal.  The term "FBDIMM" refers to Fully Buffered Dual Inline Memory Modules, which is the class of memory modules Netlist accused of infringement.

command signal and the set of output control signals to the plurality of memory devices, the first command signal and the set of input control signals corresponding to the second number of ranks and the second command signal and the set of output control signals corresponding to the first number of ranks; and

a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register.

*Id*. at claim 1.

### B.    Google's Request for *Inter Partes* Re-examination

On October 21, 2010, Google filed a request for *inter partes* re-examination of the '912 Patent, challenging each of the thirty-four claims that Netlist had asserted. *See* Ex. 3. In view of Google's challenge, the parties stipulated to a stay of this case on December 27, 2010, agreeing that "the requested stay would further interests of judicial economy and conservation of the parties' and the Court's resources." Dkt. 66. The Court adopted the stipulation and ordered the case stayed on January 26, 2011. Dkt. 68.

The U.S. Patent and Trademark Office ("PTO") formally granted Google's request and ordered *inter partes* re-examination of the asserted claims on January 18, 2011. *See* Dkt. 102 at 3. The re-examination proceedings and resulting appeals lasted more than ten years, during which time Netlist was forced to cancel or amend each of the thirty-four claims it had asserted against Google. *See* Dkt. 115 at 2-3. Netlist also added forty new claims to the '912 Patent. *See id*. The PTO issued a re-examination certificate on February 8, 2021, reflecting the claims that had been canceled, amended, and added, as shown in the excerpt below:

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **2, 5, 7, 9, 21, 23, 25, 26, 30, 33, 42, 44** and **51** are cancelled.

Claims **1, 15, 16, 28, 39** and **43** are determined to be patentable as amended.

Claims **3, 4, 6, 8, 10-14, 17-20, 22, 24, 27, 29, 31, 32, 34-38, 40, 41** and **45-50**, dependent on an amended claim, are determined to be patentable.

New claims **52-91** are added and determined to be patentable.

Ex. 4 at 2.

As explained in the re-examination certificate, material that was added to the claims via an amendment is shown in italics. *Id*. For example, the certificate shows that claim 1 was narrowed via amendment to include the following additional limitations that did not appear in the original version of the claim:

> *wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,*

> *wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row-column address signals and the bank address signals, and (iii) transmits the buffered plurality of row-column address signals and the buffered bank address signals to the plurality of DDR memory devices, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row-column address signals received by the register are separate from the at least one row address signal received by the logic element, and*

> *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.*

*Id*.

The certificate likewise uses italics to reflect amendments that Netlist made to claims 15, 16, 28, 39, and 43. *Id*. at 2-4. It also uses italics to identify new claims 52-91 that Netlist added during re-examination. *Id*. at 4-8.

### C.   Lifting of the Stay and Netlist's Amended Infringement Contentions

On February 16, 2021, the parties notified the Court that the re-examination proceedings had concluded. *See* Dkt. 110. On March 11th, the Court held a Case Management Conference and entered a scheduling order setting dates for the parties to submit early briefing on the issue of intervening rights. *See* Dkt. 117. Netlist served amended contentions between May 19th and June 18th, asserting sixty-four claims against five categories of accused products. Ex. 5. Specifically, Netlist asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 16, 18, 19, 20, 22, 24, 27-29, 31, 32, 34, 36-41, 43,

1   45-47, 50, 52-60, 62-65, 69, 70-75, 77, and 80-91 of the '912 Patent. *Id.* at 1.[4]  Netlist has also

2   accused the following categories of memory modules: 4-Rank DDR2 FBDIMMs; 4-Rank DDR3

3   LRDIMMs; 4-Rank DDR4 NVDIMMs; 4-Rank DDR4 RDIMMs; and 4-Rank DDR4 LRDIMMs.

4   *Id.* at 1-3.

5        On July 2nd and 16th, Google served supplemental responses to Netlist's Interrogatory No.

6   3, setting forth its contentions on the issue of absolute intervening rights. *See* Ex. 6.  First, Google

7   explained that each of the asserted claims was subject to intervening rights in view of amendments

8   and arguments Netlist made to overcome prior art during re-examination. *Id.* at 38-59.  Second,

9   Google identified the specific accused products subject to absolute intervening rights. *See*

10  *generally id.* at 60-64.  With respect to the accused ███████████████, Google explained

11  that ████████████████████████. *Id.* at 60.  With respect to the accused█

12  ████████████████████████, Google explained that ███████

13  ███████████████████. *Id.* at 61.  And with respect to the accused ███████

14  ████████████████, Google identified the specific quantities of these

15  products—as well as servers containing the products—that it had purchased and/or used prior to

16  issuance of the re-examination certificate. *Id.* at 61-64.  Google also produced documents on July

17  13th substantiating these prior purchases and uses, including financial records showing the exact

18  date and quantity of individual transactions for each of the products subject to Google's

19  intervening rights defense. *Id.* at 81.

20  **III.    LEGAL STANDARD**

21       "The doctrine of intervening rights first developed as courts recognized that permitting

22  substantive changes to the scope of patent claims through post-issuance procedures left 'the door

23  … open for gross injustice' where a third party, having already begun to make, use, or sell a given

24  article, finds its previously lawful activities rendered newly infringing under a modified patent."

25  *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F. 3d 1350, 1361 (Fed. Cir. 2012) (*en banc*)

26

---

27  [4]  Google has contemporaneously filed a motion to strike Netlist's assertion of claim 16 of the
    '912 Patent.  To the extent the Court grants that motion, the issues concerning claim 16 in the
28  instant motion are moot.

