QUINN EMANUEL URQUHART & SULLIVAN, LLP

David Perlson (CA Bar No. 209502)
davidperlson@quinnemanuel.com
Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Catlin Williams (CA Bar No. 336464)
catwilliams@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Deepa Acharya (CA Bar No. 267654)
deepaacharya@quinnemanuel.com
Jared Newton (admitted *pro hac vice*)
jarednewton@quinnemanuel.com
Sandy Shen (admitted *pro hac vice*)
sandyshen@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>GOOGLE LLC,<br><br>　　　Defendant. | Case No. 4:09-CV-05718-SBA<br><br>**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF ABSOLUTE INTERVENING RIGHTS (DKT. 155)**<br><br>**JUDGE**: Hon. Saundra Brown Armstrong<br>**HEARING DATE**: November 10, 2021<br>**TIME**: 2:00 PM PT |

**TABLE OF CONTENTS**

Page

I.  THE AMENDMENTS TO CLAIMS 1, 15, 28, AND 39 NARROWED THEIR SCOPE AND DISCLAIMED SUBJECT MATTER ........................................................2

    A.  Netlist's Amendments Narrowed the Logic Element Limitations ..........................3

    B.  Netlist's Amendments Narrowed the Register Limitation ......................................6

    C.  Netlist's Amendments Narrowed the PLL Device Limitation................................8

    D.  Netlist's Remaining Arguments Cannot Defeat Summary Judgment......................9

II.  NETLIST AMENDED CLAIM 16 AND NARROWED ITS SCOPE .............................11

    A.  Netlist Does Not Dispute that Claim 16 Was Literally "Amended" ......................11

    B.  Netlist Substantively Changed the Scope of Claim 16 Through Arguments ..........11

    C.  Netlist Substantively Changed the Scope of Claim 16 Under *Honeywell* ..............14

III.  NETLIST DOES NOT GENUINELY DISPUTE GOOGLE'S EVIDENCE CONCERNING ITS PURCHASE AND USE OF THE ACCUSED PRODUCTS ...........15

IV.  CONCLUSION.................................................................................................................15

# TABLE OF AUTHORITIES

*Aronsen v. Crown Zellerbach*,
   662 F.2d 584 (9th Cir. 1981) .................................................................................................. 11

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013) ......................................................................................... 12, 13

*Convolve, Inc. v. Compaq Comp. Corp.*,
   812 F.3d 1313 (Fed. Cir. 2016) ................................................................................................ 10

*eBay Inc. v. Parts-River, Inc.*,
   No. 10-cv-04947, 2011 WL 1754083 (N.D. Cal. May 9, 2011) ............................................... 9

*Galderma Labs., L.P. v. Amneal Pharms. LLC*,
   806 F. App'x 1010 (Fed. Cir. 2020) ........................................................................................ 13

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
   370 F.3d 1131 (Fed. Cir. 2004) ................................................................................................ 14

*Kaufman Co., Inc. v. Lantech, Inc.*,
   807 F.3d 970 (Fed. Cir. 1986) .................................................................................................... 6

*Laitram Corp. v. NEC Corp.*,
   163 F.3d 1342 (Fed. Cir. 1998) ...................................................................................... 6, 8, 10

*Marine Polymer Techs. v. HemCon, Inc.*,
   672 F.3d at 1362 ........................................................................................................ 2, 11, 12, 15

*Norian Corp. v. Stryker Corp.*,
   432 F.3d 1356 ........................................................................................................................... 14

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ................................................................................................ 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................................... 1, 3, 7, 10, 12

*Power Integrations, Inc. v. ON Semiconductor Corp.*,
   396 F. Supp. 3d 851 (N.D. Cal. 2019) ............................................................................... 13, 14

*Presidio Comps. v. Amer. Tech. Ceramics*,
   875 F.3d 1369 (Fed. Cir. 2017) ............................................................................................ 6, 9

*Tech. Props. Ltd. LLC v. Huawei Techs Co., Ltd.*,
   849 F.3d 1349 (Fed. Cir. 2017) ................................................................................................ 13

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
   782 F.3d 671 (Fed. Cir. 2015) .................................................................................................. 13

*X One, Inc. v. Uber Techs., Inc.*,
   440 F. Supp. 3d 1019 (N.D. Cal. 2020) ............................................................................. 13, 14

**Statutory Authorities**

35 U.S.C. § 271(a) ................................................................................................................. 2, 15

35 U.S.C. § 316(b) (pre-AIA) .......................................................................................... 2, 11, 15

During the ten-year reexamination of the '912 Patent, the original claims were rejected by the patent examiner and confirmed invalid by PTO. The rejections forced Netlist to submit detailed amendments and arguments that—by its own admission—"narrowed" the scope of the claims and "disclaimed" broader coverage. Now, however, Netlist asks the Court to find that its narrowing amendments, arguments, and disclaimers were somehow inconsequential and merely to "clarify" the claims and recite "inherent" subject matter. Netlist's litigation-driven revisionist history should be rejected.

