Exhibit 5

# (CORRECTED) EX. 1 ATTACHED TO NETLIST'S OPPOSITION TO DEFENDANT'S MOTION TO AMEND ANSWER AND COUNTERCLAIMS

1  QUINN EMANUEL URQUHART & SULLIVAN LLP

2  David Perlson (CA Bar No. 209502)               Jared Newton (admitted pro hac vice)
   davidperlson@quinnemanuel.com                   jarednewton@quinnemanuel.com
3  Jonathan Tse (CA Bar No. 305468)                Sandy Shen (admitted pro hac vice)
   jonathantse@quinnemanuel.com                    sandyshen@quinnemanuel.com
4  50 California Street, 22nd Floor                1300 I Street NW, Suite 900
   San Francisco, CA 94111                         Washington, D.C. 20005
5  Telephone: (415) 875-6600                       Telephone: (202) 538-8000
   Facsimile: (415) 875-6700                       Facsimile: (202) 538-8100
6
   Catlin Williams (CA Bar No. 336464)
7  catwilliams@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor Redwood
8  Shores, CA 94065
   Telephone: (650) 801-5000
9  Facsimile: (650) 801-5100

10 *Attorneys for Google Inc.*

11                          UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

13 NETLIST, INC.,                              CASE NO. 4:09-cv-05718-SBA
14              Plaintiff,                      [Related to Case No: CV08-04144 SBA]

15       vs.                                    **DEFENDANT GOOGLE LLC'S SECOND
                                                SUPPLEMENTAL OBJECTIONS AND
16 GOOGLE INC.,                                 RESPONSES TO PLAINTIFF NETLIST,
                                                INC.'S INTERROGATORY NO. 3**
17              Defendant.

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Google LLC

2   ("Google") hereby objects and responds in writing to Netlist, Inc.'s ("Netlist" or "Plaintiff")

3   Interrogatory No. 3 ("Interrogatory"). These formal objections and responses are supplemental to any

4   communications already exchanged between the parties regarding the above-referenced notice.

5                              **GENERAL OBJECTIONS**

6    Google makes the following general objections to each and every definition and instruction, in

7   Netlist's Interrogatory. Each of these objections is incorporated into the Specific Objections set forth

8   below, whether or not separately set forth therein. By responding to any of the interrogatories or

9   failing to specifically refer to or specify any particular General Objection in response to a particular

10  interrogatory, Google does not waive any of these General Objections, nor admit or concede the

11  appropriateness, relevance, materiality, or admissibility in evidence of any purported interrogatory or

12  any assumptions contained therein.

13       1.    Google objects to each Interrogatory, and to the Definitions, to the extent that they

14  purport to impose any obligations upon Google beyond the Federal Rules of Civil Procedure and the

15  Local Rules of the United States District Court for the Northern District of California, and the Court's

16  orders regarding limits on discovery in this Litigation.

17       2.    Google objects to the definitions of "Google," "You," and "Your" on the grounds that

18  the definitions are overbroad, unduly burdensome, and vague, including, but not limited to, the extent

19  that they include all past or present divisions, departments, parents, subsidiaries, affiliates,

20  partnerships, joint ventures, predecessors or successors thereof, and all past and present officers,

21  directors, employees, agents, representatives, consultants, managers, partners, or attorneys thereof.  In

22  answering this Interrogatory, Google will interpret these terms to mean Defendant Google LLC.

23       3.    Google objects to the definitions of "Asserted Patent" or "'912 Patent" as overly broad

24  and unduly burdensome to the extent it refers to the original, invalid claims or claims not asserted by

25  Netlist against Google. Google will interpret these terms to mean U.S. Patent No. 7,619,912 as it

26  existed on the day Netlist served this Interrogatory on Google.

27       4.    Google objects to the definition of "Memory Module" as overly broad, unduly

28  burdensome, and vague, as it would encompass Google products that are either not accused by Netlist

or not relevant to the issue of intervening rights based on Netlist's June 18, 2021 Amended Infringement Contentions and given what is accused.

5.      Google objects to the definition of "Standard" as overly broad, unduly burdensome, and vague, as it would encompass technology standards that are either not accused by Netlist or not relevant to the issue of absolute intervening rights based on Netlist's June 18, 2021 Amended Infringement Contentions and given what is accused. Google will interpret "Standard" to mean the body of standards developed and published by the JEDEC Solid State Technology Association.

6.      Google objects to the definition of "Person" as overly broad, unduly burdensome, and vague to the extent that the definition exceeds the scope of the documents set forth in the Federal Rules of Civil procedure, the Local Rules of the Northern District of California, or the rules of this Court.

7.      Google objects to the definition of "Document" as overly broad, unduly burdensome, and vague to the extent that the definition exceeds the scope of the documents set forth in the Federal Rules of Civil procedure, the Local Rules of the Northern District of California, or the rules of this Court.  Google will interpret "Document" to mean "documents or electronically stored information" as those terms are used in the Federal Rules of Civil Procedure, subject to any ESI Order entered in this case.

8.      Google objects to each Interrogatory to the extent they request Google to provide "all" or "any" information about a particular subject as overly broad and unduly burdensome, seeking information, documents, and/or things that are neither relevant nor proportional to the needs of the case.

9.      Google objects to each Interrogatory to the extent that they are tailored to seek information protected by the attorney-client privilege, the work product doctrine, or the common interest doctrine, or that is otherwise privileged or protected from discovery.

10.      Google objects to each Interrogatory to the extent that they seek information that is not relevant to the subject matter of this action and is not proportional to the needs of the case.

11.      Google objects to each Interrogatory to the extent that they are overbroad, unduly burdensome, vague, and/or ambiguous.

12.     Google objects to each Interrogatory to the extent that it uses words in a manner inconsistent with or unsupported by the plain language of the word.  To the extent possible, Google and its representatives will apply a reasonable interpretation based on the plain meaning of the words used.

13.     Google objects to each Interrogatory to the extent that they seek information that does not already exist, or that is not in Google's possession, custody, or control.

14.     Google objects to each Interrogatory to the extent that they require Google to provide information beyond what is available to Google at present from a reasonable search of its own files likely to contain relevant or responsive documents and from a reasonable inquiry of its present employees.

15.     Google objects to each Interrogatory to the extent that it seeks information protected by privacy law and/or policy.

16.     Google objects to each Interrogatory to the extent that they seek information that Google is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

17.     Google objects to each Interrogatory to the extent that they are unlimited in time or otherwise not limited to a time frame relevant to this litigation or the issue of intervening rights, and therefore burdensome, oppressive, overly broad, and not proportional to the needs of the case.  The relevant scope of discovery at this stage is limited to intervening rights and as Google has informed Netlist, Google is pursuing absolute intervening rights for its briefing on intervening rights currently due July 16, 2021.  To the extent Google agrees to produce a witness on other issues, it will amend its responses and objections as appropriate when discovery is no longer limited to the issue of absolute intervening rights.

18.     Google objects to each and every Interrogatory to the extent that they call for a legal conclusion.

19.     Google objects to each and every Interrogatory to the extent that they call for information that is publicly available and therefore equally accessible to Netlist as it is to Google.

20.     Google objects to the instruction in paragraph 16 that "[a]ll Interrogatories must be answered fully and in writing in accordance with Rules 11 and 33 of the Federal Rules of Civil Procedure.  Google will respond to the Interrogatories in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the rules of this Court.

21.     Google objects to the instruction in paragraph 18 that "[w]here knowledge or information in Your possession is requested, the request extends to knowledge or information in the possession of Your predecessors and/or successors, as well as to information in the possession of Your officers, directors, agents, employees, representatives and, unless privileged, attorneys. Whenever an answer to these Requests contains information which is not based upon Your personal knowledge, state the source and nature of such information."  Google will respond to the Interrogatories in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the rules of this Court.

22.     Google objects to the instruction in paragraph 21 that "[i]f, in responding to any Interrogatory, You elect to produce business records pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, specify the particular records from which the answer may be derived or ascertained in sufficient details to permit Netlist to locate and identify the precise pages or records from which the answer may be ascertained as readily as You may ascertain such an answer."  Google will respond to the Interrogatories in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the rules of this Court.

23.     Google objects to the instruction in paragraph 22 that "[i]f You do not answer any Interrogatory in full, state the precise reason for failing to do so. If a legal objection is made, set forth the specific nature of the grounds for the objection. If only a portion of any Interrogatory cannot or will not be answered, (i) provide a full answer to the remaining portion; and (ii) specifically set forth (a) the fact that the answer is incomplete and (b) the reasons or grounds for any omission or for Your inability or refusal to complete the answer. If an Interrogatory can be answered only in part on the basis of information available at the time of the response, (i) provide an answer on the basis of that information; (ii) indicate that Your answer is so limited; and (iii) provide a further response, in accordance with these Instructions, when further information becomes available."  Google will

respond to the Interrogatories in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the rules of this Court.

24.     Google objects to the instruction in paragraph 23 that "[i]f You contend that any Interrogatory seeks information, in whole or in part, that is protected by a legal privilege or other doctrine which precludes disclosure thereof, identify the legal privilege and/or doctrine with particularity, including all supporting facts and each person having knowledge of the factual basis for the assertion."  Google will respond to the Interrogatories in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the rules of this Court.

25.     Google objects to the instruction in paragraph 24 that "[i]f any document referred to in Your responses to these Interrogatories was, but is no longer, in Your possession, custody, or control, state that disposition was made with each document and when such disposition was made. In the event that any Document or thing or portion thereof called for by this set of requests is known to have been lost or destroyed (either as a result of a Document destruction policy or otherwise), provide a written statement setting forth the following information for each such item: (1) the nature of the item (e.g. letter, memorandum, chart, engineering drawing, etc.); (2) the identity of each sender(s), author(s), and recipient(s) of the item whether indicated as such or not on the item; (3) the date that the item was created, or if there is no record of this information, the approximate date; (4) a description of the subject matter of the item; (5) if the item is a Document, the number of pages; (6) information regarding whether any attachments or appendices to the item exist or existed, along with a description of any such attachments or appendices; and (7) the circumstances of the loss or destruction of the item including the date of destruction or loss, the identity of the Person(s) who lost or destroyed the item, and if the item was destroyed, the identity of the Person(s) who authorized the destruction."  Google will respond to the Interrogatories in accordance with the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and the rules of this Court.

26.     Google objects to the instruction in paragraph 25 that "[y]ou are required to supplement or amend Your responses to these Interrogatories as the need arises pursuant to Rule 26 of the Federal Rules of Civil Procedure."  Google will respond to the Interrogatories in accordance with the Federal

1 Rules of Civil Procedure, the Local Rules of the Northern District of California, and the rules of this

2 Court.

### SPECIFIC OBJECTIONS AND REPONSES

3

4 **INTERROGATORY NO. 3:**

5   If You contend that You are entitled to intervening rights with respect to any of the claims of

6 the '912 Patent, including separately claim 16, state the full factual and legal basis for Your

7 contention, including any Documents, materials, evidence, and witnesses.

8

9 **RESPONSE TO INTERROGATORY NO. 3:**

10   In addition to the General Objections stated above, Google objects to this interrogatory

11 because it requests information that is inconsistent with the Court's Case Management Order (D.I.

12 117). While this case was stayed, the patent-in-suit underwent *inter partes* reexamination, resulting in

13 a reexamination certificate issued on February 8, 2021 that narrowed or canceled all asserted claims.

14 When this case resumed, the Court requested a Joint Case Management Statement (D.I. 115). In that

15 Statement, the parties agreed "it would be an efficient first step to resolve the question of what

16 intervening rights exist with respect to the claims of the '912 patent, if any." D.I. 115 at 3.

17 Accordingly, the parties requested, and the Court granted, a staged resumption of this case where

18 Netlist would first serve amended infringement contentions and then the parties would brief

19 intervening rights. D.I. 115 at 5-6; D.I. 117. Other deadlines, if needed, would follow the Court's

20 intervening rights determination. *See id.* Although plaintiffs in this jurisdiction are generally required

21 to present infringement contentions before receiving detailed technical product discovery from the

22 defendant (*see* Patent Local Rule 3-1, 3-4), Netlist requested early "targeted discovery" on "the nature

23 of the memory modules currently used by Google." D.I. 115 at 3. Google stated that it was "open to

24 limited discovery in the form of a targeted interrogatory directed to the identification of memory

25 module classes (e.g., FBDIMMs, etc.) and generations (e.g., DDR, DDR2, etc.) Google currently

26 uses." *Id.* at 4. Consistent with traditional practice in this jurisdiction, Google then objected—and

27 maintains its objection—to "any broader scope of technical discovery before Google has notice of

28 [Netlist's] infringement allegations." *Id.*

1    The parties conferred on the scope of Netlist's targeted discovery. Netlist requested the

2    following (quoting from an e-mail from Netlist's counsel):

3        What types of memory modules is Google currently making, having made, and/or

4        purchasing?

5        Are FBDIMMs among the current modules Google is making, having made, and/or

6        purchasing?

7            If yes, building, buying, or both? By/from whom?

8                What is the rough volume of FBDIMMs currently in use?

9            If no active make/buy, is Google is still using FBDIMMs?

10               If yes, what is the rough volume of FBDIMMs currently in use?

11               If no, when did such use cease?

12   Google agreed to respond to these questions. Google gathered responsive information, but

13   before it had an opportunity to provide that information, new counsel for Netlist entered an

14   appearance in this case. D.I. 131. The next business day, Netlist's new counsel served these

15   interrogatories, which go well beyond the scope of the discovery the parties discussed and agreed to

16   before the Case Management Conference, and also go beyond the agreement the parties reached

17   regarding the appropriate scope of Netlist's limited early discovery. Google offered to provide

18   expedited responses to the questions Netlist previously said it needed answered if it would withdraw

19   the current interrogatories and serve new interrogatories of the scope the parties previously agreed

20   were appropriate. Netlist declined to do so.

21   Google, therefore, objects to this interrogatory to the extent it (1) exceeds the scope of the

22   limited, early discovery Netlist represented to the Court it would seek in the Joint Case Management

23   Statement, (2) exceeds the scope of discovery Google agreed it was open to providing in the Joint

24   Case Management Statement, and (3) exceeds the scope of discovery the parties agreed to after

25   conferring over the appropriate scope. Google's specific positions on intervening rights cannot be

26   determined until Netlist has provided infringement contentions defining the full scope of products at

27   issue in this case.

28

1   Google also objects to this interrogatory as premature under the Procedural Schedule (D.I.

2   117). Netlist has not yet identified which of its originally-asserted claims remain asserted, nor has it

3   identified the accused products. Because the scope of intervening rights depends at least in part on the

4   nature of the asserted claims and accused products, it is both premature and inefficient to ask Google

5   to broadly identify intervening rights for all of Google's products and all potentially asserted claims.

6   The Procedural Schedule the Court adopted here provides that Netlist will first identify the asserted

7   claims and accused products. The parties will then brief intervening rights with respect to those claims

8   and products. Google objects to Netlist's attempt to disregard the staged schedule that the parties

9   jointly requested and the Court adopted in this case.