(quoting *Sontag Chain Stores Co. v. Nat'l Nut Co.*, 310 U.S. 281, 293-95 (1940)).  "With respect to reissued patents, the concept of intervening rights was codified by the Patent Act of 1952, and the statute provides for two types of intervening rights: (1) intervening rights that abrogate liability for infringing claims added to or modified from the original patent if the accused products were made or used before the reissue, often referred to as absolute intervening rights; and (2) intervening rights that apply as a matter of judicial discretion to mitigate liability for infringing such claims even as to products made or used after the reissue if the accused infringer made substantial preparations for the infringing activities prior to reissue, often referred to as equitable intervening rights."  *Id.* at 1361-62.

Although intervening rights originated in the context of reissue proceedings, it was later extended to re-examination.  *Id.* at 1362.  The statute governing *inter partes* re-examination provides as follows:

> Any proposed amended or new claim determined to be patentable and incorporated into a patent following an inter partes reexamination proceeding shall have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation therefor, prior to issuance of a certificate under the provisions of subsection (a) of this section.

35 U.S.C. § 316(b).[5]

"Thus, after a patent emerges from reexamination, the statute makes available absolute and equitable intervening rights to the same extent provided in the reissue statute, but only with respect to 'amended or new' claims in the reexamined patent." *Marine Polymer*, 672 F.3d at 1362. After the threshold determination has been made as to whether the claims are "amended or new," the court must then analyze whether the scope of the claims was substantively changed during re-examination. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998) ("[I]n determining whether substantive changes have been made, we must discern whether the scope of

---

[5]  References to § 316(b) refer to the version of the statute in existence prior to the America Invents Act ("AIA"), which went into effect in September 2012.  The AIA replaced *inter partes* re-examination proceedings with *inter partes* review.  *See Samsung Elecs. Amer. v. Prisua Eng'g*, 948 F.3d 1342, 1345 (Fed. Cir. 2020).  However, proceedings that were in progress at the time— including the proceedings against the '912 Patent—continued until they were completed.

1   the claims are identical, not merely whether different words are used."). A substantive change in

2   claim scope occurs when the applicant narrows the claims through amendment. *Id*. at 1348. It

3   also occurs through arguments that the patent owner makes to distinguish the claims from the prior

4   art. *See Marine Polymer*, 672 F.3d at 1365.

5   **IV.    ARGUMENT**

6         **A.    The Asserted Claims Are Subject to Absolute Intervening Rights**

7                   **1.    The Asserted Claims Are "Amended or New"**

8         The "threshold" question for intervening rights is whether the claims are "amended or

9   new" as a result of *inter partes* re-examination. *Marine Polymer*, 672 F.3d at 1363; *see also* 35

10  U.S.C. § 316(b). That requirement is met here for each of the asserted claims.

11        Netlist has asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 16, 18, 19, 20, 22, 24, 27-29, 31, 32, 34,

12  36-41, 43, 45-47, 50, 52-60, 62-65, 69, 70-75, 77, and 80-91 of the '912 Patent. Ex. 5 at 1. The

13  claims can be divided into three groups. First, as reflected in the re-examination certificate,

14  asserted claims 1, 15, 16, 28, 39, and 43 were "determined to be patentable as amended." Ex. 4 at

15  2. Thus, those claims were "amended" for purposes of § 316(b). Second, asserted claims 3, 4, 6,

16  8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36, 37, 38, 40, 41, 45-47, and 50 depend from a claim

17  that was amended during re-examination. Ex. 4 at 2. Because "a dependent claim includes all the

18  limitations of the claim from which it depends," *Wahpeton Canvas Co., Inc. v. Frontier, Inc*., 870

19  F. 2d 1546, 1553 (Fed. Cir. 1989), the asserted dependent claims were also "amended" for

20  purposes of § 316(b). Third, asserted claims 52-60, 62-65, 69, 70-75, 77, and 80-91 were "added"

21  to the '912 Patent during re-examination. Ex. 4 at 2. Thus, those claims are "new" for purposes

22  of § 316(b). Accordingly, the threshold requirement is satisfied for each asserted claim.

23                 **2.    Netlist Substantively Changed The Scope Of The Asserted Claims**

24        After the threshold requirement is satisfied, the intervening rights analysis turns to the

25  question of whether the scope of the claims was "substantively changed" during re-examination.

26  *See Marine Polymer*, 672 F.3d at 1363; *Laitram Corp.*, 163 F.3d at 1346. That requirement is

27  satisfied here. With respect to the asserted claims that were *amended* during re-examination—and

28  claims that depend therefrom—Netlist substantively narrowed the scope of the claims through

detailed amendments and arguments designed to avoid the prior art. *Laitram Corp.*, 163 F.3d at

1346; *Marine Polymer*, 672 F.3d at 1365. With respect to the asserted claims that were *new*

during re-examination, Netlist drafted those claims to have the same narrow scope as the amended

claims; thus, they are not substantially identical to the claims of the original patent. *See Laitram*

*Corp.*, 163 F.3d at 1346. The following sections explain the various ways in which Netlist

substantively changed the scope of the claims during re-examination.