***First***, with respect to asserted independent claims 1, 15, 28, 39, and their dependents, Netlist submitted detailed amendments to the logic element, register, and phase-lock loop limitations. For example, the original claims placed no restriction on whether—let alone how—the logic element generated output signals. The amended claims now require the logic element to generate output signals based on four specific enumerated input signals. Netlist similarly amended the register and phase-lock loop limitations to require transmission of specific signals to specific components in the claimed circuit. While Netlist now argues that those amendments are meaningless, it told the PTO at the time that the amendments narrowed the scope of the claims:

> *As discussed above, the claims have been amended to include language about the PLL, register, and logic element. A POSITA would understand that the amendments **narrow the scope** of the claim.*

Ex. 1 at 5.

Netlist repeated those same arguments to the Federal Circuit, stating explicitly that the amendments narrowed the scope of the claims and disclaimed broader coverage:

> *Netlist did what patent owners are expected to do during a reexamination—it **narrowed its claims** to define its precise inventive contribution over the prior art.*
>
> *Netlist **revised its claims** to require a memory module with a logic element that acts "in response at least in part to" four enumerated signals. ... In fact, Netlist **unequivocally disclaimed any broader meaning** during the reexamination.*

Ex. 2 at 1-2.

Despite those unequivocal statements, Netlist argues that its amendments merely "clarify" the meaning of the original claims under *Phillips*. But prior to the stay, the parties agreed to *Phillips* constructions for the logic element, register, and phase-lock loop limitations that did not require the

numerous requirements Netlist added by amendment. Even Netlist's litigation expert admitted that the amendments imposed new substantive requirements and limited the claims to examples in the specification. Claims 1, 15, 28, 39, and their dependents are therefore subject to intervening rights.

*Second*, the reexamination certificate and the record of the proceedings demonstrate that claim 16 was literally "amended" and therefore meets the threshold requirement of intervening rights. Netlist ignores the record and instead draws an artificial distinction between *rewriting* a claim and *amending* it for purposes of the threshold requirement. That distinction does not exist in the text of 35 U.S.C. § 316(b) (pre-AIA) or the applicable case law. Netlist also argues that its narrowing arguments to the PTO for the "operatively coupled" limitation cannot substantively change the scope of the claims as a matter of law. But the case Netlist relies on for that proposition, *Marine Polymer*, contradicts Netlist and makes clear that arguments during reexamination "can affect the proper interpretation and effective scope of the[] claims."

*Third*, with respect to the accused products, Netlist raises three unsupported arguments that the Court should reject as a matter of law. Netlist argues that the intervening rights period should start when the Federal Circuit issued its affirmance, but that argument contradicts the plain text of § 316(b) (pre-AIA), which defines the period as running through the PTO's issuance of the reexamination certificate. Netlist argues that Google failed to address all of the accused products in its motion for summary judgment, but that argument ignores the fact that Google addressed the exact products Netlist has accused in its infringement contentions. And Netlist argues that some of the accused products might have been purchased or used outside of the United States, but those products are irrelevant to an infringement action under 35 U.S.C. § 271(a).

## I. THE AMENDMENTS TO CLAIMS 1, 15, 28, AND 39 NARROWED THEIR SCOPE AND DISCLAIMED SUBJECT MATTER

Netlist does not dispute that independent claims 1, 15, 28, and 39 and their dependents meet the threshold requirement for intervening rights because they were amended during reexamination. Opp. at 12. Instead, Netlist argues that the amendments simply "clarified what was inherent in the original claims," and therefore did not substantively change their scope for purposes of intervening rights. *Id.* at 17. The Court should reject that argument because it ignores the detailed nature of the

amendments and the sworn statements Netlist made to the Federal Circuit and PTO characterizing the amendments as *narrowing* the claims and *disclaiming* broader subject matter.

### A. Netlist's Amendments Narrowed the Logic Element Limitations

As detailed in Google's motion, Dkt. 155 at 11-14, the amended claims of the '912 Patent imposed new requirements on the "logic element" limitation:

> *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.*

Netlist argues that the amendment did not substantively change the scope of the claims because "the language of each original independent claims [*sic*] expressly required the logic element to receive signals (i), (ii), and (iii)," and that the logic element inherently received signal (iv). Opp. at 22. Those arguments are both irrelevant and incorrect.