10   Google objects to this interrogatory as seeking irrelevant information to the extent it is seeking

11   information related to invalidated versions of the '912 patent's claims and non-asserted claim 16.

12   Google further objects to this interrogatory as seeking material protected by attorney-client

13   privilege or work product immunity, or which may only be answered by reliance upon any

14   privileged or work-product information, including mental impressions, conclusions, opinions, or

15   legal theories of Google's counsel, experts, or consultants developed with or in anticipation of

16   litigation. For purposes of this response, to the extent reasonably possible, Google has attempted to

17   interpret this interrogatory as not seeking privileged information. Inadvertent reference to

18   privileged information by Google shall not constitute a waiver of any applicable privilege.

19   In response to the non-objectionable portions of this interrogatory, Google responds as

20   follows:

21   Google is entitled to absolute intervening rights for, at least, all asserted claims of the '912

22   patent (1, 3, 4, 6-11, 15, 18-22, 24, 25, 27-29, 31-34, 36-39, 41-45, and 50) for its purchase, use, and

23   continued use of allegedly infringing products deployed into servers or ordered before the

24   reexamination certificate issued (before February 8, 2021) because at least all asserted claims were

25   substantively amended during *inter partes* reexamination.

26   To the extent Netlist accuses memory modules that Google has used or will use after the

27   date of the reexamination certificate, Google is entitled to equitable intervening rights for, at least,

28   all asserted claims of the '912 patent because it made substantial preparations to use these modules

-9-

1   before the date of the reexamination certificate. Google will address the specific accused memory

2   modules and its specific substantial preparations in the upcoming briefing on intervening rights,

3   after Netlist identifies the asserted claims and accused products.

4          Google will provide additional information at the appropriate time under the Court's

5   Procedural Schedule.

6   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3 (JULY 2, 2021)**

7          Google incorporates by reference its prior objections and responses to this Interrogatory. As

8   the parties discussed, Google's July 2 supplemental response addresses the issue of absolute

9   intervening rights only; Google will supplement its response with respect to equitable intervening

10  rights in accordance with the parties' agreement.  Subject to and without waiving the foregoing

11  objections, Google supplements its response to Interrogatory No. 3 as follows:

12         Netlist has asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 16, 18-20, 22, 24, 27, 28, 29, 31, 32, 34, 36,

13  37, 38, 39, 40, 41, 43, 45-47, 50, 52-60, 62-65, 69-75, 77, and 80-91 of the '912 Patent (the "Asserted

14  Claims").  *See* Netlist's June 18, 2021 Amended Infringement Contentions at 1.  Each of the Asserted

15  Claims is subject to the defense of intervening rights as detailed below.

16  ***Each Asserted Claim Was Amended or Added During Re-examination***

17         The defense of intervening rights applies to claims that were amended or added during re-

18  examination.  *See Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1364 (Fed. Cir. 2012)

19  (*en banc*) ("Section 307(b) governs intervening rights arising from *ex parte* reexamination and

20  specifies that only 'amended or new' claims incorporated into a patent during reexamination 'will

21  have the same effect as that specified in section 252,' *i.e.,* will be susceptible to intervening rights.");

22  *see also id*. at 1362, n. 8 (explaining that the same requirement applies for *inter partes* reexamination).

23  Each of the asserted claims satisfies this threshold requirement.

24         First, claims 1, 15, 16, 28, 39, and 43 were amended during re-examination and are therefore

25  subject to intervening rights.  *See* February 8, 2021 *Inter Partes* Reexamination Certificate at 1

26  ("Claims 1, 15, 16, 28, 39, and 43 are determined to be patentable as amended.").  These amendments

27  are shown in the table below:

28

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | A memory module connectable to a computer system, the memory module comprising: | A memory module connectable to a computer system, the memory module comprising: |
| | a printed circuit board; | a printed circuit board; |
| | a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks; | a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks; |
| | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input control signals corresponding to a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals corresponding to the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a first command signal and the set of input control signals from the computer system by generating and transmitting a second command signal and the set of output control signals to the plurality of memory devices, the first command signal and | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input control signals corresponding to a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals corresponding to the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a first command signal and the set of input control signals from the computer system by generating and transmitting a second command signal and the set of output control signals to the plurality of memory devices, the first command signal and the set of input control signals corresponding to |

the set of input control signals corresponding to the second number of ranks and the second command signal and the set of output control signals corresponding to the first number of ranks; and

a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register.

the second number of ranks and the second command signal and the set of output control signals corresponding to the first number of ranks; and

a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,

*wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,*

*wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row-column address signals and the bank address signals, and (iii) transmits the buffered plurality of row-column address signals and the buffered bank address signals to the plurality of DDR memory devices, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row-column address signals received by the register are separate from the at least one row address signal received by the logic element, and*

*wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.*

███████████████

| | | | |
|---|---|---|---|
| 1 | 15 | A memory module connectable to a computer system, the memory module comprising: | A memory module connectable to a computer system, the memory module comprising: |
| | | a printed circuit board; | a printed circuit board; |
| | | a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks; | a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks; |
| | | a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and | a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and |
| | | a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled | a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled |

| | | | |
|---|---|---|---|
| 1 | | to the plurality of DDR memory devices, the logic element, and the register. | to the plurality of DDR memory devices, the logic element, and the register, |
| 2 | | | |
| 3 | | | *wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,* |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | *wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row/column address signals and the bank address signals, and (iii) transmits the buffered plurality of row/column address signals and the buffered bank address signals to the at least one DDR memory device of the selected one or two ranks of the first number of ranks, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element, and* |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.* |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | 16 | The memory module of claim 15, wherein the command signal is transmitted to only one DDR memory device at a time. | *[The memory module of claim 15,] A memory module connectable to a computer system, the memory module comprising:* |
| 26 | | | |
| 27 | | | *a printed circuit board;* |
| 28 | | | |

| | | |
|---|---|---|
| 1 | | |
| 2 | | *a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;* |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | *a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and* |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | *a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,* |
| 25 | | |
| 26 | | |
| 27 | | wherein the command signal is |
| 28 | | transmitted to only one DDR memory |

| 1 | | | device at a time. |
|---|---|---|---|
| 2 | 28 | memory module connectable to a computer system, the memory module comprising: | memory module connectable to a computer system, the memory module comprising: |
| | | a printed circuit board; | a printed circuit board; |
| | | a plurality of double-data-rate (DDR) dynamic random-access memory (DRAM) devices coupled to the printed circuit board, the plurality of DDR DRAM devices having a first number of DDR DRAM devices arranged in a first number of ranks; | a plurality of double-data-rate (DDR) dynamic random-access memory (DRAM) devices coupled to the printed circuit board, the plurality of DDR DRAM devices having a first number of DDR DRAM devices arranged in a first number of ranks; |
| | | a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising a row/column address signal, bank address signals, a chip-select signal, and an input command signal, the set of input control signals configured to control a second number of DDR DRAM devices arranged in a second number of ranks, the second number of DDR DRAM devices smaller than the first number of DDR DRAM devices, the second number of ranks smaller than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals comprising an output command signal, the set of output control signals configured to control the first number of DDR DRAM devices arranged in the first number of ranks, wherein the circuit further responds to the set of input control signals from the computer system by selecting at least one rank of the first number of ranks and transmitting the set of output control signals to at least | a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising a row/column address signal, bank address signals, a chip-select signal, and an input command signal, the set of input control signals configured to control a second number of DDR DRAM devices arranged in a second number of ranks, the second number of DDR DRAM devices smaller than the first number of DDR DRAM devices, the second number of ranks smaller than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals comprising an output command signal, the set of output control signals configured to control the first number of DDR DRAM devices arranged in the first number of ranks, wherein the circuit further responds to the set of input control signals from the computer system by selecting at least one rank of the first number of ranks and transmitting the set of output control signals to at least one DDR DRAM device of the |

-16-

| | | | |
|---|---|---|---|
| 1 | | one DDR DRAM device of the selected at least one rank; and | selected at least one rank; and |
| 2 | | | |
| 3 | | a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR DRAM devices, the logic element, and the register. | a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR DRAM devices, the logic element, and the register, |
| 4 | | | |
| 5 | | | |
| 6 | | | *wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR DRAM memory devices, the logic element, and the register,* |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | *wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row/column address signals and the bank address signals, and (iii) transmits the buffered plurality of row/column address signals and the buffered bank address signals to the at least one DDR DRAM device of the selected at least one rank, wherein the row/column address signal received by the logic element comprises a row address signal received by the logic element, and wherein the plurality of row/column address signals received by the register are separate from the row address signal received by the logic element, and* |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the row address signal, (ii) the bank address signals, and (iii) the chip-select signal of the set of input control signals and (iv) the PLL clock signal.* |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | 39 | A memory module connectable to a computer system, the memory module | A memory module connectable to a computer system, the memory module |
| 28 | | | |

| comprising: | comprising: |
|---|---|
| a printed circuit board having a first side and a second side; | a printed circuit board having a first side and a second side; |
| a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, each DDR memory device comprising one or more banks, the plurality of DDR memory devices arranged in two or more ranks which are selectable by a first number of chip-select signals; and | a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, each DDR memory device comprising one or more banks, the plurality of DDR memory devices arranged in two or more ranks which are selectable by a first number of chip-select signals; and |
| at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals, column address signals, bank address signals, command signals, and a second number of chip-select signals less than the first number of chip-select signals, wherein the logic element receives the bank address signals and at least one command signal of the plurality of input signals, the at least one integrated circuit element generating a plurality of output signals in response to the plurality of input signals, the plurality of output signals comprising row address signals, column address signals, bank address signals, command signals, and the first number of chip-select signals, the at least one integrated circuit element further responsive to the plurality of input signals by selecting at least one rank of the two | at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals, column address signals, bank address signals, command signals, and a second number of chip-select signals less than the first number of chip-select signals, wherein the logic element receives *at least one row address signal,* the bank address signals, *at least one chip-select signal,* and at least one command signal of the plurality of input signals, the at least one integrated circuit element generating a plurality of output signals in response to the plurality of input signals, the plurality of output signals comprising row address signals, column address signals, bank address signals, command signals, and the first number of chip-select signals, the at least one integrated circuit element further responsive to the plurality of input signals by selecting at least one rank of |

| | | or more ranks and transmitting the plurality of output signals to at least one DDR memory device of the selected at least one rank. | the two or more ranks and transmitting the plurality of output signals to at least one DDR memory device of the selected at least one rank,<br><br>*wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,*<br><br>*wherein, the register (i) receives, from among the plurality of input signals, and (ii) buffers, in response to the PLL clock signal, the bank address signals and a plurality of the row address signals, and (iii) transmits the buffered bank address signals and the buffered row address signals to the at least one DDR memory device of the selected at least one rank, and wherein the plurality of the row address signals received by the register are separate from the at least one row address signal received by the logic element, and*<br><br>*wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the plurality of input signals and (iv) the PLL clock signal.* |
| 43 | The memory module of claim 42, wherein the logic element receives the second number of chip-select signals. | The memory module of claim [42] *39*, wherein the logic element receives the second number of chip-select signals. |

Second, claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36, 37, 38, 40, 41, 45-48, and 50 depend on a claim that was amended during re-examination and thus incorporate those amendments by dependency and are subject to intervening rights. *See id.* ("Claims 3, 4, 6, 8, 10-14, 17-20, 22, 24, 27, 29, 31, 32, 34-38, 40, 41 and 45-50, dependent on an amended claim, are

1    determined to be patentable.").  Specifically, claims 3, 4, 6, 8, 10, and 11 depend directly or

2    indirectly from claim 1, which was amended as shown above; claims 18-20, 22, 24, and 27 depend

3    directly or indirectly from claim 15, which was amended as shown above; claims 29, 31, 32, 34,

4    36, 37, and 38 depend directly or indirectly from claim 28, which was amended as shown above;

5    and claims 40, 41, 45-48, and 50 depend from claim 39, which was amended as shown above.

6         Third, claims 52-60, 62-65, 69-75, 77, and 80-91 were added during re-examination and

7    thus are "new claims" subject to intervening rights.  *See id*. ("New claims 52-91 are added and

8    determined to be patentable.").

9    ***Each Asserted Claim Had Its Scope Substantively Changed During Re-examination***

10        "The doctrine of intervening rights first developed as courts recognized that permitting

11   substantive changes to the scope of patent claims through post-issuance procedures left 'the door ...

12   open for gross injustice' where a third party, having already begun to make, use, or sell a given article,

13   finds its previously lawful activities rendered newly infringing under a modified patent."  *Marine*

14   *Polymer*, 672 F.3d at 1361 (citing *Sontag Chain Stores Co. v. Nat'l Nut Co.,* 310 U.S. 281, 293-95, 60

15   S.Ct. 961, 84 L.Ed. 1204 (1940)); *see also* 35 U.S.C. § 252.  "[I]n determining whether substantive

16   changes have been made, we must discern whether the *scope* of the claims are identical, not merely

17   whether different words are used."  *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348  (Fed. Cir.

18   1998) (finding that the scope of the claims was substantively changed during re-examination because

19   "the original claims appear to cover a printer or method of printing which generates *any* quality of

20   alphanumeric characters, while the amended claims seem to cover only a printing apparatus or method

21   of printing which generates  *'type quality'* alphanumeric characters") (emphasis in original); *see also*

22   *Marine Polymer*, 672 F.3d at 1365 (explaining that "patent applicants' actions and arguments during

23   prosecution, including prosecution in a reexamination proceeding, can affect the proper interpretation

24   and effective scope of their claims").

25        As detailed below, asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 16, 18-20, 22, 24, 27, 28, 29, 31, 32,

26   34, 36, 37, 38, 39, 40, 41, 43, 45-47, and 50 of the '912 Patent were subject to significant amendments

27   and arguments during reexamination in order to overcome the prior art. These amendments and

28

1   arguments had the effect of substantively changing the scope of those claims and therefore the claims

2   are subject to intervening rights.

3          Asserted claims 52-60, 62-65, 69-75, 77, and 80-91 were all newly added to the '912 Patent

4   during reexamination in order to overcome the prior art and include the same or substantially same

5   limitations as those added to the amended claims.  Thus, the new claims are not identical to the

6   original claims and are subject to intervening rights.  *See* 35 U.S.C. §§ 252, 307(b); *see also Seattle*

7   *Box Co. v. Indus. Crating & Packing*, 731 F.2d 818, 828 (Fed. Cir. 1984) ("With respect to new or

8   amended claims, an infringer's liability commences only from the date the reissue patent is issued.").