> (a)    *Netlist Narrowed the "Phase-Lock Loop Device" Limitation*

The original claims of the '912 Patent described a memory module comprising "a phase-

lock loop device," which is an electronic component used to generate an oscillating signal. *See*,

*e.g.*, Ex. 2 at claims 1, 5, 28, and 39. The "phase-lock loop device" appeared in each of the

original independent claims directly, and therefore each of the dependent claims by dependency.

*Id*. The original claims imposed two requirements on the "phase-lock loop device": that it was

mounted to a printed circuit board; and operatively coupled to a plurality of DDR memory

devices, a logic element, and a register. *Id*. These requirements are reflected in the following

excerpt of original claim 1:

> a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register

*Id*. at claim 1.

During re-examination, the PTO Patent Trial & Appeal Board ("PTAB") determined that

claims 1, 15, 28, and 39 were invalid based on a combination of prior art references called Amidi

and Dell-2. *See* Ex. 7 at 80-85, 102. As part of that determination, the PTAB found that Amidi

and Dell-2 disclosed the "phase-lock loop device" limitation recited in the original claims. *Id*. In

response to the PTAB's invalidity ruling, Netlist asked the PTO to reopen the proceedings, and

then amended the "phase-lock loop device" limitation to distinguish the claims from Amidi and

Dell-2. Ex. 8 at 1, 48. The amendment imposed an additional requirement on the "phase-lock

loop device," as reflected in Netlist's statements to PTO:

> **A.      Phase Lock Loop (PLL) Device**
>
> Claim 1 is amended to recite (exemplary support citations in curly braces):
>
>> a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,
>>
>> wherein, in response to signals received from the computer system {5:28}, the phase-lock loop (PLL) device {50 in Figs. 1A, 1B} transmits a PLL clock signal {5:29} to the plurality of DDR memory devices, the logic element, and the register {5:29-31}[.]
>
> Claims 15, 28, 39, 52, 67, 77, 82 and 87 have identical or nearly identical recitations.  *See also* Second Supp. Sechen Decl. at ¶ 10.

*Id.* at 48.

The amended claim language is also shown in italics in the re-examination certificate for the '912 Patent.  *See* Ex. 4 at claim 1.  The amendment substantively changed the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the "phase-lock loop device" was not required to perform any specific function.  *See* Ex. 2 at claim 1.  But, because the PTAB had found the original limitation present in the prior art, Netlist was forced to narrow the scope of the claims by requiring the "phase-lock loop device" to perform the specific function of transmitting a clock signal to the plurality of DDR memory devices, the logic element, and the register.  *See* Ex. 4 at claim 1.  Indeed, Netlist characterized the amendment as a "principle" basis for distinguishing the amended claims from the prior art.  *See* Ex. 8 at 47-48.

Accordingly, Netlist substantively changed the scope of claims 1, 15, 28, and 39 when it amended the "phase-lock loop device" limitation.  *See Laitram Corp.*, 163 F.3d at 1348 (finding that the scope of the claims was substantively changed during re-examination because "the original claims appear to cover a printer or method of printing which generates *any* quality of alphanumeric characters, while the amended claims seem to cover only a printing apparatus or method of printing which generates '*type quality*' alphanumeric characters") (emphases in original).  Asserted dependent claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-47, 50, 52-60, 62-65, and 69-75 depend from one of independent claims 1, 15, 28, and 39, and therefore include the same substantive change in claim scope by virtue of dependency.  *See* Ex. 4; *Wahpeton*, 870 F. 2d 1546, 1553.  And claims 77 and 80-91 recite substantially the

same limitation and therefore include the same substantive change in claim scope as compared to any original claims of the '912 Patent.  *See* Ex. 4.  Thus, each of the foregoing claims is subject to intervening rights.  *See Laitram Corp.*, 163 F.3d at 1346.

*(b)*     *Netlist Narrowed the "Register" Limitation*

The original claims of the '912 Patent also required a circuit comprising a "register."  *See* Ex. 2 at claims 1, 15, 28, and 39.  After the PTAB invalidated those claims based on Amidi and Dell-2, Netlist amended the "register" limitation to impose additional requirements of receiving, buffering, and transmitting specific signals.  *See* Ex. 8 at 47-48.  The amended claim language is reflected in statements Netlist submitted to the PTO when it asked to reopen prosecution:

> **B.    Register**
>
> Next, the Patent Owner has amended claim 1 to recite (exemplary support citations in curly braces):
>
> a register…
>
> wherein, the register {60 in Figs. 1A, 1B} (i) receives, from the computer system {5:31}, and (ii) buffers, in response to the PLL clock signal {Figs. 1A, 1B; 5:31}, a plurality of row/column address signals {7:43-45} and the bank address signals {7:50-51}, and (iii) transmits the buffered plurality of row/column address signals and the buffered bank address signals to the plurality of DDR memory devices {30 in Figs. 1A, 1B; 5:34-36}, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row/column address signals received by the register {$A_0$-$A_B$ in Figs. 1A, 1B} are separate from the at least one row address signal received by the logic element {$A_{B+1}$ in Figs. 1A, 1B}[.]
>
> Claims 15, 28, 39, 52, 67, 77, 82 and 87 have identical or nearly identical recitations.  *See also* Second Suppl. Sechen Decl. at ¶ 11.

*Id.* at 48.

The amended claim language is also shown in italics in the re-examination certificate for the '912 Patent.  *See* Ex. 4 at claim 1.  The amendment substantively changed the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the "register" was not required to perform any specific function.  *See* Ex. 2 at claim 1.  The amendment narrowed the scope of the claims by requiring the "register" to perform the functions of receiving, buffering, and transmitting specific types of signals, which Netlist identified as another "principle" basis for distinguishing the amended claims from the prior art.  *See* Ex. 4 at claim 1; Ex. 8 at 47-48.