*First*, the arguments are irrelevant because the amended claim language does not simply require the logic element to *receive* the four enumerated signals. The amendment requires the logic element to *use* each of the four enumerated signals to *generate* output signals. Dkt. 155-5 at cl. 1. The original claims placed no restriction on whether—let alone how—the logic element generated output signals. Dkt. 155-3 at cl. 1. Likewise, when the parties submitted agreed-upon constructions for the original claims, they did not impose any requirements on the type or number of input signals the logic element must use to generate output signals. Dkt. 45-1 at 1 (explaining that a logic element is "a hardware circuit that performs a predefined function on input signals from the computer system and presents the resulting signals as its output."). Those constructions were presented to the Court under the *Phillips* standard. *Id*. Thus, if Netlist genuinely believed that the original claims required the logic element to generate output signals based on four specific input signals, it would have—and should have—proposed that requirement in its pre-stay construction. Netlist did not do that, which confirms the logic element recited in the original claims was allowed to generate output signals based on any type and any number of input signals. Dkt. 155-3 at cl. 1.

The amendments Netlist submitted during reexamination narrowed the original claims by requiring the logic element to generate output signals based on four specific enumerated signals.

Dkt. 155-5 at cl. 1. That is exactly what Netlist told the Federal Circuit. Ex. 2 at 1.[1] The amendment to the logic element limitation was a central focus of the appeal, with Netlist arguing repeatedly that the amendment narrowed the scope of the claims and overcame the PTO's finding that the original claims were invalid. *Id*. at 1-2. In the introduction to its appeal brief, Netlist told the court that it had "***revised*** its claims to require a memory module with a logic element that acts 'in response at least in part to' four enumerated signals" and "unequivocally ***disclaimed*** any broader meaning." *Id*. Netlist repeated those arguments later in the brief, explaining that its amendments and statements to the PTO were "enough to ***disclaim*** an interpretation that allows generating the recited output signals in response to less than all four enumerated signals." *Id*. at 36. Netlist made the same arguments to the PTO when it submitted the amendment for the logic element limitation. Dkt. 155-9 at 51. Netlist identified the amendment as one of three that "***narrowed*** the claim" in order to "address the Board's rejection" based on the Amidi prior art reference. *Id*. at 52. Netlist then explained that "the amended claims ***now also require*** that the logic element generates certain output control signals" in response to the four enumerated input signals, which was ***different*** than the scheme in Amidi that relied on only a subset of those signals. *Id*.[2]

*Second*, Netlist's argument that the original claims required the logic element to receive each of the four enumerated signals is incorrect. Opp. at 22. The first enumerated signal is a "row address signal." Dkt. 155-5 at cl. 1. Nothing in the original claims required the logic element to receive a "row address signal," let alone generate output signals in response to a "row address signal." Dkt. 155-3 at claim 1. The original claims required only that the logic element receive a "row/column address signal," which is broader than the "row address signal" required by the amended claims. *Id*. As the name suggests, a "row/column address signal" may represent either a row or a column, whereas a "row address signal" is limited to a row only. Dkt. 1 at 5:22-45. Thus, when Netlist amended the logic element limitation to require a "row address signal" as an input, it narrowed the

---

[1] Exhibit numbers refer to exhibits attached to the accompanying declaration of Jonathan Tse.

[2] Conversely, Netlist does not point to a single statement in the reexamination record or appeal where it characterized the amendments as simply to "clarify" the claims or recite subject matter that was allegedly "inherent" in the original claims. Opp. at 17-24.

scope of claims. Dkt. 155-9 at 48-49. That is exactly what Netlist's reexamination expert, Dr. Sechen, told the PTO when Netlist submitted the amendment. Ex. 1 at 5-6 ("A POSITA would understand that the amendments narrow the scope of the claim to a memory module in which … at least one row address signal … is received by the logic element."); *id*. at 9 ("As amended, the narrower claim dictates that a row address signal … is received by the logic element").

Netlist ignores Dr. Sechen's testimony—offered at the time of the amendment—in favor of a new declaration from its litigation expert, Dr. Annavaram. Dkt. 197-9. The declaration should be afforded little if any weight because, as Dr. Annavaram admitted during deposition, he offered no analysis of the amended claims and no opinions about whether their scope had been substantively changed. Ex. 3 at 35:25-37:16. The ostensible purpose of the declaration was to suggest that certain features were inherent in the original claims of the '912 Patent, but during deposition Dr. Annavaram admitted that he was not providing a claim construction analysis and had not considered applicable legal standards. *Id*. at 49:7-21, 52:6-19.