9   **The Applicant Substantively Changed the Scope of the Claims with Respect to the Phase-Lock Loop Device Limitation**

10         Original claims 1, 15, 28, and 39 required "a phase-lock loop device mounted to the printed

11  circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices,

12  the logic element, and the register."  During re-examination, the applicant added limitations that

13  impose additional requirements on the phase-lock loop (PLL) device, including the requirement that it

14  transmits a PLL clock signal to the plurality of memory devices, the logic element, and the register,

15  and that both the register and the logic element perform specific functions in response to the PLL

16  clock signal.  The amendments to claim 1, reproduced below, are representative:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register. | a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register, *wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register, wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, ...* |

| | | *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to ... the PLL clock signal.* |
|---|---|---|

These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the PLL was not limited by the specific function of transmitting a PLL clock signal and causing the register and logic element to perform respective functions in response to that signal.  *See* Aug. 1, 2016 Resp. at 2-3.  Notably, the patentee identified "Phase Lock Loop (PLL) Device" as a "principle amendment[] to overcome the new grounds of rejection."  *Id.* at 47, 48.  The patentee further stated that "[t]o address the Board's rejection" that "the combination of Amidi and Dell 2 teaches or suggests generating a chip-select, CAS, or rank selecting signal in response to a bank address signal," "Patent Owner narrowed the claim to include" the amended PLL device limitation.  *Id.* at 50-51 (distinguishing Amidi because it "transmits a PLL clock signal to the register and memory, but not to the CPLD.  Thus, Amidi does not disclose the PLL device transmitting the PLL clock to the logic element; the output of PLL 606 is neither directly nor indirectly transmitted to the CPLD 604.") (emphases in original).  Claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-48, 50, 52-60, 62-65, and 69-75 depend from one of claims 1, 15, 28, and 39, and therefore include the same substantive change in claim scope.  Claims 77 and 80-91 recite substantially the same limitation and therefore include the same substantive change in claim scope.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the Register Limitation**

Original claims 1, 15, 28, and 39 required a circuit mounted to the printed circuit board, the circuit comprising a logic element and a "register."  During re-examination, the applicant added limitations that impose additional requirements on the register, including that it receives, buffers, and transmits specified signals with specified conditions.  The amendments to claim 1, reproduced below, are representative:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register ... | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register …<br><br>*wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row-column address signals and the bank address signals, and (iii) transmits the buffered plurality of row-column address signals and the buffered bank address signals to the plurality of DDR memory devices, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row-column address signals received by the register are separate from the at least one row address signal received by the logic element, and* |

These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the register was not limited by the specific functions of receiving, transmitting, and buffering signals as recited in the amendment.  *See* Aug. 1, 2016 Resp. at 2-3. Notably, the patentee identified "register" as a "principle amendment[] to overcome the new grounds of rejection." *Id.* at 47. The patentee further stated that "[t]o address the Board's rejection" that "the combination of Amidi and Dell 2 teaches or suggests generating a chip-select, CAS, or rank selecting signal in response to a bank address signal," "Patent Owner narrowed the claim to include" the amended register limitation.  *Id.* at 50, 52-53 (stating that "[t]he claims also require the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element. In other words, in the configuration recited by the claims, the bank address signals are received by the logic element, the register and the plurality of memory devices. Under such circumstances, Amidi does not use bank address signals to generate control signals (and certainly not the bank address signals and the at least one row address signal).").  Claims

3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-48, 50, 52-60, 62-65, and 69-75 depend from one of claims 1, 15, 28, and 39, and therefore include the same substantive change in claim scope.  Claims 77 and 80-91 recite substantially the same limitation and therefore include the same substantive change in claim scope.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the Row / Column Address Signal Limitation**

Original claims 1, 15, and 28 required at least one row/column address signal.  During re-examination, the applicant added limitations that impose additional requirements on the row/column address signal received at the logic element, including that it comprises at least one row address signal received by the logic element and that it is separate from row address signals received by the register. The amendments to claim 1, reproduced below, are representative:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, | the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, ...<br><br>*wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row-column address signals received by the register are separate from the at least one row address signal received by the logic element* |

These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the at least one row/column address signal was not limited by the conditions recited in the amendment.  *See* Aug. 1, 2016 Resp. at 2-3.  The patentee further stated that "[t]o address the Board's rejection" that "the combination of Amidi and Dell 2 teaches or suggests generating a chip-select, CAS, or rank selecting signal in response to a bank address signal," "Patent Owner narrowed the claim to include" the amended row/column address signal limitation.  *Id.* at 50,

52-53 (stating that "[t]he claims also require the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element. In other words, in the configuration recited by the claims, the bank address signals are received by the logic element, the register and the plurality of memory devices. Under such circumstances, Amidi does not use bank address signals to generate control signals (and certainly not the bank address signals and the at least one row address signal).").  Claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 52-60, 62, 63, 64, 65, and 69-72 depend from one of claims 1, 15, and 28, and therefore include the same substantive change in claim scope.  Claims 77 and 80-91 recite substantially the same limitation and therefore include the same substantive change in claim scope.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the Logic Element Signal in Claim 39**

Original claim 39 required a logic element receiving two enumerated signals:  the bank address signal and command signal.  During re-examination, the applicant added limitations that required the logic element to receive "at least one row address signal" and "at least one chip-select signal."  The applicant further amended claim 39 to require that "the row address signals received by the register are separate from the at least one row address signal received by the logic element."  The amendments to claim 39 are shown below:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 39 | at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals... | at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals … <br><br>wherein the logic element receives *at least one row address signal,* the bank |

GOOGLE'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INTERROGATORY NO. 3

| | | address signals, *at least one chip-select signal, and at least one command signal of the plurality of input signals*<br><br>*wherein the plurality of the row address signals received by the register are separate from the at least one row address signal received by the logic element* |
| --- | --- | --- |

These amendments had the effect of substantively changing the scope of claim 39 because, prior to the amendment, the logic element did not have to receive at least one row address signal and at least one chip select signal, and the row address signal received by the logic element did not have to be separate from a row address signal received by a register. *See* Aug. 1, 2016 Resp. at 2-3. Notably, the patentee identified "logic element" as a "principle amendment[] to overcome the new grounds of rejection." *Id.* at 47, 52-53 (stating that "[t]he claims also require the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element. In other words, in the configuration recited by the claims, the bank address signals are received by the logic element, the register and the plurality of memory devices. Under such circumstances, Amidi does not use bank address signals to generate control signals (and certainly not the bank address signals and the at least one row address signal)."). Claims 40, 41, 43, 45-48, 50, and 73-75 depend from claim 39, and therefore include the same substantive change in claim scope. Claims 90-91 recite substantially the same limitation and therefore include the same substantive change in claim scope.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the Logic Element Limitation through Amendments**

Original claims 1, 15, 28, and 39 required a circuit comprising logic element receiving a set of input control signals from the computer system. During re-examination, the applicant added limitations that impose additional requirements on the logic element, including that it "generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.". The amendments to claim 1, reproduced below, are representative:

| Claim | Original Claim Language | Amended Claim Language |
| --- | --- | --- |

| 1 | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, … | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, ... |
|---|---|---|
| | the circuit generating a set of output control signals in response to the set of input control signals, | the circuit generating a set of output control signals in response to the set of input control signals, … |
| | | *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.* |

These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and 39. First, prior to the amendment, the logic element did not have to generate any specific signals. Second, prior to the amendment, neither the logic element or any other feature of the claimed memory module had to generate "column access strobe (CAS) signals or chip-select signals" "in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal." These are entirely new limitations that narrow the scope of the claimed module and specifically the logic element. The applicant's statements during appeal of re-examination proceedings confirm that the above limitations substantively narrowed the scope of the asserted claims. *See, e.g.*, App. Resp. Br. at 11-12 ("Applying the Board's adopted construction of 'in response at least in part to' and similar language, Netlist distinguished its amended claims over prior art that failed to disclose or suggest a logic element responding to all four enumerated signals."); *see also* Aug. 1, 2016 Resp. at 2-3. Notably, the patentee identified "logic element" as a "principle amendment[] to overcome the new grounds of rejection." *Id.* at 47, 52-53 (stating that "[t]he amended claims now also require that the logic element generates certain output control signals (e.g., gated column access strobe (CAS) signals or chip-select signals recited in claim 1) in response at least in part to (i) the at least one row address

1  signal, (ii) the bank address signals, and (ii) the at least one chip-select signal of the set of input

2  control signals and (iv) the PLL clock signal. Amidi's CPLD 604 never receives bank address signals

3  and hence Amidi's control signals cannot be generated based on bank address signals. Instead the

4  control signals . . . are based on the row address signals and chip-select signals. Thus, Amidi does not

5  disclose the CPLD generating the gated CAS signals or chip-select signals in response to the bank

6  address signals. Moreover, since the output of PLL 606 is neither directly nor indirectly transmitted to

7  the CPLD 604, a POSITA would understand that the PLL clock does not control the operation of

8  CPLD 604. Thus, Amidi is further deficient by failing to disclose the CPLD generating the gated CAS

9  signals or chip-select signals in response to the PLL clock signal") (emphases in original). The

10  applicant further stated that "Dell 2 does not cure the deficiencies of Amidi with respect to the

11  amended claim. Dell 2 merely discloses a remapping or reassignment of a row address bit (A12) to be

12  used as a bank address bit (BA1). Dell 2 does not disclose using bank address signals to generate a

13  chip-select signal or a CAS signal." *Id.* at 52; 53 ("The claims also require the plurality of row/column

14  address signals received by the register are separate from the at least one row address signal received

15  by the logic element. In other words, in the configuration recited by the claims, the bank address

16  signals are received by the logic element, the register and the plurality of memory devices. Under such

17  circumstances, Amidi does not use bank address signals to generate control signals (and certainly not

18  the bank address signals and the at least one row address signal). The claims, however, require

19  generating CAS signals or chip-select signals based on a row address signal and bank address

20  signals"). Claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-48, 50, 52-

21  60, 62-65, and 69-75 depend from one of claims 1, 15, 28, and 39, and therefore include the same

22  substantive change in claim scope. Claims 77 and 80-91 recite substantially the same limitation and

23  therefore include the same substantive change in claim scope.

24  **The Applicant Substantively Changed the Scope of the Claims with Respect to the Logic Element through Arguments**

25

26  During reexamination, Inphi proposed Grounds 4 and 5 involving a prior art reference called

27  Amidi, and the Examiner deemed certain claims unpatentable over those grounds, including claim 15.

28  *See* April 4, 2011 Non-Final Office Action at 20-21, 22. To overcome Grounds 4 and 5, the applicant

argued that the scope of the term "logic element" did not "encompass[] both the translation logic device and the register that passes signals onto the DRAM devices" to a person of ordinary skill in the art. *See* July 5, 2011 Response to Non-Final Office Action at 38. In regards to the applicant's substantive narrowing of the term "logic element" to not encompass "register," the applicant stated: "While the '912 patent discloses that these distinct entities may be parts of a single component..., such packaging does not merge or otherwise affect the distinct functions performed by the logic element and the register. Persons of ordinary skill in the art would still consider the logic element and the register to be distinct from one another, even if they were both contained in a single package since they have separate and distinct functionality." *Id.* The applicant further explained how the nature of the "register" differed from the "logic element." *See, e.g.*, *id.* ("[A] logic element is understood by persons of ordinary skill in the art to be different than a state-holding device, such as a register. In other words, a register is strictly not a logic element."). During appeal, the applicant continued to construe the "logic element" under a substantively narrow scope when it argued that while it had amended the register limitation with the "logic element" limitation, the "Board's decisions never address where the prior art discloses a register as amended." App. Resp. Brief at 66-67. The applicant also made a substantive narrowing of the term "logic element" to not encompass the "simple logic" contained in a register or the functionality of a complex programmable logic device ("CPLD") when used in combination with a register. *Id.* at 38-39 ("Amidi does not disclose or render obvious such a logic element" because while a "register may include some simple logic that controls how signals are ordinary temporarily stored for at least one clock cycle and outputted from the register . . . , "[p]ersons of ordinary skill would not interpret such a register's functionality to be that of a 'logic element.' Furthermore, . . . persons of ordinary skill in the art would not interpret the 'logic element' of the claims as encompassing both the functionality of the CPLD and such functionality of the register of Amidi. Thus, Amidi does not disclose or render obvious a logic element receiving a set of signals comprising bank address signals."). Based on the applicant's narrowing by argument of the term "logic element" to exclude the term "register," the Examiner withdrew the rejection of claim 15 over Grounds 4 and 5 and found that Amidi did not meet the requirement of a "logic element" receiving

1  bank address signals in view of Amidi's disclosure showing that the "register" received those signals.

2  *See* October 14, 2011 Non-Final Office Action at 15-16, 17.

3  Accordingly, the applicant substantively narrowed the scope of the term "logic element"

4  through arguments made to overcome the cited prior art.  *See Poly-Amer., L.P. v. API Industries, Inc.*,

5  839 F.3d 1131, 1137 (Fed. Cir. 2016) (finding disclaimer based on applicant's arguments); *Marine*

6  *Polymer*, 672 F.3d at 1365 (explaining that arguments may substantively change claim scope for

7  purposes of intervening rights).  The substantive change in claim scope applies to all of the asserted

8  claims, including claim 16, because they recited the claimed "logic element" that was subject to the

9  applicant's disclaimer.

10  **The Applicant Substantively Changed the Scope of the Claims with Respect to the**
   **"Operatively Coupled" Limitation through Arguments**

11  Original claims 1, 15, and 28 of the '912 Patent recited a phase-lock loop device coupled to the

12  printed circuit board, the phase-lock loop device "operatively coupled" to the plurality of DDR

13  memory devices, the logic element, and the register.  During reexamination, the applicant argued that

14  the phrase "operatively coupled" in the context of the '912 Patent means "the operations of the logic

15  element 40 are clocked either directly or indirectly (e.g., through a clock buffer) by the output of the

16  PLL 50" and that "the output of the PLL 50 controls the operation of the logic element 40."  *See* July

17  5, 2011 Remarks at 41-42.  The applicant then argued that the Amidi prior art reference did not

18  disclose a PLL "operatively coupled" to a logic element because its logic element allegedly received

19  clock signals from a computer system rather than a PLL.  *See id.*  Through these arguments, the

20  applicant surrendered the scope of any operative couplings that do not involve clock signals from the

21  PLL to the logic element, thus substantively changing the scope of claims 1, 15, and 28 and claims

22  that depend therefrom.  Notably, the specification of the '912 Patent describes the PLL providing

23  clock signals to the logic element as present only in certain embodiments.  *See*, *e.g.*, '912 Patent at

24  5:27-50.  Nothing in the patent specification limits the plain and ordinary meaning of the term

25  "operatively coupled" to require that the operations of the logic element are clocked either directly or

26  indirectly (e.g., through a clock buffer) by the output of the PLL, and that the output of the PLL

27

28

1  controls the operation of the logic element.[1]  It was not until the reexamination of the '912 Patent that

2  the applicant narrowed the scope of the term "operatively coupled" to argue around the prior art.

3  Indeed, the applicant's arguments sought to impose the same requirements on the claim language as

4  certain of the applicant's amendments with respect to the phase-lock loop limitation discussed above.