Accordingly, Netlist also substantively changed the scope of claims 1, 15, 28, and 39 when it amended the "register" limitation. *See Laitram Corp.*, 163 F.3d at 1348. Asserted dependent claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-47, 50, 52-60, 62-65, and 69-75 depend from one of independent claims 1, 15, 28, and 39, and therefore include the same substantive change in claim scope by virtue of dependency. *See* Ex. 4; *Wahpeton*, 870 F. 2d 1546, 1553. And claims 77 and 80-91 recite substantially the same limitation and therefore include the same substantive change in claim scope as compared to any original claims of the '912 Patent. *See* Ex. 4. For this additional reason, each of the foregoing claims is subject to intervening rights. *See Laitram*, 163 F.3d at 1346.

*(c)    Netlist Narrowed the "Logic Element" Limitation*

The original claims '912 Patent also required a "logic element." *See* Ex. 2 at claims 1, 15, 28, and 39. After the PTAB invalidated those claims, Netlist amended the "logic element" limitation to impose the additional requirement of generating certain signals in response to a specific set of other signals. *See* Ex. 8 at 47, 49. The amended claim language is reflected in statements Netlist submitted to the PTO when it asked to reopen prosecution:

> **C.    Logic Element**
>
> Additionally, claim 1 is amended to recite (exemplary support citations in curly braces):
>
> > the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, …
> >
> > wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals {Figs. 1A, 1B, 3A, 3B; 17:28-19:52l 22:50-63; 23:6-25} of the output control signals in response {6:55-63} at least in part to (i) the at least one row address signal {$A_{a+1}$ in Figs. 1A, 1B; A13 in Figs. 3A, 3B; 7:46-53}, (ii) [a] the bank address signals {$B_0$-$B_m$ in Figs. 1A, 1B; $BA_0$, $BA_1$ in Figs. 3A, 3B; 7:46-53}, and (iii) the at least one chip-select signal {$CS_0$, $CS_1$ in Fig. 1A; $CS_0$ in Fig. 1B; 7:46-53} of the set of input control signals and (iv) the PLL clock signal {Figs. 1A, 1B; 5:29-30; "clk_in" in 17:28-19:52}.
>
> Claims 15, 28, 39, 52, 67, 77, 82 and 87 have identical or nearly identical recitations. *See also* Second Suppl. Sechen Decl. at ¶ 12.

Ex. 8 at 49.

The amended claim language is also shown in italics in the re-examination certificate for the '912 Patent.  *See* Ex. 4 at claim 1.  The amendment substantively changed the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the "logic element" was not required to output and specific types of signals in response to any other specific types of signals.  *See* Ex. 2 at claim 1.  The amendment narrowed the scope of the claims by requiring the "logic element" to perform the function of generating "gated column access strobe (CAS) signals" or "chip-select signals" in response to "(i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the plurality of input signals and (iv) the PLL clock signal."  *See* Ex. 4 at claim 1.  Again, Netlist characterized the amendment a "principle" basis for distinguishing the amended claims from the prior art.  *See* Ex. 8 at 47, 49.  Netlist also argued on appeal to the Federal Circuit that the amendment "distinguished its amended claims over prior art that failed to disclose or suggest a logic element responding to all four enumerated signals."  *See* Ex. 11 at 11-12.

Accordingly, Netlist substantively changed the scope of claims 1, 15, 28, and 39 when it amended the "logic element" limitation.  *Laitram Corp.*, 163 F.3d at 1348.  Asserted dependent claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-47, 50, 52-60, 62-65, and 69-75 depend from one of independent claims 1, 15, 28, and 39, and therefore include the same substantive change in claim scope by virtue of dependency.  *See* Ex. 4; *Wahpeton*, 870 F. 2d 1546, 1553.  And claims 77 and 80-91 recite substantially the same limitation and therefore include the same substantive change in claim scope as compared to any original claims of the '912 Patent.  *See* Ex. 4.  For this additional reason, the foregoing claims are subject to intervening rights.  *See Laitram Corp.*, 163 F.3d at 1346.

> (d)     Netlist Narrowed the "Operatively Coupled" Limitation

The original version of claims 1, 15, 28, and 39 of the '912 Patent required that the "phase-lock loop device" discussed above was "operatively coupled" to a plurality of DDR memory

devices, the logic element, and the register.  *See* Ex. 2 at claims 1, 15, 28, and 39.[6]  The

specification and prosecution history of the '912 Patent did not define or otherwise limit the term

"operatively coupled."  *See, e.g., id.* at 5:27-45.  Thus, the term carried its plain and ordinary

meaning with respect to the original claims.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (*en banc*).

During re-examination, however, Netlist introduced a new definition that narrowed the

scope of the term in order to avoid the prior art.  *See* Ex. 9 at 41-42.  The Examiner had rejected

the pending claims in view of the Amidi prior art reference discussed above.  *See id.* at 36.  In

response to the Examiner's rejection, Netlist argued that the phase-lock loop device disclosed in

Amidi was not operatively coupled to its logic element.  *Id.* at 41.  Critical to this argument was a

new, narrower definition of the term "operatively coupled" that Netlist relied upon to distinguish

the Amidi reference.  *Id.*  Specifically, Netlist set forth a definition of "operatively coupled" that

means "the operations of the logic element 40 are clocked either directly or indirectly (*e.g.*,

through a clock buffer) by the output of the PLL 50" and that "the output of the PLL 50 controls

the operation of the logic element 40."  *Id.*  Netlist then argued that the Amidi reference did not

disclose a phase-lock loop device "operatively coupled" to a logic element because its logic

element did not receive clock signals directly or indirectly from its phase-lock loop device.  *Id.* at

41-42.