Furthermore, Dr. Annavaram contradicted the opinions set forth in his declaration during his deposition. In his declaration, Dr. Annavaram argued that the original claims and specification of the '912 Patent inherently required the logic element to receive a "row address signal." Dkt. 197-9 ¶¶ 28-29, 34. To support that opinion, he used an annotated version of Figure 1A in which he labeled the signal $A_{n+1}$ as a "row address signal." *Id*. During his deposition, however, he admitted that the annotation was a "mistake" or an "error." Ex. 3 at 70:12-71:15, 72:1-14; 90:1-6. He agreed that the specification actually identifies the signal $A_{n+1}$ as a broader "row/column address signal." *Id*. Thus, when Netlist amended the logic element limitation to require a "row address signal" as an input, it narrowed the scope of the claims as compared to the specification's broader description of the alleged invention. Dkt. 155-9 at 51. That is, of course, exactly what Netlist told the PTO and the Federal Circuit. *Id*.; Ex. 1 at 5-6, 9; Ex. 2 at 1-2, 36. Indeed, Dr. Annavaram went on to admit that a "row address signal" is just one example of a signal the logic element might use to generate its output. Ex. 3 at 90:18-91:1, 91:24-93:5. The amendments limited the claims to that example.

Accordingly, Netlist's amendments to the logic element limitation did not simply "clarify" the claims or recite "inherent" subject matter. The amendments narrowed the claims and disclaimed

broader subject matter. Thus, they substantively changed the scope of the claims as a matter of law. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1349 (Fed. Cir. 1998). The Federal Circuit's decision in *Laitram* is particularly instructive in that regard. The original claims in *Laitram* were directed to "an electro-optical printing apparatus for printing alphanumeric characters." *Id*. at 1344. During reexamination, the patentee amended the claims to require the apparatus to generate "*type quality* alphanumeric characters." *Id*. The Federal Circuit explained that "a plain reading of the claims would indicate that the original and reexamined claims are of different scope: the original claims appear to cover a printer or method of printing which generates *any* quality of alphanumeric characters, while the amended claims seem to cover only a printing apparatus or method of printing which generates '*type quality*' alphanumeric characters." *Id*. at 1348. By narrowing the claims, the amendment substantively changed their scope and subjected them to intervening rights. *Id*. at 1349 ("Thus, when Laitram added this limitation during reexamination, it narrowed the claims, thereby substantively changing their scope.").

The same rationale applies here. The original claims allowed the logic element to generate output signals based on any type or any number of input signals, whereas the amended claims require a minimum of the four enumerated signals. The amendment thus substantively changed the scope of the claims as a matter of law. *Id*. at 1348-49; *Presidio Comps. v. Amer. Tech. Ceramics*, 875 F.3d 1369, 1379-80 (Fed. Cir. 2017) ("Whether viewed as a disclaimer or as evidence relevant to the proper claim construction, it is clear that the amended claims exclude … theoretical calculation. Therefore, there was a substantive change in claim scope.").[3]

**B.      Netlist's Amendments Narrowed the Register Limitation**

As detailed in Google's motion, Dkt. 155 at 10-11, the amended claims of the '912 Patent imposed additional requirements on the "register" limitation:

> *wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row/column address signals and the bank address signals, and (iii) transmits the buffered plurality of row/column*

---

[3] The *Kaufman* decision cited in Netlist's opposition is inapposite. Opp. at 14. There, the Federal Circuit explained that the amendments added requirements that were already present in the original claims, to the point that they appeared to be "unnecessary and redundant." *Kaufman Co., Inc. v. Lantech, Inc.*, 807 F.2d 970 (Fed. Cir. 1986).

> *address signals and the buffered bank address signals to the plurality of DDR memory devices*
>
> *wherein the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element*

The amendments require the register to process specific *types* of signals—in particular "row/column address signals" and the "bank address signals." *Id*. The amendments also require that the "row/column address signals" are "separate from the at least one row address signal" that is sent to the logic element. *Id*. Netlist argues that those requirements were already "inherent" in the original claims, Opp. at 19-22, but that argument ignores the original claim language, specification, and statements Netlist made to the PTO explaining that its amendments ***narrowed*** the scope of the register limitation.

The original claim language required a "circuit comprising … a register," but placed no restriction on the operation of the register or the *type* of signals it had to process. Dkt. 155-3 at cl. 1. Likewise, the parties' agreed-upon *Phillips* construction for the "register" limitation required "a circuit component or components that receive, buffer, and transmit signals," but did not require any specific *type* of signals. Dkt. 45-1 at 1. The specification of the '912 Patent provides examples of the type of signals the register might process, "including bank address signals, row address signals, column address signals, gated column address strobe signals, [and] chip-select signals." Dkt. 155-3. Thus, the original claim language allowed the register to receive, buffer, and transmit some, all, or none of those signals, and the parties' agreed-upon construction did not limit that claim scope in any way. Dkt. 155-3 at claim 1; Dkt. 45-1 at 1.