5  **The Applicant Substantively Amended Claim 16 by Amendment**

6  Original claim 16 was in dependent form and recited "wherein the command signal is

7  transmitted to only one DDR memory device at a time."  During reexamination, the applicant

8  amended claim 16 to be written in independent form and to include the limitations of claim 15.  The

9  amendments are shown in the table below:

10

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 16 | The memory module of claim 15, wherein the command signal is transmitted to only one DDR memory device at a time. | [The memory module of claim 15,] *A memory module connectable to a computer system, the memory module comprising:* <br><br> *a printed circuit board;* <br><br> *a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;* <br><br> *a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number* |

26

27  _____

[1]  The scope of the term "operatively coupled" that applicant relied on is narrower than the
meaning of the term the applicant has advanced in connection with other proceedings involving

28  memory system patents.  *See* IPR2014-01369, Paper No. 12 at 6-7.

| | | *of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and* |
|---|---|---|
| | | *a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,* |
| | | wherein the command signal is transmitted to only one DDR memory device at a time. |

The above amendments substantively changed the scope of claim 16 based on the incorporation of new limitations, presumptive surrender, and prosecution history estoppel. *See, e.g., Felix v. American Honda Motor Co., Inc.*, 562 F.3d 1167, 1182 (Fed. Cir. 2009); *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141 (Fed. Cir. 2004).

\* \* \*

Pursuant to Federal Rule of Civil Procedure 33(d), Google will supplement this response to identify documents from which information responsive to this interrogatory may be derived in accordance with the parties' agreement, including the '912 Patent, its original prosecution history, its reexamination file histories and cited prior art, and the record of the Federal Circuit appeal.

Case No. 4:09-cv-05718-SBA
GOOGLE'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
INTERROGATORY NO. 3

████████████████████████████

1   **Absolute Intervening Rights**

2   *Legal Standard*

3       "[A]fter a patent emerges from reexamination, the statute makes available absolute and

4   equitable intervening rights to the same extent provided in the reissue statute, but only with respect to

5   'amended or new' claims in the reexamined patent." *Marine Polymer Techs., Inc. v. HemCon, Inc.*,

6   672 F.3d 1350, 1362 (Fed. Cir. 2012) (*en banc*).  Absolute intervening rights abrogates infringement

7   liability for products made, purchased, or used prior to issuance of the reexamination certificate.  *See*

8   *id.*; *see also* 35 U.S.C. §§ 252, 307(b).  Thus, if a defendant purchases an accused product prior to

9   issuance of the reexamination certificate, the defendant cannot be liable for infringement based on its

10  use of those products.  *See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1222 (Fed.

11  Cir. 1993); *Steuben Foods, Inc. v. Nestle USA, Inc.*, 2016 WL 5858930 at *2-3 (W.D.N.Y. Oct. 7,

12  2016).

13      As detailed below, any products that Google purchased prior to the reexamination certificate

14  are subject to absolute intervening rights.  This includes products that Google used but removed from

15  its server fleet prior to that date, as well as products in Google's server fleet after that date which were

16  purchased prior to the date.

17  **DDR2 FBDIMMs**

18      Netlist's infringement contentions assert claims 1, 3, 4, 6, 8, 10, 11, 15, 18-20, 22, 24, 27-29,

19  31, 32, 34, 36-41, 43, 45, 50, 52-60, 62-65, 69-75, 77, and 80-91 against certain memory modules

20  compliant with portions of the JEDEC standards and specifications for 4-Rank Double Data Rate 2

21  ("DDR2") SDRAM Fully-buffered Dual In-Line Memory Modules ("FBDIMMs").

22      Based on a reasonable investigation, Google stopped using the accused DDR2 FBDIMMs in

23  approximately September  2017. ███████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ██████████████████████   Accordingly, the accused DDR2 FBDIMMs and products

28  incorporating them are subject to absolute intervening rights.

**DDR3 LRDIMMs**

Netlist's infringement contentions assert claims 1, 3, 4, 6, 8, 10, 11, 15, 18, 19, 20, 22, 24, 27, 28, 29, 31, 32, 34, 36, 37, 38, 39, 40, 41, 43, 45, 46, 47, 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 62, 63, 64, 65, 69, 70, 71, 72, 73, 74, 75, 77, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91 against certain memory modules compliant with portions of the JEDEC standards and specifications for 4-Rank Double Data Rate 3 ("DDR3") Load Reduction Dual In-Line Memory Modules ("LRDIMMs").

Based on a reasonable investigation, Google has determined that it neither purchased nor used the accused DDR3 LRDIMM products. ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████

**DDR4 NVDIMMs**

Netlist's infringement contentions assert claim 16 against certain memory modules compliant with certain portions of the JEDEC Solid State Technology Association ("JEDEC") standards and specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Non-Volatile Dual In-Line Memory Modules ("NVDIMMs").

Based on a reasonable investigation, including an analysis of Google's purchasing information, Google has determined that it neither purchased nor used the accused DDR4 NVDIMMS.

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**DDR4 LRDIMMs**

Netlist's infringement contentions assert claim 16 against certain memory modules compliant with portions of the JEDEC Solid State Technology Association ("JEDEC") standards and specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Load Reduction Dual In-Line Memory Modules ("LRDIMMs").

Based on a reasonable investigation, including an analysis of Google's purchase orders, Google has determined that prior to February 8, 2021, it purchased the accused DDR4 LRDIMMS

██████████████████████████

1  identified in the table below. ████████████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████████████████. Accordingly, each of these DDR4 LRDIMMs

4  and products incorporating them are subject to absolute intervening rights.

5

| ████ | ████████ | ████ | ████ | ████ | ████ |
|------|----------|------|------|------|------|
| ██<br>██ | ████ | ████ | ████ | ██ | |
| ████ | ████████ | ████ | ████ | ████ | ████ |
| | ██<br>████████<br>████ | ████<br>████ | | | |
| ████ | ████████<br>████ | ████<br>████<br>████ | ████ | ████ | ████ |
| ████ | ████████<br>██<br>████████<br>████ | ████<br>████<br>████ | ████ | ████ | ████ |
| ████ | ████████<br>██<br>████████<br>████████<br>████ | ████<br>████<br>████<br>██ | ████ | ████ | ██ |
| ████ | ████████<br>██<br>████████<br>████ | ████<br>████<br>████ | ████ | ████ | ████<br>████ |
| ████<br>██ | ████████<br>████ | ████<br>████<br>████ | ████ | ████ | ████ |
| ████<br>██ | ████████<br>████ | ████<br>████<br>████ | ████ | ████ | ████ |

27  ─────────────────────
    [2] Based on date of purchase order.

28  [3] Based on date products received into inventory.

Based on a reasonable investigation, Google has determined that it purchased the following DDR4 LRDIMMs after February 8, 2021.

**DDR4 RDIMMs**

Netlist's infringement contentions assert claim 16 against certain memory modules compliant with certain portions of the JEDEC Solid State Technology Association ("JEDEC") standards and specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Registered Dual In-Line Memory Modules ("RDIMMs").

---

[4] Based on date of purchase order.
[5] Based on date products received into inventory.

█████████████████████████████████

Based on a reasonable investigation, including an analysis of Google's purchase orders, Google has determined that prior to February 8, 2021, it purchased the accused DDR4 RDIMMs identified in the table below. ███████████████████████████████████████████████████████████████████████████████████████████████████ Accordingly, each of these DDR4 RDIMMs and products incorporating them are subject to absolute intervening rights.

| | | | | | |
|---|---|---|---|---|---|
| ██ ██ | ████████ ████ | ███ ███ | ███ ███ | ███ ██ | ███ |
| ████ | █████ ███████ ████████ ███ | ████ ███ | ███ | ███ | ██ |
| ████ | ████ ████ ████████ | ████ ████ ████ | ███ | ███ | ███ |
| ████ | ████ ███ | ████ ████ ████ | ███ | ███ | ██ |
| ████ | ████ ████ | ████ ███ | ███ | ███ | █ |
| ███ █ | ████ ███ | ████ ███ ████ | ███ | ███ | ███ |
| ███ █ | ████ ███ | ████ ███ ████ | ███ | ███ | █ |
| ████ | ████ ███ | ████ ███ | ███ | ███ | █ |

Based on a reasonable investigation, Google has determined that it purchased the following DDR4 RDIMMs after February 8, 2021. ████████████████████████████████████████

---
[6] Based on date of purchase order.
[7] Based on date products received into inventory.

1

2

3

4

| | | | | | |
|---|---|---|---|---|---|
| ■ ■ | ■ ■ | ■ | ■ ■ | ■ | ■ |
| ■ | ■ | ■ | | | |
| ■ | ■ ■ | ■ | ■ | ■ | ■ |
| ■ | ■ ■ | ■ | | | |
| | ■ ■ | | | | |
| | ■ | | | | |
| ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | | | ■ |

5

6

7

8

9

10

11

12

13    Witnesses knowledgeable about the subject matter of this interrogatory response are ■

14    ■ Pursuant to Federal Rule of Civil Procedure 33(d), Google will supplement

15    this response to identify documents from which information responsive to this interrogatory may be

16    derived in accordance with the parties' agreement, including purchase orders and usage information

17    for the accused memory modules in Google's server fleet.

18    The foregoing responses are based on Google's reasonable investigation to date.  Google

19    reserves the right to supplement or modify its response based on further investigation and discovery,

20    or in response to new arguments or evidence presented by Netlist.

21    **SECOND AMENDED AND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO.**
      **3 (JULY 16, 2021)**

22

23    Google incorporates by reference its prior objections and responses to this Interrogatory.

24    Google provides the following supplemental response to address the issue of equitable intervening

25    rights and to amend and supplement its prior response regarding absolute intervening rights to account

26    for information identified after a further reasonable investigation and to identify documents from

27    ───────────────
      [8] Based on date of purchase order.

28    [9] Based on date products received into inventory.

which information responsive to the interrogatory may be ascertained.  Google reserves the right to further supplement its response as discovery progresses.  Subject to and without waiving the foregoing objections, Google amends and supplements its response to Interrogatory No. 3 as follows:

Netlist has asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 16, 18-20, 22, 24, 27, 28, 29, 31, 32, 34, 36, 37, 38, 39, 40, 41, 43, 45-47, 50, 52-60, 62-65, 69-75, 77, and 80-91 of the '912 Patent (the "Asserted Claims").  *See* Netlist's June 18, 2021 Amended Infringement Contentions at 1.  Each of the Asserted Claims is subject to the defense of intervening rights as detailed below.

**Each Asserted Claim Was Amended or Added During Re-examination**

The defense of intervening rights applies to claims that were amended or added during re-examination.  *See Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1364 (Fed. Cir. 2012) (*en banc*) ("Section 307(b) governs intervening rights arising from *ex parte* reexamination and specifies that only 'amended or new' claims incorporated into a patent during reexamination 'will have the same effect as that specified in section 252,' *i.e.,* will be susceptible to intervening rights."); *see also id.* at 1362, n. 8 (explaining that the same requirement applies for *inter partes* reexamination).  Each of the asserted claims satisfies this threshold requirement.

First, claims 1, 15, 16, 28, 39, and 43 were amended during re-examination and are therefore subject to intervening rights.  *See* February 8, 2021 *Inter Partes* Reexamination Certificate at 1 ("Claims 1, 15, 16, 28, 39, and 43 are determined to be patentable as amended.").  These amendments are shown in the table below:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | A memory module connectable to a computer system, the memory module comprising:<br><br>a printed circuit board;<br><br>a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;<br><br>a circuit mounted to the printed | A memory module connectable to a computer system, the memory module comprising:<br><br>a printed circuit board;<br><br>a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;<br><br>a circuit mounted to the printed circuit |

circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input control signals corresponding to a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals corresponding to the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a first command signal and the set of input control signals from the computer system by generating and transmitting a second command signal and the set of output control signals to the plurality of memory devices, the first command signal and the set of input control signals corresponding to the second number of ranks and the second command signal and the set of output control signals corresponding to the first number of ranks; and

a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register.

board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input control signals corresponding to a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals corresponding to the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a first command signal and the set of input control signals from the computer system by generating and transmitting a second command signal and the set of output control signals to the plurality of memory devices, the first command signal and the set of input control signals corresponding to the second number of ranks and the second command signal and the set of output control signals corresponding to the first number of ranks; and

a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,

*wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,*

*wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row-column address signals and the bank address signals,*

| | | | |
|---|---|---|---|
| | | | *and (iii) transmits the buffered plurality of row-column address signals and the buffered bank address signals to the plurality of DDR memory devices, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row-column address signals received by the register are separate from the at least one row address signal received by the logic element, and*<br><br>*wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.* |
| 15 | | A memory module connectable to a computer system, the memory module comprising:<br><br>a printed circuit board;<br><br>a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;<br><br>a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit | A memory module connectable to a computer system, the memory module comprising:<br><br>a printed circuit board;<br><br>a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;<br><br>a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating |

generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and

a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register.

a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and

a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,

*wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,*

*wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row/column address signals and the bank address signals, and (iii) transmits the buffered plurality of row/column address signals and the buffered bank address signals to the at least one DDR memory device of the selected one or two ranks of the first number of ranks, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element, and*

*wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row*

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | | | *address signal, (ii) the bank address signals and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.* |
| 4<br>5 | 16 | The memory module of claim 15, wherein the command signal is transmitted to only one DDR memory device at a time. | *[The memory module of claim 15,] A memory module connectable to a computer system, the memory module comprising:* |
| 6 | | | *a printed circuit board;* |
| 7<br>8<br>9<br>10 | | | *a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;* |
| 11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | | | *a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and* |
| 26<br>27<br>28 | | | *a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices,* |

Case No. 4:09-cv-05718-SBA<br>GOOGLE'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INTERROGATORY NO. 3

████████████████████████

| | | | |
|---|---|---|---|
| | | | *the logic element, and the register,*<br><br>wherein the command signal is transmitted to only one DDR memory device at a time. |
| | 28 | memory module connectable to a computer system, the memory module comprising: | memory module connectable to a computer system, the memory module comprising: |
| | | a printed circuit board; | a printed circuit board; |
| | | a plurality of double-data-rate (DDR) dynamic random-access memory (DRAM) devices coupled to the printed circuit board, the plurality of DDR DRAM devices having a first number of DDR DRAM devices arranged in a first number of ranks; | a plurality of double-data-rate (DDR) dynamic random-access memory (DRAM) devices coupled to the printed circuit board, the plurality of DDR DRAM devices having a first number of DDR DRAM devices arranged in a first number of ranks; |
| | | a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising a row/column address signal, bank address signals, a chip-select signal, and an input command signal, the set of input control signals configured to control a second number of DDR DRAM devices arranged in a second number of ranks, the second number of DDR DRAM devices smaller than the first number of DDR DRAM devices, the second number of ranks smaller than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals comprising an output command signal, the set of output control signals configured to control the first number of DDR DRAM devices arranged in the first number of ranks, wherein the circuit further responds to the set of input control signals from the computer system by selecting at least one rank of the first number of ranks and transmitting the set of output control signals to at least one DDR DRAM device of the selected at least one rank; and | a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising a row/column address signal, bank address signals, a chip-select signal, and an input command signal, the set of input control signals configured to control a second number of DDR DRAM devices arranged in a second number of ranks, the second number of DDR DRAM devices smaller than the first number of DDR DRAM devices, the second number of ranks smaller than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals comprising an output command signal, the set of output control signals configured to control the first number of DDR DRAM devices arranged in the first number of ranks, wherein the circuit further responds to the set of input control signals from the computer system by selecting at least one rank of the first number of ranks and transmitting the set of output control signals to at least one DDR DRAM device of the selected at least one rank; and<br><br>a phase-lock loop device coupled to |