Through those arguments, Netlist narrowed the scope of the claims in two respects.  First,

Netlist set forth a definition of "operatively coupled" that is narrower than its plain and ordinary

meaning.  *See Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 679 (Fed. Cir. 2015)

(affirming district court's narrowing construction of the term "disparate databases" in light of

"definitional" statements in the prosecution history).  Second, Netlist disclaimed any type of

"operative coupling" that does not involve the output of a phase-lock loop device directly or

indirectly clocking the operations of the logic element.  *See Tech. Props. Ltd. LLC v. Huawei*

---

[6]  Original claim 39 used the term "operationally coupled."  *See* Ex. 2 at claim 39.  However, Netlist treated that phrase as synonymous with "operatively coupled" in submitting arguments to avoid the prior art during re-examination.  *See* Ex. 9 at 41.

1    *Techs Co., Ltd.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017) ("An applicant's statements to the PTO

2    characterizing its invention may give rise to prosecution disclaimer.").

3           In *Huawei*, the Federal Circuit affirmed the district court's determination that the patentee

4    had narrowed the scope of the term "entire oscillator" through arguments made to distinguish the

5    prior art during prosecution.  *Id*. at 1358-60.  In particular, the patentee argued that the prior art

6    relied on an "external crystal" to "fix" the frequency of an oscillator and therefore did not disclose

7    an "entire oscillator" as claimed.  *Id*. at 1356.  In view of these arguments, the district court

8    found—and the Federal Circuit affirmed—that the patentee had narrowed the scope of the claims

9    to require an oscillator "whose frequency is not fixed by any external crystal." *Id*.  Thus, the

10   claims as originally drafted covered any type of entire oscillator, whereas the claims following the

11   applicant's arguments excluded any oscillators that used an external crystal to fix the frequency.

12   *Id*.

13          The same rationale applies in this case.  The original claims of the '912 Patent covered any

14   type of "operative coupling" between the phase-lock loop device and logic element. *See* Ex. 2 at

15   claim 1, 5:27-50.  Following Netlist's arguments during re-examination, however, the claims were

16   limited to only those operative couplings in which "the operations of the logic element 40 are

17   clocked either directly or indirectly (*e.g.*, through a clock buffer) by the output of the PLL 50."

18   *See* Ex. 9 at 41-42.  Accordingly, Netlist substantively changed the scope of independent claims 1,

19   15, 28, and 39 when it argued for a narrow definition of the term "operatively coupled."  *See*

20   *Marine Polymer*, 672 F.3d at 1365 (explaining that "patent applicants' actions and ***arguments***

21   during prosecution, including prosecution in a reexamination proceeding, can affect the proper

22   interpretation and effective scope of their claims") (emphasis added).

23          Asserted dependent claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40,

24   41, 43, 45-47, 50, 52-60, 62-65, and 69-75 depend from one of independent claims 1, 15, 28, and

25   39, and therefore include the same substantive change in claim scope by virtue of dependency.

26   *See* Ex. 4; *Wahpeton*, 870 F. 2d 1546, 1553.  Claims 77 and 80-91 recite substantially the same

27   limitation and therefore include the same substantive change in claim scope as compared to any

28   original claims of the '912 Patent.  *See* Ex. 4.  Likewise, asserted claim 16 was amended during re-

1    examination to incorporate the limitations of original claim 15—including the phrase "operatively

2    coupled"—and therefore claim 16 includes the same substantive change in claim scope. *Id.* Thus,

3    each of the foregoing claims is subject to intervening rights. *See Laitram Corp.*, 163 F.3d at 1346.

4            (e)     *Netlist Narrowed Claim 16 by Amending It to Include the*
5                    *Limitations of Original Claim 15*

6            In the original version of the '912 Patent, claim 16 was written as a dependent claim that

7    depended from independent claim 15. *See* Ex. 2 at claim 16.  Claim 16 recited, "The memory

8    module of claim 15, wherein the command signal is transmitted to only one DDR memory device

9    at a time." *Id.*  During the re-examination proceedings, the Patent Office Examiner rejected claim

10   15 based on various combinations of prior art references. *See* Ex. 10 at 49.  In response to the

11   Examiner's rejections, Netlist submitted the amendments to claim 15 as discussed above. *See*,

12   *e.g.*, Ex. 8 at 47-49.  Separately, Netlist decided to amend certain dependent claims—including

13   claim 16—to incorporate the original language of claim 15. *See* Ex. 10 at 48.  As a result of the

14   amendment, claim 16 was rewritten in independent form and identified as such in the re-

15   examination certificate for the '912 Patent. *See* Ex. 4 ("Claims … 16 … are determined to be

16   patentable as amended").