The amended claims, however, impose specific requirements on the *type* of signals that the register must process. Dkt. 155-5 at claim 1. The amended register limitation must receive, buffer, and transmit "row/column address signals" and "bank address signals," and the former must be "separate from the at least one row address signal received by the logic element." *Id*. When Netlist added those requirements to the claims, its expert Dr. Sechen explained that a "POSITA would understand that the amendments narrow the scope of the claim to a memory module in which the bank address signals are received by the register … and the at least one row address signal—*separate* from the plurality of row-column address signals received by the register—is received by the logic

element." Ex. 1 at 5-6. Thus, Dr. Sechen confirmed that the amendments narrowed the claims and substantively changed their scope. *Laitram*, 163 F.3d at 1348-49.

Netlist has no answer for Dr. Sechen's sworn testimony. Instead, Netlist relies—again—on the declaration from Dr. Annavaram, but his testimony contradicts the specification and provides no support for Netlist's position.[4] Netlist argues that the "command signals" recited in the original claims necessarily included the "row/column address signals" and "bank address signals" recited in the amended claims. Opp. at 19. Netlist then argues that the register would "inherently" receive those signals "because the signals from the computer system must be buffered." *Id*. at 20. Netlist is wrong on both points. First, the specification explains that "command signals" include "refresh" and "precharge" signals, ***not*** "row/column address signals" and "bank address signals" as Dr. Annavaram argues in his declaration. Dkt. 155-3. Second, Dr. Annavaram never testified that signals received from the computer system must be buffered in the register. Dkt. 197-7 ¶¶ 25-26. Netlist cites paragraphs 25 and 26 of his declaration for that point, but those paragraphs are silent about whether signals received from the computer system are buffered. *Id*. Netlist is left with conclusory attorney argument, which cannot inform the scope of the original claims.[5]

### C. Netlist's Amendments Narrowed the PLL Device Limitation

As detailed in Google's motion, Dkt. 155 at 8-9, the amended claims of the '912 Patent imposed new requirements on the "phase-lock loop device" limitation:

> *wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register*

The amendments require the PLL to transmit a clock signal to the plurality of DDR memory devices, the logic element, and the register. *Id*. Transmission of a clock signal from the PLL to the logic element is significant because Netlist relied on that requirement to distinguish the Amidi prior art reference that the PTO used to reject the original claims. Dkt. 155-9 at 51-52. The PTO

---

[4] Dr. Annavaram admitted that he was not disputing Dr. Sechen's testimony. Ex. 3 at 38:16-39:2.

[5] The specification also contradicts Netlist's argument that signals received from the computer system must be buffered in the register. Figure 1A, for example, shows an embodiment where signals $CS_0$, $CS_1$, and $A_{n+1}$ are transmitted directly from the computer system to the logic element without being buffered in the register. Dkt. 1 at Fig. 1.

recognized that the original claims did not limit the source of the clock signal for the logic element. Dkt. 155-3 at claim 1. Thus, the PTO found that Amidi disclosed the PLL limitation as claimed because Amidi's logic element received clock signals from an external computer system. Dkt. 155-9 at 51-52. In response to the PTO's determination, Netlist amended the PLL limitation to specify that it transmits clock signals to the logic element. *Id*. Netlist then relied on the amendment to distinguish Amidi and overcome the PTO's rejection. *Id*.

That amendment substantively changed the scope of the claims by narrowing the PLL device limitation. *Presidio*, 875 F.3d at 1378. The original limitation was broad enough to cover a device, like Amidi, whose logic element receives clock signals from an external source. Dkt. 155-9 at 51-52. The limitation as amended, however, excludes such a device because the logic element must receive a clock signal from the PLL. *Id*.; *Presidio*, 875 F.3d at 1378 (explaining that the scope of claim has been substantively changed if the original version reads on a device that the amended version does not); *eBay Inc. v. Parts-River, Inc.*, No. 10-cv-04947, 2011 WL 1754083 at *3-4 (N.D. Cal. May 9, 2011) (intervening rights applies where the amendment excludes an embodiment covered by the original claims).

Netlist does not dispute the statements it made to the PTO regarding the significance of the amendment to the PLL limitation. Opp. at 17-18. Instead, Netlist argues—again—that the subject matter added by amendment was already present in the original claims. *Id*. That argument is contradicted by the plain text of the original claims, which allowed for the logic element to receive clock signals from *any* source—including an external device. Dt. 155-3 at claim 1. Indeed, the specification of the '912 Patent is broad enough to cover embodiments where the logic element receives clock signals from an external clock or computer system—a point Dr. Annavaram did not dispute in his deposition. Ex. 3 at 86:24-87:1. The original claims covered those broader embodiments, and Netlist disclaimed them when it amended the claims to require the PLL to transmit clock signals to the logic element. *Presidio*, 875 F.3d at 1378.