██████████████████

| | | | |
|---|---|---|---|
| | | a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR DRAM devices, the logic element, and the register. | the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR DRAM devices, the logic element, and the register. |
| | | | *wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR DRAM memory devices, the logic element, and the register,* |
| | | | *wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row/column address signals and the bank address signals, and (iii) transmits the buffered plurality of row/column address signals and the buffered bank address signals to the at least one DDR DRAM device of the selected at least one rank, wherein the row/column address signal received by the logic element comprises a row address signal received by the logic element, and wherein the plurality of row/column address signals received by the register are separate from the row address signal received by the logic element, and* |
| | | | *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the row address signal, (ii) the bank address signals, and (iii) the chip-select signal of the set of input control signals and (iv) the PLL clock signal.* |
| | 39 | A memory module connectable to a computer system, the memory module comprising:<br><br>a printed circuit board having a first side and a second side;<br><br>a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, each DDR memory device comprising one or more banks, the plurality of DDR | A memory module connectable to a computer system, the memory module comprising:<br><br>a printed circuit board having a first side and a second side;<br><br>a plurality of double-data-rate (DDR) memory devices mounted to the printed circuit board, each DDR memory device comprising one or more banks, the plurality of DDR |

GOOGLE'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
INTERROGATORY NO. 3

memory devices arranged in two or more ranks which are selectable by a first number of chip-select signals; and

at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals, column address signals, bank address signals, command signals, and a second number of chip-select signals less than the first number of chip-select signals, wherein the logic element receives the bank address signals and at least one command signal of the plurality of input signals, the at least one integrated circuit element generating a plurality of output signals in response to the plurality of input signals, the plurality of output signals comprising row address signals, column address signals, bank address signals, command signals, and the first number of chip-select signals, the at least one integrated circuit element further responsive to the plurality of input signals by selecting at least one rank of the two or more ranks and transmitting the plurality of output signals to at least one DDR memory device of the selected at least one rank.

memory devices arranged in two or more ranks which are selectable by a first number of chip-select signals; and

at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals, column address signals, bank address signals, command signals, and a second number of chip-select signals less than the first number of chip-select signals, wherein the logic element receives *at least one row address signal,* the bank address signals, *at least one chip-select signal,* and at least one command signal of the plurality of input signals, the at least one integrated circuit element generating a plurality of output signals in response to the plurality of input signals, the plurality of output signals comprising row address signals, column address signals, bank address signals, command signals, and the first number of chip-select signals, the at least one integrated circuit element further responsive to the plurality of input signals by selecting at least one rank of the two or more ranks and transmitting the plurality of output signals to at least one DDR memory device of the selected at least one rank,

*wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,*

*wherein, the register (i) receives, from among the plurality of input signals, and (ii) buffers, in response to the PLL clock signal, the bank address signals and a plurality of the row address*

| | | signals, and (iii) transmits the buffered bank address signals and the buffered row address signals to the at least one DDR memory device of the selected at least one rank, and wherein the plurality of the row address signals received by the register are separate from the at least one row address signal received by the logic element, and<br><br>wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the plurality of input signals and (iv) the PLL clock signal. |
|---|---|---|
| 43 | The memory module of claim 42, wherein the logic element receives the second number of chip-select signals. | The memory module of claim [42] 39, wherein the logic element receives the second number of chip-select signals. |

Second, claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36, 37, 38, 40, 41, 45-48, and 50 depend on a claim that was amended during re-examination and thus incorporate those amendments by dependency and are subject to intervening rights. *See id*. ("Claims 3, 4, 6, 8, 10-14, 17-20, 22, 24, 27, 29, 31, 32, 34-38, 40, 41 and 45-50, dependent on an amended claim, are determined to be patentable."). Specifically, claims 3, 4, 6, 8, 10, and 11 depend directly or indirectly from claim 1, which was amended as shown above; claims 18-20, 22, 24, and 27 depend directly or indirectly from claim 15, which was amended as shown above; claims 29, 31, 32, 34, 36, 37, and 38 depend directly or indirectly from claim 28, which was amended as shown above; and claims 40, 41, 45-48, and 50 depend from claim 39, which was amended as shown above.

Third, claims 52-60, 62-65, 69-75, 77, and 80-91 were added during re-examination and thus are "new claims" subject to intervening rights. *See id*. ("New claims 52-91 are added and determined to be patentable.").

***Each Asserted Claim Had Its Scope Substantively Changed During Re-examination***

"The doctrine of intervening rights first developed as courts recognized that permitting substantive changes to the scope of patent claims through post-issuance procedures left 'the door ...

1   open for gross injustice' where a third party, having already begun to make, use, or sell a given article,

2   finds its previously lawful activities rendered newly infringing under a modified patent." *Marine*

3   *Polymer*, 672 F.3d at 1361 (citing *Sontag Chain Stores Co. v. Nat'l Nut Co.,* 310 U.S. 281, 293-95, 60

4   S.Ct. 961, 84 L.Ed. 1204 (1940)); *see also* 35 U.S.C. § 252.  "[I]n determining whether substantive

5   changes have been made, we must discern whether the *scope* of the claims are identical, not merely

6   whether different words are used."  *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348  (Fed. Cir.

7   1998) (finding that the scope of the claims was substantively changed during re-examination because

8   "the original claims appear to cover a printer or method of printing which generates *any* quality of

9   alphanumeric characters, while the amended claims seem to cover only a printing apparatus or method

10  of printing which generates *'type quality'* alphanumeric characters") (emphasis in original); *see also*

11  *Marine Polymer*, 672 F.3d at 1365 (explaining that "patent applicants' actions and arguments during

12  prosecution, including prosecution in a reexamination proceeding, can affect the proper interpretation

13  and effective scope of their claims").

14          As detailed below, asserted claims 1, 3, 4, 6, 8, 10, 11, 15, 16, 18-20, 22, 24, 27, 28, 29, 31, 32,

15  34, 36, 37, 38, 39, 40, 41, 43, 45-47, and 50 of the '912 Patent were subject to significant amendments

16  and arguments during reexamination in order to overcome the prior art. These amendments and

17  arguments had the effect of substantively changing the scope of those claims and therefore the claims

18  are subject to intervening rights.

19          Asserted claims 52-60, 62-65, 69-75, 77, and 80-91 were all newly added to the '912 Patent

20  during reexamination in order to overcome the prior art and include the same or substantially same

21  limitations as those added to the amended claims.  Thus, the new claims are not identical to the

22  original claims and are subject to intervening rights.  *See* 35 U.S.C. §§ 252, 307(b); *see also Seattle*

23  *Box Co. v. Indus. Crating & Packing*, 731 F.2d 818, 828 (Fed. Cir. 1984) ("With respect to new or

24  amended claims, an infringer's liability commences only from the date the reissue patent is issued.").

25  **The Applicant Substantively Changed the Scope of the Claims with Respect to the Phase-Lock Loop Device Limitation**

26

27          Original claims 1, 15, 28, and 39 required "a phase-lock loop device mounted to the printed

28  circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices,

1    the logic element, and the register."   During re-examination, the applicant added limitations that

2    impose additional requirements on the phase-lock loop (PLL) device, including the requirement that it

3    transmits a PLL clock signal to the plurality of memory devices, the logic element, and the register,

4    and that both the register and the logic element perform specific functions in response to the PLL

5    clock signal.  The amendments to claim 1, reproduced below, are representative:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register. | a phase-lock loop device mounted to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register, *wherein, in response to signals received from the computer system, the phase-lock loop (PLL) device transmits a PLL clock signal to the plurality of DDR memory devices, the logic element, and the register,* *wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, …* *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to … the PLL clock signal.* |

20   These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and

21   39 because, prior to the amendment, the PLL was not limited by the specific function of transmitting a

22   PLL clock signal and causing the register and logic element to perform respective functions in

23   response to that signal.  *See* Aug. 1, 2016 Resp. at 2-3. Notably, the patentee identified "Phase Lock

24   Loop (PLL) Device" as a "principle amendment[] to overcome the new grounds of rejection."  *Id.* at

25   47, 48. The patentee further stated that "[t]o address the Board's rejection" that "the combination of

26   Amidi and Dell 2 teaches or suggests generating a chip-select, CAS, or rank selecting signal in

27   response to a bank address signal," "Patent Owner narrowed the claim to include" the amended PLL

28   device limitation.  *Id.* at 50-51 (distinguishing Amidi because it "transmits a PLL clock signal to the

register and memory, but not to the CPLD. Thus, Amidi does not disclose the PLL device transmitting the PLL clock to the logic element; the output of PLL 606 is neither directly nor indirectly transmitted to the CPLD 604.") (emphases in original).  Claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-48, 50, 52-60, 62-65, and 69-75 depend from one of claims 1, 15, 28, and 39, and therefore include the same substantive change in claim scope.  Claims 77 and 80-91 recite substantially the same limitation and therefore include the same substantive change in claim scope.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the Register Limitation**

Original claims 1, 15, 28, and 39 required a circuit mounted to the printed circuit board, the circuit comprising a logic element and a "register."  During re-examination, the applicant added limitations that impose additional requirements on the register, including that it receives, buffers, and transmits specified signals with specified conditions.  The amendments to claim 1, reproduced below, are representative:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register ... | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register …<br><br>*wherein, the register (i) receives, from the computer system, and (ii) buffers, in response to the PLL clock signal, a plurality of row-column address signals and the bank address signals, and (iii) transmits the buffered plurality of row-column address signals and the buffered bank address signals to the plurality of DDR memory devices, wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row-column address signals received by the register are separate from the at least one row address signal received by the logic element, and* |

These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the register was not limited by the specific functions of receiving, transmitting, and buffering signals as recited in the amendment.  *See* Aug. 1, 2016 Resp. at 2-3.

1  Notably, the patentee identified "register" as a "principle amendment[] to overcome the new grounds

2  of rejection." *Id.* at 47. The patentee further stated that "[t]o address the Board's rejection" that "the

3  combination of Amidi and Dell 2 teaches or suggests generating a chip-select, CAS, or rank selecting

4  signal in response to a bank address signal," "Patent Owner narrowed the claim to include" the

5  amended register limitation. *Id.* at 50, 52-53 (stating that "[t]he claims also require the plurality of

6  row/column address signals received by the register are separate from the at least one row address

7  signal received by the logic element. In other words, in the configuration recited by the claims, the

8  bank address signals are received by the logic element, the register and the plurality of memory

9  devices. Under such circumstances, Amidi does not use bank address signals to generate control

10  signals (and certainly not the bank address signals and the at least one row address signal)."). Claims

11  3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-48, 50, 52-60, 62-65, and 69-

12  75 depend from one of claims 1, 15, 28, and 39, and therefore include the same substantive change in

13  claim scope. Claims 77 and 80-91 recite substantially the same limitation and therefore include the

14  same substantive change in claim scope.

15  **The Applicant Substantively Changed the Scope of the Claims with Respect to the Row / Column Address Signal Limitation**

16  

17  Original claims 1, 15, and 28 required at least one row/column address signal. During re-

18  examination, the applicant added limitations that impose additional requirements on the row/column

19  address signal received at the logic element, including that it comprises at least one row address signal

20  received by the logic element and that it is separate from row address signals received by the register.

21  The amendments to claim 1, reproduced below, are representative:

22

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, | the logic element receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, ...<br><br>*wherein the at least one row/column address signal received by the logic element comprises at least one row address signal received by the logic element, and wherein the plurality of row-* |

| | | |
|---|---|---|
| | | *column address signals received by the register are separate from the at least one row address signal received by the logic element* |

These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and 39 because, prior to the amendment, the at least one row/column address signal was not limited by the conditions recited in the amendment. *See* Aug. 1, 2016 Resp. at 2-3. The patentee further stated that "[t]o address the Board's rejection" that "the combination of Amidi and Dell 2 teaches or suggests generating a chip-select, CAS, or rank selecting signal in response to a bank address signal," "Patent Owner narrowed the claim to include" the amended row/column address signal limitation. *Id.* at 50, 52-53 (stating that "[t]he claims also require the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element. In other words, in the configuration recited by the claims, the bank address signals are received by the logic element, the register and the plurality of memory devices. Under such circumstances, Amidi does not use bank address signals to generate control signals (and certainly not the bank address signals and the at least one row address signal).") Claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 52-60, 62, 63, 64, 65, and 69-72 depend from one of claims 1, 15, and 28, and therefore include the same substantive change in claim scope. Claims 77 and 80-91 recite substantially the same limitation and therefore include the same substantive change in claim scope.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the Logic Element Signal in Claim 39**

Original claim 39 required a logic element receiving two enumerated signals: the bank address signal and command signal. During re-examination, the applicant added limitations that required the logic element to receive "at least one row address signal" and "at least one chip-select signal." The applicant further amended claim 39 to require that "the row address signals received by the register are separate from the at least one row address signal received by the logic element." The amendments to claim 39 are shown below:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|

| 39 | at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals... | at least one integrated circuit element mounted to the printed circuit board, the at least one integrated circuit element comprising a logic element, a register, and a phase-lock loop device operationally coupled to the plurality of DDR memory devices, the logic element, and the register, the at least one integrated circuit element receiving a plurality of input signals from the computer system, the plurality of input signals comprising row address signals … |
| --- | --- | --- |
| | | wherein the logic element receives *at least one row address signal*, the bank address signals, *at least one chip-select signal, and at least one command signal of the plurality of input signals* |
| | | *wherein the plurality of the row address signals received by the register are separate from the at least one row address signal received by the logic element* |

These amendments had the effect of substantively changing the scope of claim 39 because, prior to the amendment, the logic element did not have to receive at least one row address signal and at least one chip select signal, and the row address signal received by the logic element did not have to be separate from a row address signal received by a register. *See* Aug. 1, 2016 Resp. at 2-3. Notably, the patentee identified "logic element" as a "principle amendment[] to overcome the new grounds of rejection." *Id.* at 47, 52-53 (stating that "[t]he claims also require the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element. In other words, in the configuration recited by the claims, the bank address signals are received by the logic element, the register and the plurality of memory devices. Under such circumstances, Amidi does not use bank address signals to generate control signals (and certainly not the bank address signals and the at least one row address signal).") Claims 40, 41, 43, 45-48, 50, and 73-75 depend from claim 39, and therefore include the same substantive change in claim scope. Claims 90-91 recite substantially the same limitation and therefore include the same substantive change in claim scope.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the Logic Element Limitation through Amendments**

Original claims 1, 15, 28, and 39 required a circuit comprising logic element receiving a set of input control signals from the computer system.   During re-examination, the applicant added limitations that impose additional requirements on the logic element, including that it  "generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.". The amendments to claim 1, reproduced below, are representative:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 1 | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, … <br><br> the circuit generating a set of output control signals in response to the set of input control signals, | a circuit mounted to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input control signals from the computer system, ... <br><br> the circuit generating a set of output control signals in response to the set of input control signals, … <br><br> *wherein the logic element generates gated column access strobe (CAS) signals or chip-select signals of the output control signals in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal.* |