17           When Netlist made that amendment, it substantively changed the scope of claim 16 by

18   surrendering subject matter that the claim might have otherwise covered under the doctrine of

19   equivalents. *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139-43

20   (Fed. Cir. 2004) ("*Honeywell I*").  Infringement of a patent claim can occur in one of two ways:

21   literally or under the doctrine of equivalents. *See id.*  The doctrine of equivalents allows a claim to

22   read on a product even if each and every element of the claim is not literally present, provided that

23   any differences between the claim and the product are insubstantial. *See Warner-Jenkinson Co. v.*

24   *Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).  Prosecution history estoppel serves as a check

25   on the doctrine of equivalents and prevents a patent owner from using the doctrine to recapture

26   subject matter he or she surrendered to acquire the patent. *See Honeywell Int'l, Inc. v. Hamilton*

27   *Sundstrand Corp.*, 523 F.3d 1304, 1312 (Fed. Cir. 2008) ("*Honeywell II*").  Estoppel arises when,

28   for example, the patentee amends the claims to introduce a limitation. *Id.*; *See also Honeywell I*,

1   370 F.3d at 1139 ("That the addition of a claim limitation constitutes a narrowing amendment is

2   manifest in the language of both *Warner-Jenkinson* and *Festo*. In both of these decisions, the

3   Supreme Court indicated that amending to introduce a new element, or add a new limitation, may

4   give rise to a presumption of surrender. This language is not dictum.") (internal citations and

5   formatting omitted).

6          Applying the Supreme Court's logic in *Honeywell I*, the Federal Circuit held that a

7   presumption of estoppel arises when a patentee rewrites a dependent claim in independent form

8   and cancels the original independent claim. *Id*. at 1143-44. In that case, the original independent

9   claims were directed to an "auxiliary power unit" having a "compressor." *Id*. at 1134-35. The

10  original dependent claims required the "compressor" to include "inlet guide vanes." *Id*. During

11  prosecution, the applicant rewrote the dependent claims to include the limitations of the original

12  independent claims and then canceled those independent claims. *Id*. at 1144. The Federal Circuit

13  held that the amendment gave rise to a presumptive surrender of equivalents for the "inlet guide

14  vane" limitation recited in the original dependent claims. *Id*. ("In this case there is a presumptive

15  surrender of all equivalents to the inlet guide vane limitation.").

16         The same rationale applies in this case. In the original version of the '912 Patent, claim 16

17  was written in dependent form. *See* Ex. 2 at claim 16 ("The memory module of claim 15, wherein

18  the command signal is transmitted to only one DDR memory device at a time."). During the re-

19  examination, Netlist amended claim 16 to include the limitations of original independent claim 15.

20  *See* Ex. 4 at claim 16. Netlist then amended claim 15 to include several new limitations, which

21  had the effect of canceling the original version of claim 15 from the '912 Patent. *See id*. at claim

22  15. Thus, under *Honeywell I*, Netlist presumptively surrendered the scope of equivalents with

23  respect to the original limitation of claim 16. In other words, Netlist can no longer rely on the

24  doctrine of equivalents to argue that "the command signal is transmitted to only one DDR memory

25  device at a time" in the accused products. *See Honeywell I*, 370 F.3d at 1144. Netlist is limited to

26  literal infringement, and therefore the scope of the claim is narrower than it was in its original

27  form. *Id*.

28

1    Accordingly, the amendment to claim 16 during re-examination substantively narrowed its

2 scope by surrendering equivalents. For this additional reason, claim 16 is subject to intervening

3 rights. *See Laitram*, 163 F.3d at 1346.

4                                          * * * * *

5    Each of the asserted claims was amended or added during re-examination and had its scope

6 substantively changed based on narrowing amendments and arguments that Netlist submitted to

7 overcome the prior art. The amendments, additions, and substantive changes are summarized in

8 the table below. Accordingly, the asserted claims are subject to absolute intervening rights. *See*

9 *Marine Polymer*, 672 F.3d at 1362-63; *Laitram Corp.*, 163 F.3d at 1346.

| Asserted Claims | Amended or New | Substantive Changes in Scope |
|---|---|---|
| 1, 15, 28, 39 | Amended<br><br>*See* Ex. 4 at 2. | Narrowing amendment to the "phase-lock loop device" limitation.<br><br>Narrowing amendment to the "register" limitation.<br><br>Narrowing amendment to the "logic element" limitation.<br><br>Narrowing arguments for the "operatively coupled" limitation. |
| 3, 4, 6, 8, 10, 11, 18, 19, 20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-47, and 50 | Amended by dependency on claims 1, 15, 28, or 39<br><br>*See* Ex. 4 at 2. | Narrowing amendment to the "phase-lock loop device" limitation.<br><br>Narrowing amendment to the "register" limitation.<br><br>Narrowing amendment to the "logic element" limitation.<br><br>Narrowing arguments for the "operatively coupled" limitation. |
| 52-60, 62-65, 69, 70-75 | New and depend from amended claims 1, 15, 28, or 39<br><br>*See* Ex. 4 at 2, 4-5. | Narrowing amendment to the "phase-lock loop device" limitation.<br><br>Narrowing amendment to the "register" limitation. |

| | | Narrowing amendment to the "logic element" limitation. Narrowing arguments for the "operatively coupled" limitation. |
|---|---|---|
| 77 and 80-91 | New *See* Ex. 4 at 2, 5-8. | Narrowing amendment to the "phase-lock loop device" limitation. Narrowing amendment to the "register" limitation. Narrowing amendment to the "logic element" limitation. Narrowing arguments for the "operatively coupled" limitation. |
| 16 | Amended *See* Ex. 4 at 2-3. | Narrowing amendment to the "wherein the command signal is transmitted to only one DDR memory device at a time" limitation. Narrowing arguments for the "operatively coupled" limitation. |

### B.     The Accused Products Are Subject to Absolute Intervening Rights

Absolute intervening rights applies to products that were made, purchased, used, or sold prior to issuance of a reexamination certificate. *See Marine Polymer*, 672 F.3d at 1362; *see also* 35 U.S.C. §§ 316(b) ("Any proposed amended or new claim determined to be patentable and incorporated into a patent following an inter partes reexamination proceeding shall have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim."). As detailed below, the products at issue in this motion are memory modules that Google purchased and/or used prior to issuance of the '912 Patent's re-examination certificate on February 8, 2021. For the reasons discussed below, those products are subject to absolute intervening rights. *See id.*; *see also BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1222 (Fed. Cir. 1993).