### D. Netlist's Remaining Arguments Cannot Defeat Summary Judgment

Netlist tries to avoid summary judgment by arguing that further claim construction findings are necessary before the Court can decide intervening rights. Opp. at 13. The Court should reject

that argument because the parties already submitted agreed-upon *Phillips* constructions for the original claims of the '912 Patent, including the logic element, register, and PLL limitations. Dkt. 45-1 at 1.[6] The amendments submitted during reexamination imposed new requirements on those limitations, and Netlist fails to provide any credible explanation for why further claim construction proceedings are necessary to determine whether those clearly substantive amendments altered the scope of the claims. Opp. at 13-14.

Netlist also argues that Google improperly relied on a *per se* rule for intervening rights. Opp. at 14. That argument ignores the detailed nature of the analysis set forth in Google's motion, which explained exactly how and why the amendments narrowed the scope of the claims. Mot. at 8-15. Intervening rights arise from the narrowing and disclaimer effect of those amendments, not from some *per se* rule. *Id.*; *Laitram*, 163 F.3d at 1348-49.

Netlist also argues—in a three-sentence section of its opposition—that narrowing of a claim under *BRI* is irrelevant because intervening rights is judged based on the *Phillips* standard. Opp. at 24. That argument makes no sense and contradicts basic principles of claim construction. The prosecution and reexamination history of a patent are highly relevant sources of intrinsic evidence for determining the proper scope of a claim term under the *Phillips* standard. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*). Thus, courts routinely look to narrowing statements and disclaimers that an applicant makes during prosecution or reexamination to construe the claims under the *Phillips* standard. This is so even though those statements and disclaimers necessarily occur in the context of prosecution under the BRI standard. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Under Netlist's rationale, any narrowing of a claim or statements made in prosecution would be irrelevant to claim construction. That is obviously not the law and Netlist's argument should be rejected.

---

[6] The fact that the parties agreed to *Phillips* constructions for the original claims distinguishes this case from *Convolve*. Opp. at 13-14. There, the district court's construction for the original claims was incorrect because it failed to account for limiting language in the specification and prosecution history. *Convolve, Inc. v. Compaq Comp. Corp.*, 812 F.3d 1313, 1323 (Fed. Cir. 2016). Thus, the starting point for the Court's intervening rights analysis was incorrect. *Id.* Here, the parties already agreed on the *Phillips* construction for the relevant limitations, and the Court can rely on those constructions as the starting point for its analysis.

Finally, Google's motion explained that asserted claims 77 and 80-91 are subject to absolute intervening rights because they were added during reexamination and impose substantially the same limitations on the logic element, register, and PLL as the amended claims. Mot. at 9-12. Netlist does not address those claims and therefore summary judgment is appropriate.

## II.     NETLIST AMENDED CLAIM 16 AND NARROWED ITS SCOPE

### A.     Netlist Does Not Dispute that Claim 16 Was Literally "Amended"

As Google explained in its opening motion and its opposition to Netlist's partial motion for summary judgment, claim 16 of the '912 Patent meets the threshold requirement for intervening rights because it was amended during reexamination. Mot. at 7; Dkt. 195 at 6-9. In particular, both the record of the reexamination proceedings and the certificate issued by the PTO identify the claim as literally "amended." Dkt. 156-8 at 9; Dkt. 156-4 at 2. Netlist does not dispute that point, but argues that the amendment should not count for purposes of intervening rights because claim 16 was rewritten from dependent to independent form. Opp. at 5. There is simply no statutory support for that argument. Dkt. 195 at 7-9. The plain text of 35 U.S.C. § 316(b) (pre-AIA) applies to any "amended or new claim," without qualification. *Id*. Conversely, the statute does not exclude any particular type of amendment, including those that rewrite a claim from dependent to independent form. *Id*. Netlist's attempt to impose that requirement violates principles of statutory construction and must be rejected. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 590 (9th Cir. 1981).

### B.     Netlist Substantively Changed the Scope of Claim 16 Through Arguments

Netlist continues to misconstrue the *en banc* Federal Circuit's *Marine Polymer* decision to argue that a patentee's arguments during reexamination "cannot give rise to intervening rights." Opp. at 7. What Netlist fails to acknowledge is that *Marine Polymer* was limited to the question of whether the patentee's arguments met the ***threshold*** requirement of intervening rights. 672 F.3d at 1362-63. The claims at issue were not "new or amended" as required under the applicable statute, but the initial panel decision nevertheless found the threshold requirement was satisfied based on the applicant's arguments narrowing the scope of the claims. *Id*. The *en banc* court disagreed and found that—even though the arguments might have narrowed the scope of the claims—the threshold requirement was not satisfied absent new or amended claims. *Id*.