These amendments had the effect of substantively changing the scope of claims 1, 15, 28, and 39.  First, prior to the amendment, the logic element did not have to generate any specific signals. Second, prior to the amendment, neither the logic element or any other feature of the claimed memory module had to generate "column access strobe (CAS) signals or chip-select signals" "in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (iii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal."  These are entirely new limitations that narrow the scope of the claimed module and specifically the logic

element.  The applicant's statements during appeal of re-examination proceedings confirm that the above limitations substantively narrowed the scope of the asserted claims.  *See, e.g.*, App. Resp. Br. at 11-12 ("Applying the Board's adopted construction of 'in response at least in part to' and similar language, Netlist distinguished its amended claims over prior art that failed to disclose or suggest a logic element responding to all four enumerated signals."); *see also* Aug. 1, 2016 Resp. at 2-3. Notably, the patentee identified "logic element" as a "principle amendment[] to overcome the new grounds of rejection."  *Id.* at 47, 52-53 (stating that "[t]he amended claims now also require that the logic element generates certain output control signals (e.g., gated column access strobe (CAS)signals or chip-select signals recited in claim 1) in response at least in part to (i) the at least one row address signal, (ii) the bank address signals, and (ii) the at least one chip-select signal of the set of input control signals and (iv) the PLL clock signal. Amidi's CPLD 604 never receives bank address signals and hence Amidi's control signals cannot be generated based on bank address signals. Instead the control signals . . . are based on the row address signals and chip-select signals. Thus, Amidi does not disclose the CPLD generating the gated CAS signals or chip-select signals in response to the bank address signals. Moreover, since the output of PLL 606 is neither directly nor indirectly transmitted to the CPLD 604, a POSITA would understand that the PLL clock does not control the operation of CPLD 604. Thus, Amidi is further deficient by failing to disclose the CPLD generating the gated CAS signals or chip-select signals in response to the PLL clock signal") (emphases in original). The applicant further stated that "Dell 2 does not cure the deficiencies of Amidi with respect to the amended claim. Dell 2 merely discloses a remapping or reassignment of a row address bit (A12) to be used as a bank address bit (BA1). Dell 2 does not disclose using bank address signals to generate a chip-select signal or a CAS signal." *Id.* at 52; 53 ("The claims also require the plurality of row/column address signals received by the register are separate from the at least one row address signal received by the logic element. In other words, in the configuration recited by the claims, the bank address signals are received by the logic element, the register and the plurality of memory devices. Under such circumstances, Amidi does not use bank address signals to generate control signals (and certainly not the bank address signals and the at least one row address signal). The claims, however, require generating CAS signals or chip-select signals based on a row address signal and bank address

1   signals").  Claims 3, 4, 6, 8, 10, 11, 18-20, 22, 24, 27, 29, 31, 32, 34, 36-38, 40, 41, 43, 45-48, 50, 52-

2   60, 62-65, and 69-75 depend from one of claims 1, 15, 28, and 39, and therefore include the same

3   substantive change in claim scope.  Claims 77 and 80-91 recite substantially the same limitation and

4   therefore include the same substantive change in claim scope.

5   **The Applicant Substantively Changed the Scope of the Claims with Respect to the Logic Element through Arguments**

6

7          During reexamination, Inphi proposed Grounds 4 and 5 involving a prior art reference called

8   Amidi, and the Examiner deemed certain claims unpatentable over those grounds, including claim 15.

9   *See* April 4, 2011 Non-Final Office Action at 20-21, 22. To overcome Grounds 4 and 5, the applicant

10  argued that the scope of the term "logic element" did not "encompass[] both the translation logic

11  device and the register that passes signals onto the DRAM devices" to a person of ordinary skill in the

12  art. *See* July 5, 2011 Response to Non-Final Office Action at 38. In regards to the applicant's

13  substantive narrowing of the term "logic element" to not encompass "register," the applicant stated:

14  "While the '912 patent discloses that these distinct entities may be parts of a single component..., such

15  packaging does not merge or otherwise affect the distinct functions performed by the logic element

16  and the register. Persons of ordinary skill in the art would still consider the logic element and the

17  register to be distinct from one another, even if they were both contained in a single package since

18  they have separate and distinct functionality." *Id.* The applicant further explained how the nature of

19  the "register" differed from the "logic element." *See, e.g.*, *id.* ("[A] logic element is understood by

20  persons of ordinary skill in the art to be different than a state-holding device, such as a register. In

21  other words, a register is strictly not a logic element."). During appeal, the applicant continued to

22  construe the "logic element" under a substantively narrow scope when it argued that while it had

23  amended the register limitation with the "logic element" limitation, the "Board's decisions never

24  address where the prior art discloses a register as amended." App. Resp. Brief at 66-67. The applicant

25  also made a substantive narrowing of the term "logic element" to not encompass the "simple logic"

26  contained in a register or the functionality of a complex programmable logic device ("CPLD") when

27  used in combination with a register. *Id.* at 38-39 ("Amidi does not disclose or render obvious such a

28  logic element" because while a "register may include some simple logic that controls how signals are

ordinary temporarily stored for at least one clock cycle and outputted from the register . . . , "[p]ersons of ordinary skill would not interpret such a register's functionality to be that of a 'logic element.' Furthermore, . . . persons of ordinary skill in the art would not interpret the 'logic element' of the claims as encompassing both the functionality of the CPLD and such functionality of the register of Amidi. Thus, Amidi does not disclose or render obvious a logic element receiving a set of signals comprising bank address signals."). Based on the applicant's narrowing by argument of the term "logic element" to exclude the term "register," the Examiner withdrew the rejection of claim 15 over Grounds 4 and 5 and found that Amidi did not meet the requirement of a "logic element" receiving bank address signals in view of Amidi's disclosure showing that the "register" received those signals. *See* October 14, 2011 Non-Final Office Action at 15-16, 17.

Accordingly, the applicant substantively narrowed the scope of the term "logic element" through arguments made to overcome the cited prior art. *See Poly-Amer., L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) (finding disclaimer based on applicant's arguments); *Marine Polymer*, 672 F.3d at 1365 (explaining that arguments may substantively change claim scope for purposes of intervening rights). The substantive change in claim scope applies to all of the asserted claims, including claim 16, because they recited the claimed "logic element" that was subject to the applicant's disclaimer.

**The Applicant Substantively Changed the Scope of the Claims with Respect to the "Operatively Coupled" Limitation through Arguments**

Original claims 1, 15, and 28 of the '912 Patent recited a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device "operatively coupled" to the plurality of DDR memory devices, the logic element, and the register. During reexamination, the applicant argued that the phrase "operatively coupled" in the context of the '912 Patent means "the operations of the logic element 40 are clocked either directly or indirectly (e.g., through a clock buffer) by the output of the PLL 50" and that "the output of the PLL 50 controls the operation of the logic element 40." *See* July 5, 2011 Remarks at 41-42. The applicant then argued that the Amidi prior art reference did not disclose a PLL "operatively coupled" to a logic element because its logic element allegedly received clock signals from a computer system rather than a PLL. *See id.* Through these arguments, the

1   applicant surrendered the scope of any operative couplings that do not involve clock signals from the

2   PLL to the logic element, thus substantively changing the scope of claims 1, 15, and 28 and claims

3   that depend therefrom.  Notably, the specification of the '912 Patent describes the PLL providing

4   clock signals to the logic element as present only in certain embodiments.  *See*, *e.g.*, '912 Patent at

5   5:27-50.  Nothing in the patent specification limits the plain and ordinary meaning of the term

6   "operatively coupled" to require that the operations of the logic element are clocked either directly or

7   indirectly (e.g., through a clock buffer) by the output of the PLL, and that the output of the PLL

8   controls the operation of the logic element.[10]  It was not until the reexamination of the '912 Patent that

9   the applicant narrowed the scope of the term "operatively coupled" to argue around the prior art.

10  Indeed, the applicant's arguments sought to impose the same requirements on the claim language as

11  certain of the applicant's amendments with respect to the phase-lock loop limitation discussed above.

12  **The Applicant Substantively Amended Claim 16 by Amendment**

13         Original claim 16 was in dependent form and recited "wherein the command signal is

14  transmitted to only one DDR memory device at a time."  During reexamination, the applicant

15  amended claim 16 to be written in independent form and to include the limitations of claim 15.  The

16  amendments are shown in the table below:

| Claim | Original Claim Language | Amended Claim Language |
|---|---|---|
| 16 | The memory module of claim 15, wherein the command signal is transmitted to only one DDR memory device at a time. | [The memory module of claim 15,] *A memory module connectable to a computer system, the memory module comprising:*<br><br>*a printed circuit board;*<br><br>*a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;* |

---

[10]   The scope of the term "operatively coupled" that applicant relied on is narrower than the meaning of the term the applicant has advanced in connection with other proceedings involving memory system patents.  *See* IPR2014-01369, Paper No. 12 at 6-7.

|  |  |  | *a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and* |
|  |  |  | *a phase-lock loop device coupled to the printed circuit board, the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,* |
|  |  |  | wherein the command signal is transmitted to only one DDR memory device at a time. |

The above amendments substantively changed the scope of claim 16 based on the incorporation of new limitations, presumptive surrender, and prosecution history estoppel. *See, e.g., Felix v. American Honda Motor Co., Inc.*, 562 F.3d 1167, 1182 (Fed. Cir. 2009); *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141 (Fed. Cir. 2004).

███████████████████████████████████

**Absolute Intervening Rights**

***Legal Standard***

"[A]fter a patent emerges from reexamination, the statute makes available absolute and equitable intervening rights to the same extent provided in the reissue statute, but only with respect to 'amended or new' claims in the reexamined patent." *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1362 (Fed. Cir. 2012) (*en banc*). Absolute intervening rights abrogates infringement liability for products made, purchased, or used prior to issuance of the reexamination certificate. *See id.*; *see also* 35 U.S.C. §§ 252, 307(b). Thus, if a defendant purchases an accused product prior to issuance of the reexamination certificate, the defendant cannot be liable for infringement based on its use of those products. *See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1222 (Fed. Cir. 1993); *Steuben Foods, Inc. v. Nestle USA, Inc.*, 2016 WL 5858930 at *2-3 (W.D.N.Y. Oct. 7, 2016).

As detailed below, any products that Google purchased prior to the reexamination certificate are subject to absolute intervening rights. This includes products that Google used but removed from its server fleet prior to that date, as well as products in Google's server fleet after that date which were purchased prior to the date.

**DDR2 FBDIMMs**

Netlist's infringement contentions assert claims 1, 3, 4, 6, 8, 10, 11, 15, 18-20, 22, 24, 27-29, 31, 32, 34, 36-41, 43, 45, 50, 52-60, 62-65, 69-75, 77, and 80-91 against certain memory modules compliant with portions of the JEDEC standards and specifications for 4-Rank Double Data Rate 2 ("DDR2") SDRAM Fully-buffered Dual In-Line Memory Modules ("FBDIMMs").

Based on a reasonable investigation, Google stopped using the accused DDR2 FBDIMMs in approximately September 2017. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████            Accordingly, the accused DDR2 FBDIMMs and products incorporating them are subject to absolute intervening rights.

███████████████████████████████████████

**DDR3 LRDIMMs**

Netlist's infringement contentions assert claims 1, 3, 4, 6, 8, 10, 11, 15, 18, 19, 20, 22, 24, 27, 28, 29, 31, 32, 34, 36, 37, 38, 39, 40, 41, 43, 45, 46, 47, 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 62, 63, 64, 65, 69, 70, 71, 72, 73, 74, 75, 77, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91 against certain memory modules compliant with portions of the JEDEC standards and specifications for 4-Rank Double Data Rate 3 ("DDR3") Load Reduction Dual In-Line Memory Modules ("LRDIMMs").

Based on a reasonable investigation, Google has determined that it neither purchased nor used the accused DDR3 LRDIMM products. ████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
██████████████████████████████

**DDR4 NVDIMMs**

Netlist's infringement contentions assert claim 16 against certain memory modules compliant with certain portions of the JEDEC Solid State Technology Association ("JEDEC") standards and specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Non-Volatile Dual In-Line Memory Modules ("NVDIMMs").

Based on a reasonable investigation, including an analysis of Google's purchasing information, Google has determined that it neither purchased nor used the accused DDR4 NVDIMMS.
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

**DDR4 LRDIMMs**

Netlist's infringement contentions assert claim 16 against certain memory modules compliant with portions of the JEDEC Solid State Technology Association ("JEDEC") standards and specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Load Reduction Dual In-Line Memory Modules ("LRDIMMs").

Based on a reasonable investigation, including an analysis of Google's purchase orders, Google has determined that prior to February 8, 2021, it purchased the accused DDR4 LRDIMMS

identified in the table below. ███████████████████████

████████████████████████████████████████████

███████████████████████████ Accordingly, each of these DDR4 LRDIMMs

and products incorporating them are subject to absolute intervening rights.



---

[11] Based on date of purchase order.
[12] Based on date products received into inventory.

**DDR4 RDIMMs**

Netlist's infringement contentions assert claim 16 against certain memory modules compliant with certain portions of the JEDEC Solid State Technology Association ("JEDEC") standards and specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Registered Dual In-Line Memory Modules ("RDIMMs").

Based on a reasonable investigation, including an analysis of Google's purchase orders, Google has determined that prior to February 8, 2021, it purchased the accused DDR4 RDIMMs identified in the table below. ███████████████████████████████████████████████ Accordingly, each of these DDR4 RDIMMs and products incorporating them are subject to absolute intervening rights.



---

[13] Based on date of purchase order.
[14] Based on date products received into inventory.
[15] Based on date of purchase order.
[16] Based on date products received into inventory.

Google further identifies ███████████ a memory module that Google ███████ ███████████████████ prior to February 8, 2021.

Witnesses knowledgeable about the subject matter of this interrogatory response are Srinivas Nori and Mike Branch.  Pursuant to Federal Rule of Civil Procedure 33(d), Google cites to the following evidence: GNLP-00000001 to -17883.

The foregoing responses are based on Google's reasonable investigation to date.  Google reserves the right to supplement or modify its response based on further investigation and discovery, or in response to new arguments or evidence presented by Netlist.

**Equitable Intervening Rights**

Google serves its equitable intervening rights contentions based on the schedule agreed-upon by the parties (Dkt. 150) and based on its reasonable investigation to date.  Google has informed Netlist that it does not intend to brief equitable intervening rights on July 30, 2021, but provides the following contentions in accordance with the parties' agreement and based on a reasonable investigation to date.  Google reserves its right to supplement its contentions related to equitable intervening rights after a further investigation and in response to arguments and evidence raised by Netlist.