1      **1.**  ███████████

2          The first category of accused products are ████████████, which are a class of

3   memory modules that Netlist originally accused in its complaint filed on December 4, 2009.  *See*

4   Dkt. 1.[7]  Netlist has now asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 18-20, 22, 24, 27-29, 31, 32, 34,

5   36-41, 43, 45, 50, 52-60, 62-65, 69-75, 77, and 80-91 against ████████████.  *See* Ex.

6   5 at 2-3.

7          The evidence shows that ████████████████████████

8   ████████  *See* Branch Decl. ¶¶ 3-6. ████████████████████

9   ████████████████████████████ *Id.* ████████

10  ████████████████████████████████████

11  ████████████████████████████████

12  ████████ *Id.* ¶ 4. ████████████████████████

13  ████████████████████████. *Id.* ¶¶ 3-6.

14  The results of the ████████ are shown in Exhibits D and E attached to Mr. Branch's

15  declaration.  *Id.*

16  ████████████████████████████ *Id.* ¶ 5; Ex.

17  D. ████████████████████████████ *Id.*

18  ████████████████████████████████████

19  *Id.* ████████████████████████████

20      *Id.* ████████████████████████

21  ████████████ *Id.*; Branch Decl. ¶ 5. ████████

22  ████████████████ *Id.* ¶ 6; Ex. E. ████████

23  ████████████████████████████████████

24      *Id.*; Branch Decl. ¶ 6.

25  ████████████████████████████████

26  ████████████████████████████

27  ────────────
    [7] ████ is an older generation of technology that was released in 2003 and has since been
28  superseded by later generations.





1   ████████████████████████████████████████. *See id.* ¶¶ 3, 5-6. ████████

2   ████████████████████████████████████████████████████████████████████

3   ████████████████████████ *Id.* ¶¶ 7-10; *see also* Ex. 5 at 2. ████████████

4   ████████████████████████████████████████████████████████████████████

5   ██████████████████ as of February 7, 2021—the day before the re-examination certificate

6   issued for the '912 Patent. *See* Branch Decl. ¶¶ 7-10; Ex. F.

7        Accordingly, Google's use of ████████████████ occurred before issuance of the

8   '912 Patent re-examination certificate on February 8, 2021, and the products are therefore subject

9   to absolute intervening rights. *See* 35 U.S.C. § 316(b); *BIC Leisure Prods., Inc.*, 1 F.3d at 1221

10   (explaining that absolute intervening rights extend to anything "made, purchased, or ***used*** before

11   the grant of the reissue patent") (emphasis added).

12        **2.**   ████████████████

13        The second category of accused products are ████████████████. *See* Ex. 5 at 2.

14   Netlist has asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 18-20, 22, 24, 27-29, 31, 32, 34, 36-41, 43, 45,

15   46, 47, 50, 52-60, 62-65, 69-75, 77, and 80-91 against this category. *Id.* ████████████

16   ████████████████████████████████████████████████████████████████ *See*

17   Burdsall Decl. ¶ 9.  Thus, those products are moot for purposes of this litigation.  However, to the

18   extent Netlist continues to accuse the products, Google requests an order stating that any alleged

19   purchase or use prior to issuance of the re-examination certificate on February 8, 2021 is subject to

20   absolute intervening rights.

21        **3.**   ████████████████

22        The third category of accused products are ████████████████. *See* Ex. 5 at 1-2.

23   Netlist has asserted claim 16 of the '912 Patent against this category. *Id.* ████████████

24   ████████████████████████████████████████████████████████████████ *See*

25

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████ *See* Branch Decl. ¶ 10. ████████████████████████████
     ████████████████ *Id.*

GOOGLE'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ABSOLUTE INTERVENING RIGHTS

Burdsall Decl. ¶ 8.  Thus, those products are moot for purposes of this litigation, but again, to the extent Netlist continues to accuse the products, Google requests an order stating that any alleged purchase or use prior to issuance of the re-examination certificate on February 8, 2021 is subject to absolute intervening rights.

 **4.** ███████████████

The fourth category of accused products are ██████████████████.  Ex. 5 at 2.  Netlist has asserted claim 16 of the '912 Patent against those products.  *Id.* ████████████████ ██████████████████████████████████████████████ ██████████████████████.  Those products are subject to absolute intervening rights based on the following evidence.