The fact pattern here is different because claim 16 was literally amended and the threshold requirement of intervening rights is satisfied. Dkt. 195 at 6-9. In that regard, *Marine Polymer's* observation that an applicant's "actions and arguments during prosecution, including prosecution in a reexamination proceeding, can affect the proper interpretation and effective scope of their claims" is directly relevant to the Court's analysis here. 672 F.3d at 1365.[7] After Netlist amended claim 16, it argued for a narrower definition of the "operatively coupled" limitation and thereby substantively changed the scope of the claim. Dkt. 195 at 10-14. Netlist fails to show otherwise.

*First*, Netlist mischaracterizes its pre-stay claim construction arguments for the "operatively coupled" limitation. At the time, Netlist argued that the *Phillips* construction required nothing more than a generic functional relationship between components. Dkt. 48 at 1, 19. Now, however, Netlist argues that a person of ordinary skill in the art would understand the term—as recited in the original claims—is much narrower and requires the PLL device to transmit specific clock signals to the logic element, register, and memory devices. Opp. at 11. That argument should be rejected because Netlist does not identify any evidence in the original claims or specification of the '912 Patent that would limit the "operatively coupled" limitation to a specific arrangement where the PLL transmits clock signals to the logic element, register, and memory devices. *Id*. Indeed, the specification is broad enough to cover embodiments where one or more of those components receive clock signals from an external source—a point Dr. Annavaram did not dispute. Ex. 3 at 86:24-87:1.

*Second*, Netlist mischaracterizes the record of the reexamination proceedings to argue that its statements to the PTO did not narrow the scope of the "operatively coupled" limitation. Opp. at 9-10. Netlist contends that it "put forth its interpretation" of the limitation at the "outset" of the proceedings. *Id*. But that is not what happened. Dkt. 155-10 at 41-42; Dkt. 195 at 10-13. Netlist argued for a narrower definition of "operatively coupled" only *after* the examiner rejected the claims. *Id*. The examiner found that Amidi met the "operatively coupled" limitation because its

---

[7] The quoted passage from *Marine Polymer* is, of course, consistent with Federal Circuit precedent explaining that prosecution history disclaimer—including through argument—is a fundamental precept of claim construction that "promotes the public notice function" and "narrows the meaning of the claim consistent with the scope of the claims surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013).

12   CASE NO. 4:09-CV-05718-SBA
GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ABSOLUTE INTERVENING RIGHTS

logic element and PLL device shared a clock signal and worked together to transmit control signals to a plurality of memory devices. *Id*. Netlist disagreed and argued for a narrower definition that required the PLL device to "control the operation of the logic element" by clocking it "directly or indirectly." *Id*.

Thus, prior to the reexamination proceedings, Netlist argued for a broad ordinary meaning construction of "operatively coupled" that simply required the PLL to "functionally cooperate with" the logic element—which the Amidi reference disclosed. During reexamination, however, Netlist argued for a narrower definition that required the PLL to "control the operation" of the logic element by directly or indirectly clocking it. Dkt. 195 at 10-13. Those arguments narrowed the scope of the claims through definitional statements and disclaimer. *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 679 (Fed. Cir. 2015); *Tech. Props. Ltd. LLC v. Huawei Techs Co., Ltd.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017).

*Third*, Netlist asks the Court to disregard its narrowing arguments because the examiner did not accept its definition of "operatively coupled." Opp. at 10. The case law Netlist relies on, however, involved the PTO expressly rejecting the patentee's definition. *Galderma Labs., L.P. v. Amneal Pharms. LLC*, 806 F. App'x 1010, 1011 (Fed. Cir. 2020) (*non-precedential*); *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 866 (N.D. Cal. 2019). That did not happen here. The examiner never addressed—let alone expressly rejected—Netlist's proposed definition for the "operatively coupled" limitation. Dkt. 197-4 at 18-20. And Netlist never withdrew its definition or argued for a broader understanding. The facts here are also distinguishable because the claims of the '912 Patent were ultimately allowed. Dkt. 155-5. In *Power Integrations*, the court explained that prosecution history disclaimer "is meant to hold patentees to the arguments they make to secure *allowed* claims, not rejected claims." 396 F. Supp. 3d at 865. Thus, the court declined to hold the patentee to the definition it relied on during *inter partes* review, because the PTO expressly rejected that definition and rejected the claims as a result. *Id*. Here, Netlist relied on its definition of "operatively coupled" to secure allowance of the claims, which were ultimately allowed by the PTO. In these circumstances, the public notice function of prosecution disclaimer binds Netlist to its definitional statements and narrows the scope of the claims. *Biogen*, 713 F.3d at 1095; *X One,*

*Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1044 (N.D. Cal. 2020) (declining to extend *Power Integrations* and finding disclaimer for allowed claims).[8]