1    Based on Netlist's June 18, 2021 Amended Infringement Contentions and given what is

2    accused, equitable intervening rights is only relevant for claim 16.  Google reserves its rights to

3    supplement its response if Netlist accuses additional products not currently identified in its June 18,

4    2021 Amended Infringement Contentions.

5    ***Legal Standard***

6    "[A]fter a patent emerges from reexamination, the statute makes available absolute and

7    equitable intervening rights to the same extent provided in the reissue statute, but only with respect to

8    'amended or new' claims in the reexamined patent."  *Marine Polymer Techs., Inc. v. HemCon, Inc.*,

9    672 F.3d 1350, 1362 (Fed. Cir. 2012) (*en banc*).  Equitable rights preclude infringement liability for

10   products that were made, used, sold, etc. after issuance of the re-examination certificate if the accused

11   infringer made substantial preparation for those products prior to issuance of the certificate.  *See also*

12   35 U.S.C. §§ 252, 307(b).  "The remedy of equitable intervening rights is 'calculated to protect an

13   infringer's preexisting investments and business.'"  *Univ. of Virginia Pat. Found. v. Gen. Elec. Co.*,

14   792 F. Supp. 2d 904, 917 (W.D. Va. 2011) (quoting *Seattle Box II*, 756 F.2d at 1580).  Courts have

15   considered a non-exhaustive list of factors that are relevant to equitable intervening rights, including

16   "whether the infringer made 'substantial preparation' before the patent reissued" and "whether there

17   were existing orders or contracts."  *Visto Corp. v. Sprogit Tech., Inc.*, 413 F. Supp. 2d 1073, 1090

18   (N.D. Cal. 2006).  These are factors that a court "may consider" in evaluating equitable intervening

19   right; it is not a requirement to show that each factor is present.  *See id*.

20   For the "substantial preparation" factor in particular, courts have examined the investments the

21   accused infringer has made into the accused products prior to the issuance of the reexamination

22   certificate which would justify granting equitable intervening rights for the accused infringer's

23   continued use of the accused products after the issuance of the reexamination certificate.  *See John*

24   *Bean Techs. Corp. v. Morris & Assocs., Inc.*, No. 4:14-CV-00368-BRW, 2019 WL 7176779, at *2

25   (E.D. Ark. Sept. 23, 2019), *aff'd*, 988 F.3d 1334 (Fed. Cir. 2021) (finding that the accused infringer's

26   "years of research, developments, investments, improvements, promotion, and goodwill associated

27   with the accused product . . . supports the inference that [the accused infringer] made 'substantial

28   preparation' before Plaintiff was issued the reexamined [asserted] patent"); *2-Way Computing, Inc. v.*

██████████████████████████

1  *Sprint Nextel Corp.*, No. 2:11-CV-12 JCM PAL, 2014 WL 2960455, at *5 (D. Nev. June 27, 2014)

2  (finding that substantial preparations existed when an accused infringer "invested billions of dollars

3  into its network in order to achieve consistent and reliable push-to-talk functionality."); *Alps S., LLC*

4  *v. Ohio Willow Wood Co.*, No. 808CV1893T35MAP, 2013 WL 12164771, at *2 (M.D. Fla. Mar. 19,

5  2013) (finding investments in equipment and factory, among others, related to the accused products to

6  be sufficient to show substantial preparation).

7      As detailed below, the accused products that Google purchased after the issuance of the

8  reexamination certificate are subject to equitable intervening rights.

9  **DDR4 LRDIMMs**

10      Netlist's infringement contentions assert claim 16 against certain memory modules compliant

11  with portions of the JEDEC Solid State Technology Association ("JEDEC") standards and

12  specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Load

13  Reduction Dual In-Line Memory Modules ("LRDIMMs").

14      Based on a reasonable investigation, Google has determined that it purchased the following

15  accused DDR4 LRDIMMs after February 8, 2021. ████████████████████

16  ███████████████████████████████████████████████

17  ███████████████████████████████████████████████

18  ████████████████  Each of the listed parts is subject to equitable intervening rights.

19

20

21

22

23

24

25

26

27

| | | | | | |
|---|---|---|---|---|---|
| ██████ | | | | | |
| | ████████ | | | | |
| | ███ | | | | |
| ████ | ████████ | ██████ | ████ | ████ | █ |
| | | ████ | | | |

**DDR4 RDIMMs**

Netlist's infringement contentions assert claim 16 against certain memory modules compliant with certain portions of the JEDEC Solid State Technology Association ("JEDEC") standards and specifications for 4-Rank Double Data Rate 4 ("DDR4") Synchronous DRAM ("SDRAM") Registered Dual In-Line Memory Modules ("RDIMMs").

Based on a reasonable investigation, Google has determined that it purchased the following DDR4 RDIMMs after February 8, 2021. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ Each of the listed parts is subject to equitable intervening rights.

| | | | | | |
|---|---|---|---|---|---|
| ████ | ██████ | ████ | ████ | ████ | ████ |
| ███ | ██████ | ████ | ███ | ███ | |
| ███ | | | ██ | | |
| ███ | ██████ | ██████ | ████ | ████ | ██ |
| | ██████ | ████ | | | |
| ██ | ██████ | | | | |
| | ███ | | | | |
| ███ | ██████ | ██████ | ████ | ████ | ███ |
| ██ | ███ | ██████ | | | ███ |
| ███ | ██████ | ██████ | ████ | ████ | ███ |
| | ██████ | | | | |
| | ███ | | | | |
| ███ | ██████ | ████ | ████ | ████ | ███ |
| | ██████ | ██ | | | ███ |

---

[18] Based on date products received into inventory.
[19] Based on date of purchase order.
[20] Based on date products received into inventory.
[21] Based on date of purchase order.

*Substantial Preparation Before Issuance of Reexamination Certificate*

Prior to issuance of the reexamination certificate for the '912 Patent, Google engaged in substantial preparation to purchase and use the products that Netlist has accused of infringement.  As detailed below, Google invested at least six years on the accused memory modules and associated server platforms by, among other things, establishing supplier relationships, negotiating prices, overcoming memory challenges with third-party suppliers, testing and qualification, and participating and contributing to the Joint Electron Device Engineering Council ("JEDEC") and its development of the DDR4 standard.

Google's "substantial preparation" exceeds other accused infringers' investments for which the Northern District of California and other courts have deemed sufficient to establish "substantial preparation."  *See, e.g.*, *Linear Tech. Corp. v. Micrel, Inc.*, 524 F. Supp. 2d 1147, 1164 (N.D. Cal. 2005) (finding that defendant's expenditure of $500,000 was "substantial preparation").

As a result, Google's substantial investment in money and time prior to the issuance of the reexamination certificate for the accused memory modules and corresponding server platforms constitute "substantial preparation" and are therefore entitled to equitable intervening rights.

**Substantial Preparation for the Accused Memory Modules**

First, Google engaged in substantial preparation to █████████████████

---

[22] Based on date products received into inventory.

████████████████████████████████████

1 would be able to rely on its suppliers to provide the DDR4 memory modules that Netlist has accused

2 of infringement years into the future.

3        Second, Google engaged in substantial preparation to ████████████████████████

4 ███████████████████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████████████████

6 ████████████████████████████████████████  For example, Google qualified ████████

7 ███████████████████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████████████████████

9 █████████████  █████████████████████████████████████████████████████

10 ███████████████████████████████████████  Google performs this

11 qualification process to identify memory modules that meet its design needs and can be purchased and

12 incorporated into Google's machines on a going-forward basis.

13        ██████████████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████████████████

16 ████████████  ████████████████████████████████████████████████████████

17 █████████████  With respect to the accused memory modules in particular, Google ████████

18 ███████████████████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████████████████

23 ███████████████████████  Another example of Google's ████████████████████

24 ███████████████████████████████████████████████████████████████████

25        Third, Google's purchasing history of the accused memory modules and associated server

26 platforms prior to February 8, 2021 is evidence of substantial preparation. Specifically, ████████

27 ███████████████████████████████████████████████████████████████████

28 ███████████████████████████████████████  prior to the issuance of the

1   reexamination certificate for ██████████████████████████████

2   prior to the issuance of the reexamination certificate for ████████████

3   ████████████████████████████████████████████████████████

4   ███████████████████████ prior to the issuance of the reexamination certificate for

5   ████████████████ and ██████████████████████████████████████

6   prior to the issuance of the reexamination certificate for ██████████  Google's long and

7   substantial purchasing history of these modules prior to February 8, 2021 shows its substantial

8   preparation to continue purchasing the same models after that date.  Google made those purchases

9   with the expectation that it would be able to continue purchasing the same parts on a going-forward

10  basis.

11          Fourth, Google's deployment history of the accused memory modules and associated server

12  platforms prior to February 8, 2021 is evidence of substantial preparation.  For example, prior to

13  February 8, 2021, ████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ███████████████████████████ Google's deployment history of these

17  modules prior to February 8, 2021 show substantial preparation to continue deploying the same

18  modules after that date.

19          Fifth, Google has also invested in replacing the accused memory modules, which is additional

20  evidence of Google's substantial preparation for equitable intervening rights analysis.  For example,

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████ These forecasted spare parts

25  are derived from Google's experience with the historical consumption rate of the accused memory

26  modules and are therefore also subject to equitable intervening rights.

27          Finally, Google engaged in substantial preparation with respect to the accused memory

28  modules through its participation and contributions to the Joint Electron Device Engineering Council

██████████████████████████████

1    ("JEDEC"), and in particular to JEDEC's development of the DDR4 specifications that the accused

2    memory modules products are designed to implement.  Google began contributing to JEDEC in 2006

3    and increased its level of participation over time.  Between 2010 and 2012, Google became a full

4    member of JEDEC, and in 2016, Google became a board-level member of the organization.   In

5    connection with its participation in JEDEC, Google has attended each quarterly meeting and

6    participated in specific committees and task groups, ████████████████████████

7    █████████████████████████████████████████████████████

8    █████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████

10   █████████████████████████████████████████████████████

11   ███████████████████████ Google invests time and resources analyzing proposed changes to DDR4,

12   and preparing and presenting educational materials to JEDEC in order to detail the benefits and

13   drawbacks of the changes.  Google makes those investments with the expectation that it will be able to

14   use JEDEC-compliant technology in its own products and benefit from Google's contributions to the

15   technology. ████████████████████████████████████████████

16   █████████████████████████████████████████████████████

17   ████████████████████████████████████████████████ Google

18   also pays annual membership fees to JEDEC.

19   **Substantial Preparation for Server Platforms Incorporating the Accused Memory Modules**

20       Google not only made significant investments in the accused memory modules that are subject

21   to equitable intervening rights, but also in the associated server platforms that incorporate the accused

22   memory modules. ██████████████████████████████████████

23   ████████████████████████████████████ ██ ███████████████

24   █████████████████████████████████████████████████████

25   ████████████████████████████ ██

26   _____

27   ██ ████████████████████████████████████████████████

28   ██ ████████████████████████████████████████████████

GOOGLE'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
INTERROGATORY NO. 3

1

2        Google made substantial preparations to use ████████████████████████████████

3    prior to the issuance of the reexamination certificate based on its significant investment in time and

4    resources ██████████████████████████    Google ███████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████████

7    ██████████████████████    ██████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████    Google undertook these efforts with the expectation

25   that it would be able to continue using the accused memory modules in ████████████    on a going-

26   forward basis.

27       Google's substantial preparation in the ████████████████    is also demonstrated by the

28   number of machines it deployed prior to the issuance of the reexamination certificate.  For example,

on February 8, 2021, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

      Google made "substantial preparations" to use ███████████████████ prior to the issuance of the reexamination certificate based on its significant investment in time and resources for developing ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████     ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ which further illustrates Google's investment in time and resources for a server platform that incorporates the accused memory modules subject to equitable intervening rights. Google undertook these efforts with the expectation that it would be able to continue using the accused memory modules in ██████████████████ on a going-forward basis.

      Google's substantial preparation in the ██████████████████ is also demonstrated by the number of machines it deployed prior to the issuance of the reexamination certificate. For example, on February 8, 2021, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

████████████████████████████████████████

1    Google made substantial preparations to use ████████████████████████████ prior

2 to the issuance of the reexamination certificate based on its significant investment in time and

3 resources for developing ███████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████████████

11 ███████████████████████████████████████  █████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████████████

14 ██████████████████████

15    Google invested significant time and resources for selecting the accused memory modules and

16 ensuring that any issues related to the accused memory modules are addressed. ██████████████

17 ███████████████████████████████████████████████████████  █████████████████████

18 ████████████████████████████████████████████████████████████████████████████████

19 █████████████

20   ██████████████████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████████  ███████████████████

24 ████████████████████████████████████████████████████████████████████████████████

25 ████████████████████████

26    Google also continues to make substantial investments in maintaining the █████████████

27 ██████████  For example, ███████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████████████████████████

███████████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 Google undertook these efforts with the expectation that it would be able to continue using the

8 accused memory modules in ████████████ on a going-forward basis.

9     Google's substantial preparation in the ████████████ is also demonstrated by the

10 number of machines it purchased and deployed prior to the issuance of the reexamination certificate.

11 For example, on February 8, 2021, ██████████████████████████

12 ████████████████████████████████ ████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████

19 **Existing Orders or Contracts**

20     Google incorporates by reference its discussion above on the existing orders, contracts, and

21 purchasing history with third-party suppliers and vendors, ██████████████████████

22 with respect to the substantial preparation of the accused memory modules and associated server

23 platforms prior to the issuance of the reexamination certificate, which demonstrate the significant

24 investment Google has made in the accused memory modules subject to equitable intervening rights.

25 As a result of these existing agreements, Google's purchases of the accused memory modules and

26 associated server platforms prior to the issuance of the reexamination certificate (discussed above)

27 created an existing pipeline and constitute "substantial preparation" for the accused memory modules

28 and associated server platforms that are subject to equitable intervening rights.

**Netlist's Allegations of Willful Infringement**

Google provides the following response to Netlist's argument that alleged willful infringement is relevant to the question of equitable intervening rights. Through its pleadings and infringement contentions, Netlist has failed to demonstrate that Google willfully infringed any claim of the '912 Patent.