 *First*, ████████████████████████████████████████ ████.  *See BIC Leisure Prods.,* 1 F.3d at 1222 (affirming district court's reliance on purchase order dates for absolute intervening rights).  As detailed in the accompanying declaration of Google Financial Analyst, Collin Burdsall, ████████████████████████ ██████████████████████████████████████████ ███████████.  *See* Burdsall Decl. ¶¶ 2-5.  ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ████████.  *Id.*; Exs. A and B. ██████████████████████████████████████████████ ████████████.  *See* Burdsall Decl. ¶ 6.  Attached as Exhibit C to Mr. Burdsall's declaration is ██████████████████ ██████████████████████████████████.  *Id.*; Ex. C.[9] ██████████ ██████████████████████████████████████████ ████████████.  *Id.*

_____

[9] ██████████████████████████████████████████, discussed in Section IV.B.5 *infra.*

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮. *Id.*

3     As Mr. Burdsall explains in his declaration, ▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮ *See* Burdsall Decl. ¶ 6. ▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. C.

8 Because those ▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮ to issuance of the re-examination certificate and are therefore

10 subject to absolute intervening rights. *See BIC Leisure Prods.,* 1 F.3d at 1222 ("[T]he district

11 court found that the telex purchase order, dated February 10, 1983, between BIC and an affiliated

12 supplier, BIC Marine, bound BIC to purchase the sailboards.  This court discerns no error in the

13 trial court's determination that these sailboards were purchased within the meaning of section 252

14 before the critical date of March 8, 1983.").

15     ***Second***, ▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮. *See* Burdsall Decl. ¶¶ 6-

17 7.  Specifically, ▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮ *Id.*; Ex. C. ▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*;

21 Ex. C.  Thus, ▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮, and the products are therefore subject to absolute intervening rights.  *See*

23 35 U.S.C. §§ 252, 316(b); *BIC Leisure Prods.,* 1 F.3d at 1222.

24     ***Third***, ▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮. *See* Branch Decl. ¶¶ 8-9.  Exhibit F to Michael Branch's

27 declaration shows ▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮





1    ▮▮▮▮▮▮▮▮▮▮▮▮.[10]  Ex. F; *see also* Ex. C.  ▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮ within the meaning of 35 U.S.C. § 316(b) and are subject to absolute

3    intervening rights.  *Marine Polymer*, 672 F.3d at 1361-62 (explaining that absolute intervening

4    rights abrogates liability for products "used" before the re-examination certificate).

5      Accordingly, ▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮▮

8      **5.**    ▮▮▮▮▮

9      The final category of accused products are ▮▮▮▮▮▮.  Ex. 5 at 2.  Netlist

10   has asserted claim 16 of the '912 Patent against those products.  *Id.* ▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮.

13      ***First,*** ▮▮▮▮▮▮▮▮▮▮

14   ▮.  *See BIC Leisure Prods.*, 1 F.3d at 1222.  As discussed above, ▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮.  *See* Burdsall Decl. ¶ 6.

16   ▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮.  *Id.*; Ex. C.[11]  As Mr. Burdsall

18   explains in his declaration, ▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮ *See* Burdsall Decl. ¶¶ 6, 7; Ex. C.

21   ▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮.  *See* Ex. C.  Because the ▮▮▮▮▮▮

24   ▮▮▮▮▮▮ prior to issuance of the re-examination

25

26   ‾‾‾‾‾‾‾‾‾‾‾‾‾
  [10] ▮▮▮▮▮▮▮▮▮▮, as discussed in Section IV.B.5,

27   *infra.*
  [11] ▮▮▮▮▮▮▮▮▮▮▮▮, as

28   discussed in Section IV.B.4 *supra.*

1  certificate and are therefore subject to absolute intervening rights.  *See BIC Leisure Prods.,* 1 F.3d

2  at 1222 (affirming district court's reliance on purchase order dates as evidence of purchase for

3  absolute intervening rights).

4        ***Second***, ████████████████████████████████████████████

5  ████████████████████████  *See* Burdsall Decl. ¶¶ 6-7.  As detailed above, ████████

6  ███████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████. *Id*. ██████████

8  ███████████████████████████████████████████████████

9  ████████████████████████████. *Id*.; Ex. C.  Thus, ████████████

10 ███████████████████████████████████████████████████

11 and those products are subject to absolute intervening rights.  *See* 35 U.S.C. §§ 252, 316(b).

12       ***Third***, ████████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 ████████████████████████████. *See* Branch Decl. ¶¶ 8-9.  Exhibit F to Michael Branch's

15 declaration shows ████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ████████████████. Ex. F; *see also* Ex. C.[12] ███████████████████

18 ████████████████ within the meaning of 35 U.S.C. § 316(b) and are subject to absolute intervening

19 rights.  *See Marine Polymer*, 672 F.3d at 1361-62 (explaining that absolute intervening rights

20 abrogates liability for products "used" before the reissue).

21       Accordingly, ██████████████████████████████████████████████

22 ████████████████████████████.

23                                    * * * * *

24

25

26

27 ─────────────
   [12] ████████████████████████████████████████████████████, as discussed in

28 Section IV.B.4 *supra*.

## V.    CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court grant this motion for summary judgment and order as follows: that each of the asserted claims was amended or new for purposes of 35 U.S.C. § 316(b); that each of the asserted claims had its scope substantively changed based on amendments and/or arguments that Netlist made during the re-examination proceedings; and that each of the accused products which Google purchased and/or used prior to February 8, 2021 is subject to absolute intervening rights.

DATED: July 30, 2021

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By    /s/ *David Perlson*
          David Perlson

David Perlson (CA Bar No. 209502)
davidperlson@quinnemanuel.com
Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Jared Newton (admitted *pro hac vice*)
jarednewton@quinnemanuel.com
Sandy Shen (admitted *pro hac vice*)
sandyshen@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Catlin Williams (CA Bar No. 336464)
catwilliams@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Defendant Google LLC*