### C. Netlist Substantively Changed the Scope of Claim 16 Under *Honeywell*

Netlist argues that amending a claim from dependent to independent form does not surrender claim scope. Opp. at 6. But that argument—and the cases Netlist relies on—are irrelevant because they do not address the circumstances at issue in *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004) (*en banc*) ("*Honeywell I*"), which involved facts analogous to those here. Dkt. 195 at 15-18. In *Honeywell I*, the Federal Circuit expressly rejected the argument that amending a dependent claim to independent form cannot change its content or scope. 370 F.3d at 1141, 1147. The court explained that if a dependent claim is amended to incorporate the limitations of the original independent claim, and the original claim is canceled, then the patentee has effectively admitted it was not entitled to the scope of the original claim. *Id*. at 1143. The same rationale applies to this case. The examiner rejected the original version of independent claim 15 and, in response, Netlist amended dependent claim 16 to incorporate the limitations of claim 15. Dkt. 156-8 at 9. Netlist then made several substantive amendments to claim 15, such that it was narrower in scope than its original form. Dkt. 155-9 at 47-49, 51. Through those amendments, Netlist—like Honeywell—conceded that it was not entitled to the original scope of the claimed subject matter. *Honeywell I*, 370 F.3d at 1143-44.

Netlist's response to *Honeywell I* relies on the same arguments presented in its partial motion for summary judgment—*i.e.*, that the doctrine of equivalents is inapplicable to intervening rights and extends only to insubstantial differences. Opp. at 7. As Google explained in its opposition to that motion, those arguments rely on non-controlling and inapposite case law that cannot overcome the Federal Circuit's rationale in *Honeywell I*, and that mischaracterize the requirement for a substantive change in the context of intervening rights. Dkt. 195 at 16-18.

---

[8] The fact that Netlist relied on further arguments and amendments to secure allowance of the claims does not limit the scope of its disclaimer with respect to the "operatively coupled" limitation. *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361-62 ("In such cases, we have held the patentees to the scope of what they ultimately claim, and we have not allowed them to assert that claims should be interpreted as if they had surrendered only what they had to.").

### III. NETLIST DOES NOT GENUINELY DISPUTE GOOGLE'S EVIDENCE CONCERNING ITS PURCHASE AND USE OF THE ACCUSED PRODUCTS

Rather than disputing the detailed documentary evidence and witness testimony Google presented in its motion, Mot. at 18-24, Netlist puts forward three undeveloped and unsupported arguments that should be rejected as a matter of law. Opp. 24-25.

*First*, Netlist argues that the intervening rights period should stop when the Federal Circuit affirms the PTO's reexamination decision. That argument is not credible. The applicable statute explicitly provides that amended or new claims are not part of the patent until the PTO issues a reexamination certificate, and that the intervening rights period for any such claims runs until the date the certificate issues. 35 U.S.C. § 316 (pre-AIA); *Marine Polymer*, 672 F.3d at 1362.

*Second*, Netlist argues that Google's motion does not identify all of the accused products, and in particular 8-Rank and 16-Rank memory modules. Opp. at 24. That argument ignores the fact that Netlist's operative infringement contentions are limited to 4-Rank memory modules, with no allegations against 8-Rank or 16-Rank products. Dkt. 154-8 at 1-2. Those contentions govern the scope of the accused products, and Google was entitled to rely on the contentions when it submitted its opening brief on intervening rights. Netlist has never asked the Court for leave to amend to accuse 8-Rank or 16-Rank products, and Netlist cannot do so now in an effort to avoid summary judgment.

*Third*, Netlist argues that the purchase orders and inventory data Google presented in its motion are insufficient to show that certain products were used or purchased in the United States. That argument is irrelevant. Google provided detailed and comprehensive evidence to show the purchase and inventory data for every accused memory module it has purchased or used. To the extent certain products were purchased or used outside of the United States, they cannot be accused of infringement in the first place. 35 U.S.C. § 271(a).

### IV. CONCLUSION

For the foregoing reasons and those set forth in its opening motion, Google requests that the Court grant summary judgment on the issue of absolute intervening rights for products that Google purchased and used in the United States prior to February 8, 2021.

| | | |
|---|---|---|
| DATED: September 21, 2021 | | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| | By | /s/ *David Perlson* <br> David Perlson |

David Perlson (CA Bar No. 209502)
davidperlson@quinnemanuel.com
Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Jared Newton (admitted *pro hac vice*)
jarednewton@quinnemanuel.com
Deepa Acharya (CA Bar No. 267654)
deepaacharya@quinnemanuel.com
Sandy Shen (admitted *pro hac vice*)
sandyshen@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Catlin Williams (CA Bar No. 336464)
catwilliams@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Defendant Google LLC*