To allege willful infringement, "a plaintiff must allege facts plausibly showing that as of the time of the claim's filing, the accused infringer: (1) knew of the patent-in-suit; (2) after acquiring that knowledge, it infringed the patent; and (3) in doing so, it knew, or should have known, that its conduct amounted to infringement of the patent." *Välinge Innovation AB v. Halstead New England Corp.*, Civil Action No. 16–1082–LPS–CJB, 2018 WL 2411218, [*Välinge II*] at *13 (D. Del. May 29, 2018). "Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages." *Finjan, Inc. v. Cisco Sys.*, No. 17-cv-00072-BLF, 2017 U.S. Dist. LEXIS 87657, at *10-11 (N.D. Cal. June 7, 2017) (citing *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016)); *see also NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-cv-02352, 2018 WL 4510737, at *2 (N.D. Cal. Sept. 18, 2018) ("Knowledge remains a key factor in [willfulness] determination. . . . To willfully infringe a patent, the patent must exist and one must have knowledge of it."); *Ansell Healthcare Prods. LLC v. Reckitt Benckiser LLC*, Civil Action No. 15–915–RGA, 2018 WL 620968, at *6 (D. Del. Jan. 30, 2018) ("[A] party's pre-suit knowledge of the patent is not by itself sufficient to find 'willful misconduct' … the patentee must identify evidence beyond pre-suit knowledge of the patent to show that the accused infringer's infringement is 'egregious,' 'deliberate,' or 'wanton.'"); *Kyowa Hakka Bio, Co. v. Ajinomoto Co.*, Civil Action No. 17-313, 2018 WL 834583, at *13 (D. Del. Feb. 12, 2018) (a willful infringement complaint must "permit[] an inference that the defendant was on notice of the potential infringement and still continued its infringement"); *Atmos Nation, LLC v. BnB Enter., LLC*, Case No. 16-62083-CIV-DIMITROULEAS, 2017 WL 5004844, at *2 (S.D. Fla. Aug. 22, 2017) ("Willfulness must be pled, and allegations of knowledge alone are insufficient."); *CG Tech. Dev., LLC v. Zynga, Inc.*, Case No. 2:16–cv–00859–RCJ–VCF, 2017 WL 662489, at *4 (D. Nev. Feb. 17, 2017) (dismissing willful infringement claim even where the complaint alleged plaintiffs had sent defendant an infringement notice because "merely asserting that Defendant knew about the patent and

GOOGLE'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
INTERROGATORY NO. 3

1   continued its allegedly infringing activity is not enough to constitute willful infringement"); *cf.*

2   *Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS, 2016 WL 7217625, at *3 (D. Del. Dec. 13,

3   2016) ("The key inquiry in this case is whether there is evidence ***in addition to AVX's pre-suit***

4   ***knowledge of the patents*** that could show that AVX's infringement was 'egregious,' 'deliberate,'

5   'wanton,' or otherwise characteristic of the type of infringement that warrants the Court exercising its

6   discretion to impose the 'punitive' sanction of enhanced damages.") (emphasis in original).  The

7   Northern District of California and other courts agree that willful infringement claims must be pled as

8   to the specific patent in suit.  *See, e.g.*, *Finjan, Inc. v. Juniper Networks, Inc.*, Case No. C 17-05659

9   WHA, 2018 WL 905909, at *3 (N.D. Cal. Feb. 14, 2018) (dismissing willful infringement claims

10   where complaint failed to allege "that Juniper had pre-suit knowledge of the patents-in-suit, as

11   opposed to Finjan's patent portfolio"); *Finjan, Inc. v. Cisco Sys. Inc.*, Case No. 17-cv-00072-BLF,

12   2017 WL 2462423, at *5 (June 7, 2017) ("Knowledge of a patent portfolio generally is not the same

13   thing as knowledge of a specific patent."); *Continental Circuits LLC v. Intel Corp.*, Case No. CV16-

14   2026 PHX DGC, 2017 WL 679116, at *9 (D. Ariz. Feb. 21, 2017)  ("[K]nowledge of the patent

15   allegedly infringed cannot be inferred from mere knowledge of other patents, even if somewhat

16   similar." (internal quotation marks omitted)).

17       Netlist has insufficiently pled that Google willfully infringed in the '912 patent.  For example,

18   none of Netlist's pre-suit allegations indicate that Netlist ever identified the '912 patent to Google.  In

19   its December 4, 2009 Complaint, Netlist alleged, among other things that Google willfully infringed

20   the '912 patent but provided no specificity for its willful infringement allegations.  Dkt. 1, ¶ 12

21   (contending that "[o]n information and belief, Google's infringement has been, and continues to be,

22   willful and deliberate, and has caused substantial damage to Netlist").

23       On April 8, 2010, Netlist served its initial infringement contentions, in which it asserted 34

24   claims, i.e., claims 1, 3, 4, 6-11, 15, 18-22, 24-25, 27-29, 31-34, 36-39, 41-45, and 50) of the '912

25   patent against certain 4-rank DDR2 FBDIMMs but also identified certain pre-suit activities by Google

26   as its bases for willful infringement.  *See* Apr. 8, 2010 Infringement Contentions at 1-2, 6-7.  Notably,

27   all of the pre-suit activities Netlist identified revolved around U.S. Patent No. 7,289,386, which is a

28   patent that is related to the '912 patent for which Google initiated a declaratory judgment action on

1    prior to this lawsuit.  *Id.* at 6-7; *see also Google Inc. v. Netlist, Inc.*, No. 4:08-cv-04144 (N.D. Cal.).

2    Netlist, however, never identified the '912 patent specifically to Google prior to filing its Complaint

3    and does not claim otherwise.  Furthermore, Netlist did not allege that Google infringed original claim

4    16 of the '912 Patent at the time of the initial complaint, so Netlist cannot identify any basis of

5    willfulness with respect to that claim.

6        Netlist's June 18, 2021 Amended Infringement Contentions fare no better.  After the

7    reexamination certificate for the '912 patent issued, Netlist now asserts 64 claims, i.e., claims 1, 3, 4,

8    6, 8, 10, 11, 15, 16, 18, 19, 20, 22, 24, 27, 28, 29, 31, 32, 34, 36, 37, 38, 39, 40, 41, 43, 45, 46, 47, 50,

9    52, 53, 54, 55, 56, 57, 58, 59, 60, 62, 63, 64, 65, 69, 70, 71, 72, 73, 74, 75, 77, 80, 81, 82, 83, 84, 85,

10   86, 87, 88, 89, 90, 91 of the '912 patent, against certain 4-rank DDR2 FBDIMMs, 4-rank DDR3

11   LRDIMMs, and 4-rank DDR4 LRDIMMs, RDIMMs, and NVDIMMs, including claim 16 against

12   certain 4-rank DDR4 LRDIMMs, RDIMMs, and NVDIMMs.  *See* June 18, 2021 Amended

13   Infringement Contentions at 1-3.  As an initial matter, these claims did not exist before issuance of the

14   re-examination certificate, and therefore Netlist cannot establish any basis for alleged willfulness prior

15   to that date.  Netlist also fails to identify any post-reexamination activity on the part of Google that

16   allegedly amounts to willful conduct.

17       As its basis for willful infringement, Netlist identifies pre-suit activities that relate only to the

18   '386 patent, not the '912 patent.  *Id.* at 8-9.  Netlist further attempts to impute pre-suit knowledge of

19   the '912 patent on Google based on its pre-suit knowledge of the related '386 patent and that the '912

20   patent was published and issued prior to the suit, which Netlist claims to purportedly show that

21   Google has "long had knowledge of the '912 Patent, through at least the filing of the complaint in this

22   matter."  *See* June 18, 2021 Amended Infringement Contentions at 9.  Under Netlist's logic, accused

23   infringers would be found to willfully infringe ***any*** patents that are related or part of a family of a

24   patent that the patentee had previously identified to the accused infringer, which contradicts well-

25   established caselaw in the Northern District of California and other courts.  *See, e.g.*, *Finjan, Inc. v.*

26   *Juniper Networks, Inc.*, Case No. C 17-05659 WHA, 2018 WL 905909, at *3 (N.D. Cal. Feb. 14,

27   2018) (dismissing willful infringement claims where complaint failed to allege "that Juniper had pre-

28   suit knowledge of the patents-in-suit, as opposed to Finjan's patent portfolio"); *Finjan, Inc. v. Cisco*

1  *Sys. Inc.*, Case No. 17-cv-00072-BLF, 2017 WL 2462423, at *5 (N.D. Cal. June 7, 2017)

2  ("Knowledge of a patent portfolio generally is not the same thing as knowledge of a specific patent.");

3  *Continental Circuits LLC v. Intel Corp.*, Case No. CV16-2026 PHX DGC, 2017 WL 679116, at *9 (D.

4  Ariz. Feb. 21, 2017) ("[K]nowledge of the patent allegedly infringed cannot be inferred from mere

5  knowledge of other patents, even if somewhat similar." (internal quotation marks omitted)). Since

6  Netlist has not sufficiently pled that Google was even aware of the '912 patent prior to the complaint,

7  Netlist's willful infringement claim fails on this basis alone.

8        Netlist also alleges that "Google was aware of Netlist's technology via the JEDEC process,"

9  but this argument plainly fails to demonstrate willfulness. *Id.* at 9-10. As an initial matter, Netlist's

10  allegations are vague and ambiguous, as they fail to mention, among other things, the timeframe for

11  Google's purported awareness, which Netlist technology Google was aware of, and how that

12  unidentified Netlist technology would purportedly put Google on notice of the '912 patent.

13        In fact, Google's participation in JEDEC contradicts Netlist's willfulness allegations. As a

14  member of JEDEC, Google abides by and receives the benefit of other members' FRAND

15  commitment. To the extent the '912 Patent reads on portions of the JEDEC specifications

16  implemented in the accused products, it makes no sense that Google would willfully infringe the

17  patent when, at most, any damages flowing from infringement would be subject to FRAND

18  obligations.

19        Even assuming Netlist has adequately pled that Google had pre-suit knowledge of the '912

20  patent (it did not), Netlist has failed to establish that Google's conduct rises to the level of being

21  "egregious" or "wanton." Netlist alleges that due to Google's participation in the reexamination

22  proceedings of the '912 patent, "Google has had notice for large portions of the reexamination

23  proceeding that several claims [such as claim 16] of the '912 Patent had been found valid," and

24  accuses Google of "incorporat[ing], and continu[ing] to incorporate DDR4 RDIMMs, DDR4

25  LRDIMMs, and DDR4 NVDIMMs in its computer servers in an infringing manner." *See* June 18,

26  2021 Amended Infringement Contentions at 9. As an initial matter, claim 16 is the only claim at issue

27  for willfulness since it is the only claim that Netlist has asserted against the DDR4 RDIMMs, DDR4

28  LRDIMMs, and DDR4 NVDIMMs. Netlist's argument ignores the fact that it never asserted claim 16

████████████████████████████████████

1 against DDR4 modules until serving final amended infringement contentions in June 2021.  Netlist

2 offers no evidence or argument to show how, allegedly, Google could willfully infringe the '912

3 Patent based on a claim that Netlist chose not to assert until a month ago.   None of Netlist's

4 willfulness allegations against Google's conduct "render a claim of willfulness plausible, and not

5 merely possible."  *See Slot Speaker Techs., Inc. v. Apple, Inc.*, No. 13-cv-01161-HSG, 2017 WL

6 4354999, at *2 (N.D. Cal. Sept. 29, 2017) ("Defendant's ongoing [operations], on their own, are

7 equally consistent with a defendant who subjectively believes the plaintiff's patent infringement

8 action has no merit.").

9     In addition, ████████████████████████████████████

10 ██████████████████████████  The accused memory modules are ████████████████████

11 ████████████████████████████████  and each complies with JEDEC industry

12 standards.   Netlist fails to provide any evidence or argument to show how, allegedly, simply

13 purchasing and using industry-standard memory modules rises to the level of "egregious" or "wanton"

14 conduct required for a finding of willfulness.

15     Netlist also accuses Google of allegedly infringing portions of the JEDEC standard yet failed

16 to commit or disclose the asserted patent to the JEDEC standard.  *See* June 18, 2021 Amended

17 Infringement Contentions at 9-10.  It is true that both Netlist and Google are members of JEDEC.

18 Google has invested significant time and effort to participate, contribute, and steer the JEDEC

19 standard (as discussed above), and expected in return a FRAND commitment for any JEDEC-

20 compliant parts.  Despite being a member of JEDEC, however, Netlist has asserted infringement

21 theories against Google's memory modules that rely predominantly on JEDEC standards based on a

22 patent that Netlist withheld from the standard.   There is no justification for Netlist to withhold the

23 asserted patent from the JEDEC standard only to turn around to accuse Google of infringing the same

24 patent based on the JEDEC standard.  Thus, Netlist's own bad faith should preclude any finding of

25 willful infringement.

26     In sum, Netlist's threadbare allegations are insufficient to establish Google's willful

27 infringement of the '912 patent.

28                         *     *     *

████████████████████████████████

1    Witnesses knowledgeable about the subject matter of this interrogatory response are ████

2  ████████████████████ both of whom are identified in Google's June 28, 2021 Amended Initial

3  Disclosures.  Pursuant to Federal Rule of Civil Procedure 33(d), Google identifies the following

4  documents from which information responsive to this interrogatory may be derived: JEDEC-GNET-

5  00000001-22655.   Google  will  supplement  this  response  to  identify  documents  from  which

6  information responsive to this interrogatory may be derived in accordance with the parties' agreement.

7    The foregoing responses are based on Google's reasonable investigation to date.  Google

8  reserves the right to supplement or modify its response based on further investigation and discovery,

9  or in response to new arguments or evidence presented by Netlist.

10  DATED: July 16, 2021                    QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP
11

12

13                                       By  /s/ David Perlson
                                            David Perlson
14
                                          David Perlson (CA Bar No. 209502)
15                                        davidperlson@quinnemanuel.com
                                          Jonathan Tse (CA Bar No. 305468)
16                                        jonathantse@quinnemanuel.com
                                          50 California Street, 22nd Floor
17                                        San Francisco, CA 94111
                                          Telephone: (415) 875-6600
18                                        Facsimile: (415) 875-6700
19
                                          Jared Newton (admitted *pro hac vice*)
20                                        jarednewton@quinnemanuel.com
                                          Sandy Shen (admitted *pro hac vice*)
21                                        sandyshen@quinnemanuel.com
                                          1300 I Street NW, Suite 900
22                                        Washington, D.C. 20005
                                          Telephone: (202) 538-8000
23                                        Facsimile: (202) 538-8100
24
                                          Catlin Williams (CA Bar No. 336464)
25                                        catwilliams@quinnemanuel.com
                                          555 Twin Dolphin Drive, 5th Floor
26                                        Redwood Shores, CA 94065
                                          Telephone: (650) 801-5000
27                                        Facsimile: (650) 801-5100
28

GOOGLE'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
INTERROGATORY NO. 3

*Attorneys for Defendant Google LLC*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is 50 California St., 22nd Floor, San Francisco, CA 94111.

On July 16, 2021, I served true copies of the following document(s) described as **DEFENDANT GOOGLE LLC'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF NETLIST, INC.'S INTERROGATORY NO. 3** on the interested parties in this action as follows:

**SEE ATTACHED LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I transmitted PDF format copies of the document(s) described above to the e-mail addresses on the attached Service List pursuant to the agreement between the parties to serve discovery, in lieu of other service methods, by email under Fed. R. Civ. P. 5(b)(2)(E).  The documents were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 16, 2021 at San Francisco, California.


*/s/ Jonathan Tse*
Jonathan Tse

**SERVICE LIST**

*Netlist, Inc. v. Google LLC*
*Case No. 09-cv-05718-SBA (JCS)*

*Attorneys for Plaintiff Netlist, Inc.*

IRELL & MANELLA LLP
Jason G. Sheasby (CA SBN 205455)
jsheasby@irell.com
Andrew J. Strabone (CA SBN 301659)
astrabone@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone: (310) 277-1010
Facsimile: (310) 203-7199